# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANDAN, HIDATSA, AND ARIKARA NATION,<br><br>         *Plaintiff*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID L. BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior; and DANIEL H. JORJANI, in his official capacity as Solicitor of the United States Department of the Interior,<br><br>         *Defendants*. | Case No._____<br><br><br>**COMPLAINT** |

## INTRODUCTION

1.      In this action the Mandan, Hidatsa, and Arikara Nation ("MHA Nation")[1] seeks to set aside an arbitrary and unlawful decision of the Defendants, which contravenes more than 80 years of precedent from the United States Department of Interior ("DOI") recognizing that the United States holds the Missouri Riverbed minerals within the Fort Berthold Reservation ("Reservation") in trust for the MHA Nation. Specifically, the MHA Nation asks the Court to set aside defendant Daniel Jorjani's recent M-Opinion that purports to give away the MHA Nation's trust property to the State of North Dakota. The Jorjani M-Opinion must also be set aside because it

---

[1] The MHA Nation, also known as the Three Affiliated Tribes of the Fort Berthold Reservation, consists of the Mandan, Hidatsa, and Arikara Tribes, which are sometimes referred to individually or, where appropriate, collectively as the "Tribes."

was the result of improper political pressure. The MHA Nation also seeks an accounting and an order directing the DOI to carry out its fiduciary, statutory, and regulatory obligations to protect and administer the riverbed and the underlying mineral estate for the benefit of the MHA Nation.

2.  The MHA Nation has long owned the bed of the Missouri River within the boundaries of the Reservation. The Reservation and the Missouri Riverbed within it are part of the MHA Nation's aboriginal territory. The Reservation was set aside for the MHA Nation before the State of North Dakota—within which the Reservation is located—was created and admitted to statehood. Since at least 1936, the DOI has consistently affirmed and reaffirmed the MHA Nation's title to the Missouri riverbed minerals, until the Jorjani M-Opinion.

3.  In 1936, the Solicitor of the DOI issued an M-Opinion determining that an island formed from the bed of the Missouri River subsequent to North Dakota's statehood belonged to the MHA Nation, and not to North Dakota, because the Missouri Riverbed itself was part of the Reservation prior to the admission of North Dakota to statehood.

4.  In 1949, the United States took title to more than 150,000 acres encompassing the Missouri River within the Reservation that would be flooded by the construction of the Garrison Dam and the creation of Lake Sakakawea.

5.  In 1979, the Interior Board of Land Appeals ("IBLA") issued a final adjudication holding that the Missouri Riverbed within the boundaries of the Reservation is a part of the Reservation and that it is not owned by the State of North

Dakota. *Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979). The IBLA held that the 1949 Takings Act included the Missouri Riverbed and underlying minerals, so that the minerals became federally owned after 1949. The *Impel Energy* decision constituted final agency action.

6.       The State of North Dakota, which had intervened in the IBLA action, did not seek review of this decision and it became *res judicata*.

7.       In 1984, Congress expressly restored all mineral interests in the taken lands (with some exceptions not relevant here) to the MHA Nation, to be held in trust by the United States.

8.       Beginning in 2005, the MHA Nation began executing leases of the oil and gas under Lake Sakakawea, including the Missouri riverbed. The leases were executed pursuant to the Indian Mineral Development Act, 25 U.S.C. §§ 2101-2108 and required Secretarial approval.

9.       Despite the binding decision in *Impel Energy*, the State of North Dakota has continued to assert ownership of the Missouri Riverbed within the boundaries of the Reservation and has issued competing leases to minerals beneath the Riverbed to private parties, who have proceeded to extract oil and gas from the leased land.

10.      The Leases executed by the MHA Nation for the minerals under the Lake were approved by the Bureau of Indian Affairs ("BIA"), an agency of the Department of Interior (DOI). However, the BIA did not include the riverbed portions of the leases in its approval because the riverbed minerals were not shown as trust minerals in the BIA

land title records. Instead, the BIA considered the riverbed minerals to be owned by the MHA Nation in fee, which did not require BIA approval.

11.     Since 2011, the MHA Nation has repeatedly requested that the DOI, pursuant to its obligations under 25 C.F.R. Part 150, prepare title documents and maps to show that the bed of the Missouri River and the underlying mineral estate within the Reservation is held in trust for the MHA Nation. DOI has failed to do so.

12.     DOI has also failed to take the requisite steps under applicable laws and regulations to administer and account for the MHA Nation's mineral rights in the lands underlying the Missouri Riverbed within the Reservation, and to collect, deposit and invest funds owing to the MHA Nation from the extraction of mineral resources from those lands.

13.     In 2017, the DOI Solicitor issued another M-Opinion reaffirming the 1936 M-Opinion determining the MHA Nation's beneficial ownership of the Missouri Riverbed within the boundaries of the Reservation.

14.     On May 26, 2020, the current DOI Solicitor issued yet another opinion, M-37056 (the "Jorjani Opinion"), which concluded that the State of North Dakota owns the lands beneath the Missouri Riverbed within the Reservation and advised the DOI "to take any actions deemed necessary to comply with this opinion, to include the withdrawing of any existing oil and gas permits for extraction in submerged lands beneath the Missouri River."

## JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1362, and under sections 701 through 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

16.     The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706. There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201.

17.     This Court also has the authority under 28 U.S.C. § 1361 to issue an order in the nature of a writ of mandamus compelling the performance of required duties.

18.     Venue is appropriate under 28 U.S.C. § 1391(e) because the Defendants reside in the District of Columbia.

## PARTIES

19.     Plaintiff, the MHA Nation, is a federally-recognized Indian tribe located in the Fort Berthold Indian Reservation in central North Dakota. Composed of the Mandan, Hidatsa, and Arikara Tribes, the MHA Nation is also known as The Three Affiliated Tribes of the Fort Berthold Reservation.

20.     The DOI is a Cabinet-level agency of the United States government responsible for protecting and administering the property interest of the MHA Nation in the Reservation.

21.     Defendant David L. Bernhardt is the Secretary of the DOI. Secretary Bernhardt is sued in his official capacity.

22.     Defendant Daniel H. Jorjani is the Solicitor of the DOI and is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.   THE MHA NATION OWNS THE MISSOURI RIVERBED MINERALS WITHIN THE RESERVATION.**

   *A.    The development of the boundaries of the Reservation.*

23.     The United States has continuously recognized MHA Nation's use and occupation of the Missouri River and the surrounding area since the first treaties were made with the MHA Nation in 1825.

24.     Following the Arikara War of 1823, the United States sent General Henry Atkinson and Indian Agent Benjamin O'Fallon to make peace with the Tribes. In the summer of 1825, the treaty delegation travelled up the Missouri River and met with all three Tribes at their respective villages on the river. The United States executed and ratified treaties with the Tribes to establish "a firm and lasting peace" and promote "friendly intercourse" between the Tribes and the United States. Among other terms, the United States acknowledged the Tribes' "country" and agreed to receive the Tribes "into their friendship, and under their protection[.]" The 1825 treaties also addressed bilateral trade and promised indemnification for property taken from the Tribes. Treaty with the Arikara, 7 Stat. 259; Treaty with the Mandan, 7 Stat. 264; Treaty with the Hidatsa, 7 Stat. 261.

25.     The 1851 Treaty of Fort Laramie was the United States' attempt to make peace and divide the territory south and west of the Missouri River among a number of tribes, including the MHA Nation. Article 5 of the treaty recognized the vast territory

used and occupied by the MHA Nation south and west of the Missouri River, but also

acknowledged that the MHA Nation did not "hereby abandon or prejudice any rights

or claims they may have to other lands." Treaty of Fort Laramie with Sioux, Etc., Sept.

17, 1851, 11 Stat. 749.

      26.     On April 12, 1870, President Grant signed an Executive Order that limited

the boundaries of the MHA Nation's territory, becoming known as the Fort Berthold

Reservation. Exec. Order (Apr. 12, 1870) (1870 Executive Order). The boundaries of this

Reservation encompassed approximately 7.8 million acres of land. The Tribes consulted

about and consented to the 1870 Executive Order. The Reservation boundaries were

described as beginning and ending at a point on the Missouri River and expressly

included the entirety of the Missouri River:

> From a point on the Missouri River 4 miles below the Indian
> Village (Berthold), in a northeast direction 3 miles (so as to include
> the wood and grazing around the village); from this point a line
> running so as to strike the Missouri River at the junction of the
> Little Knife River with it; thence along the left bank of the Missouri
> River to the mouth of the Yellowstone River, along the south bank
> of the Yellowstone River to the Powder River, up the Powder River
> to where the Little Powder River unites with it; thence in a direct
> line across to the starting point 4 miles below Berthold. (Emphasis
> added.)

Use of the term "left bank" meant the north and east sides of the Missouri River,

thereby necessarily including the width of the River within the Reservation boundaries.

      27.     A decade later, and without any tribal consultation or consent, President

Hayes signed an 1880 Executive Order that altered the Reservation by removing a large

tract of land in the south and west portion, and adding some land north and east. Exec. Order (July 13, 1880) (1880 Executive Order).

28.    Both the 1870 Executive Order and the 1880 Executive Order expressly included the Missouri River within the Reservation's boundaries, describing the boundaries by reference to the Missouri River's outer banks.

29.    Congress recognized that the 1870 and 1880 Executive Orders set aside the Reservation for the MHA Nation.

30.    In 1886, the United States negotiated another agreement with the Tribes. By this 1886 Agreement, the Tribes ceded additional lands back to the United States. Congress ratified this Agreement in 1891. Act of Mar. 3, 1891, ch. 543, § 23, 26 Stat. 989, 1032 (1891). This 1886 Agreement set the boundaries for the Reservation that, for the most part, constitute the Reservation today.

31.    The State of North Dakota constitutionally disclaimed all right and title to "Indian lands" upon its admission to the Union in 1889. N.D. Const., art. XVI, § 203 (1889).

B.    *The United States acquires Reservation land for the Garrison Dam Project and subsequently restores the subsurface mineral rights to the MHA Nation.*

32.    In 1944, Congress authorized construction of the Garrison Dam as part of a federal plan to develop a series of dams along the Missouri River. In order to construct the dam, in 1949 the United States took more than 150,000 acres of land in the Reservation that would be flooded by the creation of Lake Sakakawea.

33.     Pursuant to the 1949 Takings Act, Congress vested title to the "Taking Area" solely in the United States. Pub. L. No. 81-437, ch. 790, 63 Stat. 1026 (1949). The MHA Nation lost all of its most fertile agricultural bottom land and was deprived of the subsurface minerals within the Taking Area. Over 90% of the MHA Nation's population was forcibly relocated from their traditional homes along the river bottom to the harsh uplands on the Reservation.

34.     In the early 1970s the Reservation was found to overlay one of the largest oil fields in the United States, with an estimated 250 billion barrels of oil reservoir-wide and hundreds of millions of barrels of oil, millions of cubic feet of gas, and tons of coal beneath the Reservation itself.

35.     In 1984, Congress explicitly restored the mineral interests in the taken lands to trust status for the benefit and use of the MHA Nation in the Fort Berthold Reservation Mineral Restoration Act ("Restoration Act"). Pub. L. No. 98-602, tit. 2, 98 Stat. 3149, 3152 (1984).

## II.    THE DOI IS BOUND BY PRIOR DECISIONS THAT THE MISSOURI RIVERBED IS PART OF THE RESERVATION AND IS NOT OWNED BY THE STATE OF NORTH DAKOTA.

36.     In 1936, DOI Solicitor Nathan Margold issued an M-Opinion determining that the Missouri riverbed, and an island formed from the riverbed subsequent to North Dakota's statehood, belonged to the MHA Nation and not to North Dakota. He opined that the Riverbed was part of the Reservation prior to the admission of North Dakota to statehood and so islands subsequently formed from the Riverbed were part of the

Reservation. The Margold M-Opinion was approved by the Office of the Secretary of the DOI.

37.     In 1978, the DOI's Bureau of Land Management ("BLM") rejected Impel Energy Corporation's application for fifteen federal oil and gas leases covering the Missouri Riverbed lands within the Reservation. The BLM took the position that the Riverbed passed to North Dakota at statehood and was no longer held in trust for the MHA Nation.

38.     Impel Energy appealed that decision to the IBLA. On appeal, Impel Energy argued that the riverbed lands were "federally owned, because title to the lands was held by the United States in trust for the Indians of the Fort Berthold reservation from 1851 until title was transferred to the United States in 1949 to permit construction of the Garrison Dam and Reservoir." *Impel Energy Corp.*, 42 IBLA 105, 110 (Aug. 16, 1979). The State of North Dakota intervened in that appeal and advocated that the Riverbed belonged to it.

39.     The IBLA agreed with Impel Energy, ruling that "the language of the Treaty of Fort Laramie and the Executive Order of April 12, 1870, when considered with the case law and the various utterances made contemporaneously with the treaty, discloses an intention to include the lands underlying the Missouri River, insofar as it runs through the Fort Berthold reservation, among the lands of the reservation itself. The import of this finding is that title to the lands which Impel seeks to lease for oil and gas has never passed to the State of North Dakota." 42 IBLA at 114.

40.     The IBLA decision is a final agency action and is binding on the parties, including the DOI. 43 C.F.R. § 4.403.

41.     The State of North Dakota did not seek review of the IBLA's *Impel* decision. Accordingly, the *Impel* decision is *res judicata* and is binding on the DOI and the State of North Dakota.

42.     The BLM subsequently issued the oil and gas leases at issue in *Impel Energy*. The leases were initially held as Federal leases until the 1984 Restoration Act restored mineral interests within the Reservation to the MHA Nation, at which point BLM transferred the leases to the BIA.

43.     Following the Restoration Act, the BIA assigned mineral tribal tract numbers, commonly known as MT tracts (denoting "mineral tribal"), and recorded the island (at issue in the 1936 M-Opinion) in trust for the benefit of the MHA Nation in the DOI's Office of Land Titles and records. The BIA failed, however, to assign mineral tract numbers or record trust title to the rest of the riverbed minerals.

## III.    DOI HAS NOT PROTECTED THE MHA NATION'S OWNERSHIP OF THE MISSOURI RIVERBED WITHIN THE RESERVATION.

44.     Land held in trust by the United States for the benefit of an Indian tribe is inalienable except as authorized by Congress. 25 U.S.C. § 177.  If Congress alienated the MHA Nation's mineral estate beneath the Missouri Riverbed in the 1949 Taking Act, it restored it in trust for the MHA Nation in the 1984 Restoration Act.  Alternatively, if Congress did not take the Missouri Riverbed in the 1949 Taking Act, then the riverbed and underlying minerals have never been alienated by Congress, remain a part of the

11

MHA Nation's aboriginal territory, and are held in trust by the United States for the MHA Nation.

45.     DOI has failed to properly record the MHA Nation's trust tile and take the administrative steps necessary to effectuate MHA Nation's beneficial ownership of the Missouri Riverbed and underlying mineral estate within the boundaries of the Reservation.

46.     The DOI has allowed oil and gas operators to drill horizontally into and extract oil and gas from the Missouri riverbed within the Reservation without authorization required by federal law. The DOI has failed to collect revenue owed to the MHA Nation in connection with such drilling and extraction, the amount of which now exceeds $200,000,000.

47.     Various statutes and regulations, including 25 U.S.C. §§ 2, 5-6, 9, and 25 C.F.R. Part 150, impose fiduciary obligations on the United States to record, provide custody, and maintain records that affect titles to the MHA Nation's trust property.

48.     Various statutes and regulations, including 25 U.S.C. § 177, 25 U.S.C. §§ 396a–396g, 25 U.S.C. § 464, 25 U.S.C. §§ 2101-2108, 25 U.S.C. §§ 4011 & 4043, 30 U.S.C. §§ 1701–1757, 25 C.F.R. Parts 211 and 225, and 30 C.F.R. Parts 202 and 206, impose fiduciary obligations on the DOI to administer, manage, and account for the MHA Nation's trust property and oil and gas resources, and to do so in such a manner as to ensure that the MHA Nation obtains full and fair value for the lease or use of its property and resources.  This includes an obligation to ensure the prompt and proper collection and disbursement of royalties.

12

49.     Other statutes and regulations, including 25 U.S.C. §§ 155, 161a, 162a, and 4043(b)(2)(B), and 25 C.F.R. Part 115,  impose fiduciary obligations on the DOI to collect funds owing to the MHA Nation from the lease or use of Tribal land, resources or assets, to deposit those funds in interest bearing accounts for the MHA Nation, to invest such funds and the interest on such funds in a prudent manner.

50.     The MHA Nation repeatedly requested that the DOI record its interest in the Missouri Riverbed minerals. The MHA Nation could not develop its riverbed minerals without the assigned mineral tract numbers.

51.     On August 2, 2011, the MHA Nation's then-Chairman Hall sent a letter to the DOI's Assistant Secretary – Indian Affairs requesting that the BIA "complete any actions necessary to implement the Department of Interior decisions that the bed of the Missouri River is owned by the United States in trust for the MHA Nation." Further, the letter noted that the BIA had begun correcting title documents but that title work was not completed. Chairman Hall's letter warned that "[t]he currently incomplete title documents and maps are causing confusion regarding ownership, delaying oil and gas development and the payment of royalties."

52.     The MHA Nation followed Chairman Hall's letter with another letter, this one dated September 26, 2011, to Carla Clark, Deputy Realty Officer for the BIA. This letter also requested that BIA complete its work on the title documents showing that the United States held the bed and banks of the Missouri River within the Reservation in trust for the MHA Nation.

53.     On September 12, 2012, Chairman Hall addressed the National

Commission on Indian Trust Administration and Reform established by the DOI. The

Chairman noted that the United States had failed to implement the 1936 M-Opinion and

the 1979 IBLA decision and stated "[i]n order to fulfill its trust responsibility, it is

incumbent upon the BIA to implement the Solicitor's opinion and accomplish the

ministerial act of recording the MHA Nation's trust title in the Office of Land Titles and

Records."

54.     Nonetheless, to date, the DOI has failed and refused:

a.  to take the actions necessary to document the MHA Nation's ownership of

    the Missouri Riverbed and underlying mineral estate within the

    Reservation;

b.  to administer, manage, and account for the MHA Nation's mineral rights

    in the lands underlying the Missouri Riverbed within the Reservation; and

c.  to collect, deposit and invest, or pay over funds owing to the MHA Nation

    from the extraction of mineral resources, including oil and gas, from the

    lands underlying the Missouri Riverbed within the Reservation.

55.     In 2017, DOI Solicitor Hilary Tompkins issued another M-Opinion, which

reaffirmed the 1936 M-Opinion and concluded that the mineral interests underlying the

original bed of the Missouri River within the Reservation are held in trust for the benefit

of the MHA Nation.

56.     As Solicitor Tompkins explained, if the 1949 Takings Act is construed to

include the Missouri Riverbed as part of the Taking Area, then Congress restored it to

the MHA Nation in the 1984 Restoration Act. If the 1949 Takings Act is construed to exclude the Missouri Riverbed from the Taking Area, then the MHA Nation has always owned it.

## IV.   THE JORJANI M-OPINION PURPORTS TO REVERSE THE IBLA ADJUDICATION AND REPUDIATES THE UNITED STATES' FIDUCIARY DUTIES TO THE MHA NATION.

57.     In August of 2017, the State of North Dakota urged the DOI to revisit its decisions that the minerals under the Missouri River are held in trust for the MHA Nation. North Dakota elected and appointed officials and/or staff expressed a desire for the State to "re-engage" with BIA on North Dakota's efforts to take the MHA Nation's valuable mineral interests, and explicitly asked: "Could the current solicitor suspend the [2017 Tompkins M-Opinion]?" This request was forwarded through political channels to Daniel H. Jorjani, then-Principal Deputy Solicitor for DOI, who promised to look into the issue.

58.     On June 8, 2018, Mr. Jorjani issued opinion M-37052, which suspended the 2017 M-Opinion insofar as it addresses "ownership of minerals located beneath the original bed of the Missouri River," claiming that "the underling historical record should be reviewed and perhaps expanded upon by a professional historian."

59.     The DOI notified the MHA Nation of the suspension in a phone call on the same day the 2017 M-Opinion was suspended. DOI officials on the call told MHA Nation Chairman Mark Fox that they were doing it to help the MHA Nation and to make the 2017 M-Opinion stronger.

60.     The MHA Nation protested the suspension of the 2017 M-Opinion.  In addition, in May 2019, the MHA Nation advised the DOI that it had retained a distinguished historian to conduct a review of the historical record and requested that the DOI not complete its analysis of the 2017 M-Opinion until the DOI had reviewed the report and findings of the MHA Nation's expert historian.

61.     On May 26, 2020, without prior notice to the MHA Nation and without awaiting the report of the MHA Nation's historian, Solicitor Jorjani issued opinion M-37056, which concluded that the State of North Dakota is the legal owner of submerged lands beneath the Missouri River where it flows through the Reservation.  This opinion purported to alter previous Departmental decisions related to this issue and to supersede "guidance" provided in Solicitor's Opinion in 1936, and by the IBLA in its 1979 *Impel Energy* decision.

62.     The Jorjani Opinion concluded by advising the BIA and BLM "to take any actions deemed necessary to comply with this opinion, to include the withdrawing of any existing oil and gas permits for extraction in submerged lands beneath the Missouri River."

63.     The Jorjani Opinion constitutes final agency action.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE APA

64.     Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

16

65.     The Jorjani Opinion is contrary to (1) the binding *Impel Energy* decision; (2) eighty years of DOI precedent; and (3) the historical record developed by the DOI's historian and by the historian engaged by the MHA Nation.

66.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

67.     The Jorjani Opinion is arbitrary, capricious, and not in accordance with law.

68.     The MHA Nation is entitled to injunctive relief preventing the Defendants from taking any steps to implement the Jorjani Opinion.

69.     The MHA Nation is entitled to an order setting aside the Jorjani Opinion.

## COUNT II: VIOLATION OF THE APA

70.     Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

71.     The Jorjani Opinion was the result of improper political pressure to disregard the MHA Nation's interests in favor of the interests of the State of North Dakota. In withdrawing the 2017 M-Opinion and subsequently issuing the Jorjani Opinion, the DOI acted at the behest of the State of North Dakota. These actions were in direct conflict with the interests of the MHA Nation and the United States' obligations as trustee. In so doing, the United States considered conflicting state interests over its trust responsibility to protect the MHA Nation's property.

72.     Interference from North Dakota elected officials and/or their staffs tainted the administrative process that culminated in the Jorjani Opinion. Extraneous considerations impermissibly intruded into the calculus of the decision-makers leading up to, and resulting in, the Jorjani Opinion.

73.     The reversal of DOI's longstanding and binding precedent was motivated, in whole or in part, by improper and undue political influences, pressures, and considerations that were directed at Defendants. Absent those undue political influences, pressures, and considerations, the Jorjani Opinion would not have reached the conclusion that the Missouri Riverbed within the Reservation belongs to the State of North Dakota.

74.     Because the Jorjani Opinion was motivated, in whole or in part, by such improper considerations, it is arbitrary, capricious, and not in accordance with the law.

75.     The MHA Nation is entitled to injunctive relief preventing the Defendants from taking any steps to implement the Jorjani Opinion.

76.     The MHA Nation is entitled to an order setting aside the Jorjani Opinion.

## COUNT III: ACCOUNTING

77.     Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

78.     The DOI, as trustee, has a duty to account to the MHA Nation for the trust property that it holds and manages for the benefit of the MHA Nation.

79. The DOI's duty to account includes a full disclosure and description of each item of property constituting the corpus of the trust, as well as any funds that have been collected or received in connection with the trust property.

80. The DOI has failed to account to the MHA Nation for the trust property comprised of the Missouri Riverbed within the Reservation and the underlying mineral estate.

81. The APA empowers this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

82. This Court also has original jurisdiction to compel an accounting.

83. The Court should enter an order directing the DOI to provide an accounting to the MHA Nation, in accordance with the DOI's statutory, regulatory, and trust obligations, regarding the Missouri Riverbed within the Reservation and the underlying mineral estate, and the production and extraction of minerals from that property, and all royalties due and/or collected on such minerals.

## COUNT IV: BREACH OF FIDUCIARY DUTY - PROTECTION OF TRUST PROPERTY

84. Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

85. The Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. empowers this Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

86.     The MHA Nation is entitled to a declaration the IBLA *Impel Energy* decision is *res judicata* and is binding on the DOI.

87.     The APA empowers this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

88.     This Court also has the authority under 28 U.S.C. § 1361 to issue an order in the nature of a writ of mandamus to compel Defendants to perform their statutory, regulatory, and fiduciary duties owed to the MHA Nation.

89.     The MHA Nation is entitled to an order under the APA and/or 28 U.S.C. § 1361 compelling the Defendants:

    a.   to take the actions necessary to document that the MHA Nation is the beneficial owner of the Missouri Riverbed and the underlying mineral estate within the Reservation;

    b.   to administer and account for the MHA Nation's mineral rights in the lands underlying the Missouri Riverbed within the Reservation; and

    c.   to collect, deposit and invest, or pay over funds owing to the MHA Nation from the extraction of mineral resources, including oil and gas, from the lands underlying the Missouri Riverbed within the Reservation.

## PRAYER FOR RELIEF

Therefore, Plaintiff respectfully requests that the Court:

A.     Set aside the Jorjani Opinion;

B.     Grant injunctive relief preventing the Defendants from taking any steps to implement the Jorjani Opinion;

C.      Compel DOI to account to the MHA Nation regarding the Missouri Riverbed and underlying mineral estate within the Reservation, including the production and extraction of minerals from this trust property and the value of royalties owed thereon;

D.      Declare that the IBLA *Impel Energy* decision is *res judicata* and is binding on the DOI;

E.      Compel DOI to take the requisite administrative steps to document that the Missouri Riverbed and underlying mineral estate within the boundaries of the Reservation is held in trust by the United States for the benefit of the MHA Nation;

F.      Compel DOI to take the requisite steps to administer and account for the MHA Nation's mineral rights in the lands underlying the Missouri Riverbed within the Reservation;

G.      Compel DOI to collect, deposit and invest or pay over all funds owing to the MHA Nation from the extraction of mineral resources, including oil and gas, from the lands underlying the Missouri Riverbed within the Reservation;

H.      Award plaintiff its reasonable fees, costs, and expenses, including attorneys' fees; and

I.      Grant such further relief as the Court deems may deem just and equitable.

Dated: July 16, 2020                    Respectfully submitted,

                                        **HOLLAND & KNIGHT LLP**

                                        By:  ___/s/_____
                                        Steven D. Gordon (D.C. Bar No. 219287)
                                        Philip Baker-Shenk (D.C. Bar No. 386662)
                                        800 17th Street, N.W., Suite 1100
                                        Washington, D.C.  20006
                                        steven.gordon@hklaw.com
                                        philip.baker-shenk@hklaw.com
                                        Tel: (202) 955-3000
                                        Fax: (202) 955-5564


                                        *and*


                                        **ROBINS KAPLAN LLP**
                                        Timothy Q. Purdon *(admission in process)*
                                        1207 West Divide Avenue, Suite 200
                                        Bismarck, ND 58501
                                        701-255-3000
                                        TPurdon@RobinsKaplan.com

                                        Timothy W. Billion *(admission in process)*
                                        140 North Phillips Avenue, Suite 307
                                        Sioux Falls, SD 57104
                                        605-335-1300
                                        TBillion@RobinsKaplan.com


                                        *Attorneys for Plaintiff Mandan, Hidatsa, and
                                        Arikara Nation*