**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MANDAN, HIDATSA, AND ARIKARA
NATION,

        Plaintiff

   v.

THE UNITED STATES Department of Interior,
*et al.*,

        Defendants

Civil Action No.
1:20-cv-01918-ABJ

**UNITED STATES DEPARTMENT OF INTERIOR'S OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.      Introduction ........................................................................................................ 1

II.     Background ......................................................................................................... 3

        A.      Factual Background ................................................................................. 3

        B.      Procedural Background ............................................................................ 7

III.    Legal Standards .................................................................................................. 8

        A.      Preliminary Injunction ........................................................................... 8

        B.      Summary Judgment ................................................................................ 9

IV.     Argument .......................................................................................................... 10

        A.      Summary Judgement should be entered for the Defendants and Plaintiff is
                not likely to succeed on the merits ....................................................... 10

                1.      The 2020 M-Opinion is not a "final agency action" reviewable
                        under the APA .............................................................................. 10

                2.      The 2020 M-Opinion correctly found the State owns the property at
                        issue and it is thus not arbitrary and capricious. ........................... 14

                3.      Interior is not precluded from issuing the 2020 M-Opinion. ................. 29

        B.      Plaintiff has made no showing of irreparable harm. ............................ 36

        C.      A preliminary injunction is not in the public interest. ........................ 37

V.      Conclusion ....................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Air Cal. v. U.S. Dep't of Transp.*,
654 F.2d 616 (9th Cir. 1981) ............................................... 12

*Albertson v. FCC*,
182 F.2d 397 (D.C. Cir. 1950) ............................................. 35

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ........................................... 9

*Am. Hosp. Ass'n v. Azar*,
No. 1:19-CV-03619 (CJN), 2020 WL 3429774 (D.D.C. June 23, 2020) ........................... 9, 10

*Am. Med. Int'l Inc. v. Sec'yof Health, Educ. & Welfare*,
677 F.2d 118 (D.C. Cir. 1981) ............................................. 33

*Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*,
461 U.S. 402 (1983) ...................................................... 14

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ........................................... 13

*\*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................... 11

*Bobby v. Bies*,
556 U.S. 825 (2009) ................................................... 33, 34

*Borax Consolidated, Ltd. v. City of Los Angeles*,
296 U.S. 10 (1935) ....................................................... 30

*Caiola v. Carroll*,
851 F.2d 395 (D.C. Cir. 1988) ............................................. 9

*Calloway v. Harvey*,
590 F. Supp. 2d 29 (D.D.C. 2008) ........................................ 9

*Canonsburg Gen. Hosp. v. Burwell*,
807 F.3d 295 (D.C. Cir. 2015) ......................................... 33, 35

*Center for Biological Diversity v. U.S. Bureau of Land Management*,
2019 WL 2635587 (C.D. Cal. June 20, 2019) ............................. 12, 14

*Chaplaincy of Full Gospel Churches v. England*,
*(Chaplaincy)*, 454 F.3d 290 (D.C. Cir. 2006) ............................ 36

*Collins v. Nat'l Transp. Safety Bd.*,
351 F.3d 1246 (D.C. Cir. 2003) ........................................... 28

*Comm'r of Internal Revenue v. Sunnen*,
333 U.S. 591 (1948) ...................................................... 34

*Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*,
  75 F. Supp. 3d 387 (D.C. Cir. 2016)...................................................................... 14, 15

*Dallas Safari Club v. Bernhardt*,
  No. 19-CV-03696 (APM), 2020 WL 1809181 (D.D.C. Apr. 9, 2020) ..................... 37

*Dun & Bradstreet Corp. Found. v. United States Postal Serv.*,
  946 F.2d 189 (2d Cir. 1991) .................................................................................... 35

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)................................................................................................. 29

*Finch v. United States*,
  433 U.S. 676 (1977)................................................................................................. 34

*Fund for Animals, Inc. v. U.S. Bureau of Land Management.*,
  460 F.3d 13 (D.C. Cir. 2006)............................................................................. 12, 13

*Hearst Radio, Inc. v. FCC*,
  167 F.2d 225 (D.C. Cir. 1948)................................................................................. 10

*Henry v. Sec'y of Treasury*,
  266 F.Supp.3d 80 (D.D.C. 2017)............................................................................... 9

*Herrera v. Wyoming*,
  139 S. Ct. 1686 (2019)............................................................................................. 34

*Ho–Chunk, Inc. v. Sessions*,
  253 F.Supp.3d 303 (D.D.C. 2017)............................................................................. 9

*I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*,
  723 F.2d 944 (D.C. Cir. 1983)................................................................................. 32

*Idaho v. United States*,
  533 U.S. 262 (2001)........................................................................... 15, 16, 19, 21, 22

*Invention Submission Corp. v. Rogan*,
  357 F.3d 452 (4th Cir. 2004) .................................................................................. 10

*Karem v. Trump*,
  404 F. Supp. 3d 203 (D.D.C. 2019)........................................................................... 8

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955)................................................................................................. 33

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)....................................................................................... 8

*Limbach v. Hooven & Allison Co.*,
  466 U.S. 353 (1984)................................................................................................. 34

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
  140 S. Ct. 1589 (2020)............................................................................................. 32

iii

*Manning v. United States*,
  146 F.3d 808 (10th Cir. 1998) ........................................................................... 28

*Marshall Cty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ........................................................................... 9

*Mashpee Wampanoag Tribe v. Bernhardt*,
  No. 18-2242 (PLF), 2020 WL 3034854 (D.D.C. June 5, 2020) ............................. 37

*Massachusetts v. EPA*,
  415 F.3d 50 (D.C. Cir. 2005) ............................................................................. 12

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................................... 8

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013) ....................................................................... 13, 28

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
  255 F. Supp. 3d 48 (D.D.C. 2017) ....................................................................... 8

*Miami Tribe of Okla. v. United States*,
  198 F. App'x 686 (10th Cir. 2006) ..................................................................... 12

*Montana v. United States*,
  440 U.S. 147 (1979) ......................................................................................... 34

*Montana v. United States*,
  450 U.S. 544 (1981) ................................................. 17, 18, 19, 22, 23, 26, 35, 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................... 14

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................................... 8

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
  No. 18-CV-4596 (VEC), 2020 WL 4605235 (S.D.N.Y. Aug. 11, 2020) ................. 13

*Nat'l Ass'n of Home Builders v. E.P.A.*,
  682 F.3d 1032 (D.C. Cir. 2012) ......................................................................... 29

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ......................................................................................... 29

*Nat'l Mining Ass 'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) ..................................................................... 36

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................. 8, 37, 39

*Norton v. S. Utah Wilderness*,
  *All.*, 542 U.S. 55 (2004) ................................................................................... 11

iv

*Oceana, Inc. v. Pritzker,*
    24 F. Supp. 3d 49 (D.D.C. 2014) ................................................................................. 20

*Oneida Cty., N.Y. v. Oneida Indian Nation of N. Y. State,*
    470 U.S. 226 (1985) ..................................................................................................... 21

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,*
    429 U.S. 363 (1977) ................................................................................................ 15, 38

*Orton Motor, Inc. v. United States Dep't of Health & Hum. Servs.,*
    884 F.3d 1205 (D.C. Cir. 2018) ................................................................................... 28

*Postsecondary Sch. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018) .............................................................................. 36

*PPL Montana, LLC v. Montana,*
    565 U.S. 576 (2012) ..................................................................................................... 15

*S. Utah Wilderness All. v. BLM,*
    425 F.3d 735 (10th Cir. 2005) ...................................................................................... 30

*Sabella v. United States,*
    863 F. Supp. 1 (D.D.C. 1994) ...................................................................................... 13

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg'l Comm'n,*
    789 F.2d 26 (D.C. Cir. 1986) ....................................................................................... 20

*Scenic Am. Inc. v. U.S. Dep't of Transp.,*
    836 F.3d 42 (D.C. Cir. 2016) ....................................................................................... 11

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ....................................................................................... 8

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ................................................................................................ 27, 28

*Smalls v. United States,*
    471 F.3d 186 (D.C. Cir. 2006) ..................................................................................... 32

*Spanish Int'l Broad. Co. v. FCC,*
    385 F.2d 615 (D.C. Cir. 1967) ..................................................................................... 35

*St. Croix Chippewa Indians of Wisc. v. Kempthorne,*
    No. Civ. 07-2210 (RJL), 2008 WL 4449620 (D.D.C. Sept. 30, 2008) ......................... 13

*Sw. Airlines Co. v. U.S. Dep't of Transp.,*
    832 F.3d 270 (D.C. Cir. 2016) ..................................................................................... 11

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ..................................................................................................... 32

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) ..................................................................................... 10

*Trujillo v. Gen. Elec. Co.*,
    621 F.2d 1084 (10th Cir. 1980) .......................................................................... 35

*U.S. Postal Serv. v. Gregory*,
    534 U.S. 1 (2001) ............................................................................................... 14

*United States v. Alaska*,
    521 U.S. 1 (1997) ............................................................................ 15, 20, 21, 23

*United States v. Finch*,
    548 F.2d 822 (9th Cir. 1976) ............................................................................. 34

*United States v. Holt State Bank*,
    270 U.S. 49 (1926) ....................................................................... 16, 17, 18, 19, 38

*United States v. Louisiana*,
    229 F. Supp. 14 (W.D. La. 1964) ................................................................. 30, 31

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ........................................................................................... 27

*United States v. Mendoza*,
    464 U.S. 154 (1984) ........................................................................................... 33

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001) ........................................................................................... 39

*Utah Div. of State Lands v. United States*,
    482 U.S. 193 (1987) ............................................................................... 16, 23, 26

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
    259 F.2d 921 (D.C. Cir. 1958) ........................................................................... 37

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
    537 U.S. 371 (2003) ........................................................................................... 28

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ........................................................................................... 38

*West v. Standard Oil Co.*,
    278 U.S. 200 (1929) ........................................................................................... 33

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 8, 36, 38

*Wisc. Gas Co. v. FERC*,
    758 F.2d 674 (D.D.Cir. 1985) ...................................................................... 36, 37

*Yamaha Corp. of Am. v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ........................................................................... 33

**Statutes**

5 U.S.C. § 551(13) .................................................................................................. 11

5 U.S.C. § 702 ......................................................................................................... 10

5 U.S.C. § 706(2)(A) ............................................................................................... 14

Pub. L. No. 81-437, 63 Stat. 1026 (1949) ............................................................... 5

Pub. L. No. 98-602, 98 Stat. 3149 (1984) ........................................................... 5, 27

**Rules**

FED. R. CIV. P. 56 ..................................................................................................... 9

FED. R. CIV. P. 56(A) ........................................................................................... 9, 20

**Regulations**

43 C.F.R. § 4.1 .................................................................................................. 30, 31

43 C.F.R. § 4.5(a) .................................................................................................... 31

## I.     INTRODUCTION

This case concerns a Department of the Interior ("Interior") legal opinion regarding submerged land under the Missouri River within the boundaries of the Fort Berthold Indian Reservation in North Dakota.  The opinion, called an M-Opinion ("2020 M-Opinion"), concluded that upon North Dakota's admission to the Union, the submerged land passed to State ownership, and thus was not land held in trust by the Federal government as part of the Reservation.  The 2020 M-Opinion reached this conclusion based on the Supreme Court caselaw regarding the rights States have to submerged lands, the specific documents establishing the Fort Berthold Reservation, and the history and purpose of the Reservation.

The 2020 M-Opinion is correct as a matter of law that the submerged lands belong to the State rather than Federal government.  However, whether the property in question belongs to the State or is held in trust by the Federal government is determined by the Constitution, Congressional and Executive acts, and the Supreme Court caselaw that interprets the Constitution and those acts—not an Interior opinion.  The 2020 M-Opinion expresses Interior's legal view, but this view has no legal consequences for the Plaintiff Mandan, Hidatsa, and Arikara Nation ("Plaintiff" or "the Nation") or anyone else outside the agency.  Interior may in future take an action with legal consequences based on the analysis in the 2020 M-Opinion (for instance, by cancelling or modifying a lease of the land at issue).  But the 2020 M-Opinion itself causes no such consequences.  Because it is only an opinion without legal consequences it does not fall within the Administrative Procedure Act's ("APA") definition of reviewable actions and Plaintiff's APA claim fails.  Even if the Court concludes that it is a final action subject to review, however, the 2020 M-Opinion is not arbitrary, capricious or contrary to law and need not be set aside under the APA.

1

Plaintiff's arguments to the contrary are unavailing.  Notably, Plaintiff entirely fails to engage with the 2020 M-Opinion's analysis on the merits.  That is, the Plaintiff does not argue that the 2020 M-Opinion's interpretation of the law and the reservation's history is incorrect such that the submerged lands are in fact held in trust by the United States as part of the Fort Berthold Reservation.  Plaintiff does not argue the 2020 M-Opinion is incorrect that the governing Supreme Court case law establishes a strong presumption that submerged land becomes property of a State when it joins the Union.  Nor does Plaintiff argue that the Congressional and Executive acts establishing the Fort Berthold Reservation manifested any intent whatsoever to reserve submerged land for the Federal government to hold in trust.

Instead, Plaintiff argues that a 1979 decision by the Interior Board of Land Appeals ("IBLA") that found otherwise is forever binding upon Interior by application of the doctrine of *res judicata*.  This argument is unpersuasive for several reasons.  First, this doctrine cannot be applied offensively against the United States as Plaintiff seeks to do.  Moreover, the IBLA lacks the power to resolve title disputes; but even if it had such authority, it is well-established that *res judicata* does not apply when there has been a substantial change in the legal landscape.  And there has undoubtedly been such a change here since the 1979 decision issued.  Only two years after the IBLA decision, the Supreme Court issued the seminal modern case on the question of submerged lands and since this time it has continued to affirm and refine the caselaw on this complex issue.  The 1979 IBLA decision does not forever lock Interior into an interpretation that ignores all subsequent legal developments.  Nor do prior M-Opinions freeze Interior's positions in amber the moment they are written.  To the contrary, Interior has inherent power to reconsider its decisions as well as its legal opinions, and it has appropriately done so here.

Ultimately, Plaintiff has failed to demonstrate that the 2020 M-Opinion is reviewable

under the APA or, if it were, that it is arbitrary and capricious or contrary to law.  On this basis summary judgement should be granted for the Federal Defendants as to Plaintiff's first claim, and no preliminary injunctive relief is warranted.  Injunctive relief is also inappropriate here because Plaintiff has identified no irreparable harm that is traceable to the 2020 M-Opinion.  To the extent Interior modifies any leases in reliance on the 2020 M-Opinion resulting in the Nation losing royalties, this monetary harm is not irreparable.  In sum, the 2020 M-Opinion is correct on the law and should be upheld, and no injunction should issue.

## II.     BACKGROUND

### A.     Factual Background

The Fort Berthold Indian Reservation is home to the Plaintiff Mandan, Hidatsa, and Arikara Nation, located on the Missouri River in central North Dakota.[1]  *See* Compl., ECF No. 1, at ¶ 19.  The Reservation was established by an Executive Order signed by President Grant in 1870.  AR at 165–67 (Exec. Order (Apr. 12, 1870), reprinted in 1 Charles J. Kappler, Indian Affairs: Laws And Treaties 881–83 (2d ed. 1904) (hereinafter "1870 Executive Order")).  The 1870 Executive Order set out the geographic boundaries of the Reservation, defining one boundary as running "along the left bank of the Missouri River to the mouth of the Yellowstone River."  This language refers to the full span of the Missouri River.  *See* Compl., ECF No. 1, at ¶ 15; AR at 460 (2020 M-Opinion at 4) ("The use of the term 'left bank' meant the north and east sides of the Missouri River, and thus this description includes the span of the river within the Reservation's boundaries.").

---

[1] Indian lands such as reservations are generally held in trust by the United States for the benefit of the given Tribe.  *See generally*, Felix R. Cohen, *Cohen's Handbook of Federal Indian Law* § 5.04[4][a] (2005).

In 1880, President Hayes signed an Executive Order modifying portions of the Reservation.  AR at 167 (1880 Exec. Order, reprinted in 1 Charles J. Kappler, Indian Affairs: Laws And Treaties 883 (2d ed. 1904) (the "1880 Executive Order")).  The 1880 Executive Order included the same "left bank" boundary description encompassing the span of the Missouri River. *Id.*  In 1886, the Nation and Federal government executed an agreement that ceded certain parts of the reservation. AR at 174–78 (Transmittal of 1886 Agreement to Congress) (the "1886 Agreement").[2]  The 1886 Agreement does not contain a description of the Reservation's boundaries, instead describing only a cession of certain portions of the Reservation as established by the 1870 and 1880 Executive Orders.  *Id.*

North Dakota was granted statehood in 1889 and was required to "disclaim all right and title . . . to all lands lying within [the State] owned or held by any Indian or Indian tribes" as a condition for admission to the Union.  Enabling Act of Feb. 22, 1889, § 4, cl. 2, 25 Stat. 676, 677.  The Act further provided that all such Indian land shall "remain subject to the disposition of the United States, and . . . shall remain under the absolute jurisdiction and control of the Congress of the United States."  *Id.*  North Dakota's original Constitution contained, in identical terms, the required jurisdictional disclaimers.  *See* N.D. Const., Art. XVI, § 203, cl. 2 (1889).

In 1936, the Solicitor of the Department of the Interior issued an M-Opinion determining that an island formed from the bed of the Missouri River subsequent to North Dakota's statehood belonged to the Federal government, and not to North Dakota, because the Missouri Riverbed itself was part of the Reservation prior to the admission of North Dakota to statehood.  AR at 88–90 (Solicitor's Opinion M-28120, the "Margold Opinion").

---

[2] Though the agreement was executed in 1886, it was not ratified until 1891, two years after North Dakota's statehood.  Act of Mar. 3, 1891, ch. 543, 26 Stat. 989, 1032.

4

In 1944, Congress authorized construction of several dams and reservoirs along the Missouri River.  AR at 468–69 (2020 M-Opinion at 12–13).  Thereafter, the Army Corps of Engineers built Garrison Dam downstream of the Reservation.  *Id.*  The Garrison Dam flooded a portion of the Reservation, an area now known as Lake Sakakawea. AR at 468 (2020 M-Opinion at 12).  The United States took the land that made up Lake Sakakawea through the Takings Act in 1949 and provided compensation to the Nation. AR at 7–9 (A Joint Resolution to vest title to certain lands of the Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota, in the United States, and to provide compensation therefore, Pub. L. No. 81-437, ch. 790, 63 Stat. 1026) (1949) ("Takings Act")).[3]

In 1979 the IBLA heard a dispute in which an oil and gas producer, Impel Energy Corporation, appealed the Bureau of Land Management's administrative decision that it could not lease the Missouri riverbed because it was not held in trust for the Nation but instead had passed to the State of North Dakota under the equal footing doctrine.  *Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979).  North Dakota intervened in this case and argued for State ownership of the riverbed.  The IBLA ruled against BLM and the State, reasoning that because "[c]ourts have regularly found that lands underlying navigable waters were included by the terms of Federal treaties or Executive Orders establishing an Indian reservation," and because the Treaty of Fort Laramie and Executive Order of 1870 included the Missouri River within the geographic boundaries of the Reservation, the riverbed was held in trust for the Nation.  *Id.* at 114.  Impel

---

[3] In 1984, Congress restored the mineral interests in the taken lands to the Nation through the Fort Berthold Reservation Mineral Restoration Act ("Restoration Act").  The Restoration Act returned to the Nation "all mineral interests in the lands located within the exterior boundaries of the Forth Berthold Indian Reservation which . . . were acquired by the United States, for the construction, operation, or maintenance of the Garrison Dam and Reservoir Project."  Pub. L. No. 98-602, tit. 2, § 202(a)(1), 98 Stat. 3149, 3152 (1984).

never actually drilled any wells or produced any oil and gas from the riverbed, however.  In fact,
there was no riverbed production until decades later when, with the advent of new hydraulic
fracturing and horizontal drilling technologies, much more of the Bakken Shale formation
resources became extractable.

On January 18, 2017, Solicitor Hilary Tompkins issued Solicitor's Opinion M-37044 (the
"Tompkins Opinion"), again addressing ownership of minerals located beneath the original bed
of the Missouri River, as well as ownership of minerals beneath uplands flooded by the
construction of Garrison Dam and the subsequent formation of Lake Sakakawea.  AR at 91–127.
The Tompkins Opinion concluded, consistent with the previous Margold Opinion and IBLA's
decision in *Impel*, that the riverbed had not passed to the State but was instead held in trust for
the Nation.  *Id.*

On June 8, 2018, then-Principal Deputy Solicitor Daniel Jorjani issued Solicitor's
Opinion M-37052, a partial suspension and temporary withdrawal of the Tompkins Opinion, in
order to ensure a thorough legal and factual basis for that opinion through review of the
underlying historical record by a professional historian, a task not performed prior to completion
of the Tompkins Opinion.  Following Solicitor Jorjani's 2018 M-Opinion, professional historians
employed by Historical Research Associates, Inc. produced a comprehensive report titled
"Historical Examination of the Missouri River within the Fort Berthold Indian Reservation,
Precontact-1902" ("HRA Report").  AR at 342–422.

The 2020 M-Opinion examined the Department's prior M-Opinions and the IBLA
opinion regarding the property at issue here and found that these opinions were not informed by
the comprehensive history provided in the HRA Report, and with the exception of the Tompkins
Opinion, preceded the Supreme Court's governing decisions described below.  AR at 457–58

6

(2020 M-Opinion).  In these cases, the Supreme Court perfected its reasoning with regard to

federal reservations of submerged lands.  As such, the Solicitor concluded that the Department's

earlier analyses must be reexamined.  *Id.*  After reviewing the HRA Report and reconsidering

contemporary judicial precedent, the Executive Orders, and the Congressionally-ratified

Agreement establishing the Reservation, Solicitor Jorjani issued the 2020 M-Opinion,

withdrawing those portions of the Tompkins Opinion that address ownership of minerals located

beneath the original bed of the Missouri River and replacing that analysis with the conclusion

that the State of North Dakota is the legal owner of submerged lands beneath the Missouri River

where it flows through the Reservation. AR at 457–71 (2020 M-Opinion).

### B.    Procedural Background

On July 16, 2020, Plaintiff filed a Complaint against Interior challenging the 2020 M-

Opinion as allegedly unlawful final agency action.  In sum, Plaintiff argues that the 2020 M-

Opinion violated the Administrative Procedure Act, that *res judicata* bars the Solicitor from

making such a decision, that the 2020 M-Opinion was the result of improper political pressure,

and that the Department has failed in its fiduciary duty to protect and administer tribal lands.  *See*

Compl., ECF No. 1, at ¶¶ 64–89.  Plaintiff also filed a motion for preliminary injunction seeking

to prevent Interior from taking any steps to implement the 2020 M-Opinion.  *See* Mot. for

Prelim. Inj., ECF No. 2.  That motion is premised on the argument that the 2020 M-Opinion is

arbitrary and capricious.  *See* Mem. in Supp. of Mot. for PI, ECF No. 2-1, at 10 ("Mot. for PI").

Following a series of status conferences, the Court set a schedule whereby the Parties

will concurrently brief a response to the motion for preliminary injunction with cross motions for

summary judgment as to Plaintiffs' first claim.  Order, ECF No. 7, at 2.  Plaintiff agreed that its

motion for preliminary injunction can be considered Plaintiff's motion for partial summary

judgment on its first claim.  *Id.*  Plaintiff served the United States Attorney for the District of

Columbia on August 3, 2020.

## III.    LEGAL STANDARDS

### A.    Preliminary Injunction

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never

awarded as [a matter] of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations and

internal quotation marks omitted).  A court may only grant the "extraordinary remedy . . . upon a

clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

Specifically, a plaintiff must show that it is: (1) "likely to succeed on the merits"; (2) "likely to

suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in

[its] favor"; and (4) "an injunction is in the public interest."  *Id.* (citations omitted).  Where the

federal government is the opposing party, the balance of equities and public interest factors

merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[4]

The Court should not grant preliminary relief unless the Nation makes "a clear showing

that [the] four factors, taken together, warrant relief."  *League of Women Voters of the U.S. v.

Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotations omitted); *Mdewakanton Sioux Indians

of Minn. v. Zinke*, 255 F. Supp. 3d 48, 51 (D.D.C. 2017) (the party moving for injunctive relief

---

[4] Prior to the Supreme Court's ruling in *Winter*, a number of circuits, including the D.C. Circuit, evaluated the four factors using a "sliding scale" approach—allowing a strong showing on one of the factors to make up for a weaker showing on another factor.  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The D.C. Circuit has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a more demanding burden requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm.  *See Karem v. Trump*, 404 F. Supp. 3d 203, 209 (D.D.C. 2019) *aff'd as modified,* 960 F.3d 656 (D.C. Cir. 2020).  In any event, it is clear that *Winter* rejected the argument that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm."  555 U.S. at 21.

carries the burden of persuasion).

### B.    Summary Judgment

Although Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" Fed. R. Civ. P. 56(a), in APA cases, the summary judgment standard functions slightly differently, because "the reviewing court generally . . . reviews the [agency's] decision as an appellate court addressing issues of law." *Henry v. Sec'y of Treasury*, 266 F.Supp.3d 80, 86 (D.D.C. 2017).

Because "[t]he 'entire case' on review is a question of law," there is "no real distinction between questions presented in a Rule 12(b)(6) motion to dismiss and motion for summary judgment." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citing *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)); *Am. Hosp. Ass'n v. Azar*, No. 1:19-CV-03619 (CJN), 2020 WL 3429774, at *5 (D.D.C. June 23, 2020) (same).  Therefore, whether the issue is one of reviewability or otherwise, the court must limit its review to the administrative record  and the facts and reasons contained therein[5] to determine whether the agency's action was "consistent with the relevant APA standard of review."  *Ho-Chunk, Inc. v. Sessions*, 253 F.Supp.3d 303, 307 (D.D.C. 2017) (alteration and citation omitted), *aff'd*, 894 F.3d 365 (2018); *see also Caiola v. Carroll*, 851 F.2d 395, 398 (D.C. Cir. 1988).

---

[5] Plaintiff's Motion for Preliminary Injunction includes a declaration.  ECF No. 2-2.  It is appropriate to consider this declaration for purposes of evaluating the Preliminary injunction. However, for purposes of evaluating the Motions for Summary Judgment, because this Declaration is not a document within the Administrative Record, it should not be considered in evaluating Interior's action under the APA.  *See, e.g.*, *Calloway v. Harvey*, 590 F. Supp. 2d 29, 38 (D.D.C. 2008) (declining to consider extra-record declarations).

IV.    **ARGUMENT**

      A.    **Summary Judgement should be entered for the Defendants
and Plaintiff is not likely to succeed on the merits.**

           **1.**    **The 2020 M-Opinion is not a "final agency action" reviewable
under the APA.**

Plaintiff's suit is premised on the idea that the 2020 M-Opinion changed whether the riverbed is the property of the United States or the State of North Dakota.  This is not correct.  The 2020 M-Opinion instead described the Solicitor's understanding of the law as applied to the property.  Such an opinion is not an "agency action" nor is it "final" under the APA and Plaintiff's suit thus fails as a matter of law.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof."  5 U.S.C. § 702.  However, the APA generally limits causes of action to those challenging "agency action" that is also "final" as defined by the Act.  *Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006).  Although in this Circuit the final agency action requirement is not considered jurisdictional, it is still a basis to dismiss for failure to state a claim under the APA or alternately for summary judgment.  *See, e.g., Am. Hosp. Ass'n*, 2020 WL 3429774, at *5 ("no real distinction between questions presented in a Rule 12(b)(6) motion to dismiss and motion for summary judgment" in APA case).  Plaintiff's first claim fails because it does not concern "agency action" within the meaning of the APA.  That term has a particular meaning in this context and cannot be treated as "a general term with the all-embracive meaning usually conveyed by those words."  *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948).  "Broad as is the judicial review provided by the [APA], it covers only those activities included within the statutory definition of 'agency action,'" *Hearst Radio*, 167 F.2d at 227, and "does not provide judicial review for everything done by an administrative agency."  *Invention Submission Corp. v. Rogan*, 357 F.3d

10

452, 459 (4th Cir. 2004).

"Agency action" is defined in the APA to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  The 2020 M-Opinion, which is the legal advice of the Solicitor to the Secretary and Interior officials, does not meet any of these categories.  It certainly is not a "rule" as it was not created through a process of rulemaking.  *See id.* at § 551(4)-(5); *see id.* § 553 (describing rulemaking process).  Nor is the opinion an order, license, sanction, or form of relief.  *Id.* § 551(6), (8)-(11).  Unlike these agency actions, the 2020 M-Opinion itself does not have any legal effect.  Its analysis may well be applied in the modification of a lease or other document with legal effect, but the analysis in an M-Opinion divorced from a practical application is not an "agency action."

Even if the 2020 M-Opinion were an "agency action" it would still not be reviewable under the APA because it is not "final."  Agency actions are final if two independent conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154 (1997) (internal quotation marks omitted); *see also Scenic Am. Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 55–56 (D.C. Cir. 2016).  "An order must satisfy both prongs of the *Bennett* test to be considered final."  *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

The 2020 M-Opinion is not a final agency action because it does not establish any legal rights or obligations.  *See Bennett*, 520 U.S. at 177–78.  The Department's opinion about ownership of property does not determine the ownership of that property—any legal rights to the

subsurface lands at issue are determined by Congress and the Constitution, not Interior.  Nor does the 2020 M-Opinion itself change any legal rights or obligations that may flow from a future lease of the submerged property at issue.  If and when the Department issues a lease based on the 2020 M-Opinion it may well determine legal obligations, but Plaintiff does not challenge such a lease.  Under similar circumstances numerous courts have found that the issuance of a legal opinion is not a final agency action.  *See Air Cal. v. U.S. Dep't of Transp.*, 654 F.2d 616, 620 –21 (9th Cir. 1981) (letter from FAA's Chief Counsel not "a document with the status of law."); *Massachusetts v. EPA*, 415 F.3d 50, 54 (D.C. Cir. 2005) (EPA general counsel's memorandum containing legal advice was not a final agency action), *rev'd on other grounds*,  549 U.S. 497 (2007); *Miami Tribe of Okla. v. United States*, 198 F. App'x 686, 690 (10th Cir. 2006).

Courts that have considered M-Opinions specifically have also concluded they are not final agency actions, particularly where a subsequent action may apply the opinion in a way with legal consequences.  For instance, in *Center for Biological Diversity v. U.S. Bureau of Land Management*, the court considered whether an M-Opinion was a final agency action.  No. CV 17-8587-GW(ASX), 2019 WL 2635587, at *12 (C.D. Cal. June 20, 2019).  The court reasoned that it was not the M-Opinion that "actually sets the rights of any third-parties."  Rather, "the 2017 M-Opinion provides abstract guidance to the agency that only affects parties' rights when the opinion is *applied* to a particular situation."  *Id.*  This same reasoning animated the D.C. Circuit's decision in *Fund for Animals, Inc. v. U.S. Bureau of Land Management.,* 460 F.3d 13, 22 (D.C. Cir. 2006).  There, the Circuit found that a Congressional budget request did not constitute final agency action because it did not "adversely affect complainant but only affect[s] his rights adversely on the contingency of future administrative action."  *Id.*  The court explained

that the budget request was "very unlike a substantive rule that, as a practical matter, requires the

parties affected to adjust their conduct as soon as the rule is issued." *Id.* at 20.  Rather, the

budget request at issue was merely "a statement by [the agency] about what it plans to

do[.]" *Id.* at 21–22 (internal quotations and citation omitted).  *See also Sabella v. United States*,

863 F. Supp. 1, 5 (D.D.C. 1994) (no final agency action where agency's general counsel

provided the "opinion that U.S. citizens may not lawfully engage in any foreign tuna fishing

operations after February 28, 1994 that would involve the intentional encirclement of marine

mammals unless they are engaged in scientific research . . . In the near future the National

Marine Fisheries Service will issue rules to inform the public of this interpretation."); *St. Croix

Chippewa Indians of Wisc. v. Kempthorne*, No. Civ. 07-2210 (RJL), 2008 WL 4449620, at *5

(D.D.C. Sept. 30, 2008), *aff'd*, 384 F. App'x 7 (D.C. Cir. 2010); *McMaster v. United States*, 731

F.3d 881, 898 (9th Cir. 2013) (examining the BLM's reservation of the surface estate for the

United States in a mining patent, rather than looking to the M-Opinion that dictated the result);

*but see Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, No. 18-CV-4596 (VEC), 2020

WL 4605235, at *8 (S.D.N.Y. Aug. 11, 2020) (reviewing M-Opinion that the court found

changed the set of actions covered by the Migratory Bird Treaty Act).

     As with the opinions considered in the foregoing cases, the 2020 M-Opinion represents

the Solicitor's legal interpretation of the status of the property at issue, but it does not have legal

consequences like that of a final agency action, a type of action of which it can be said "[i]t

commands, it requires, it orders, it dictates," *Appalachian Power Co. v. EPA*, 208 F.3d 1015,

1023 (D.C. Cir. 2000).  The 2020 M-Opinion at issue here does none of those things.  Legal

consequences as to the ultimate ownership of the property at issue flow from the constitution and

Congress—not from Interior.  The 2020 M-Opinion provides abstract guidance to the agency that

"only affects parties' rights when the opinion is *applied* to a particular situation." *Ctr. for Biological Diversity,* 2019 WL 2635587, at \*12.  For that reason it is not a final agency action reviewable under the APA.

> **2.    The 2020 M-Opinion correctly found the State owns the property at issue and it is thus not arbitrary and capricious.**

Even were the 2020 M-Opinion reviewable under the APA it easily meets the Act's deferential standard.  The APA directs the Court to uphold an agency's final action unless it is deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Although the inquiry must be thorough, the standard of review is narrow and highly deferential, an agency's decisions are entitled to a "presumption of regularity," and the Court cannot substitute its judgment for that of the agency decision maker. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).  The Court need not find that an agency decision "is the only reasonable one, or even that it is the result [the court] would have reached." *Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).

The Court must determine whether the agency:  (1) "relied on factors which Congress ha[d] not intended it to consider;" (2) "entirely failed to consider an important aspect of the problem;" (3) "offered an explanation for its decision that runs counter to the evidence before the agency;" or, (4) offered an explanation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 396 (D.C. Cir. 2016).  The 2020 M-Opinion's conclusion that North Dakota owns the bed of the Missouri River running through the Nation's Reservation was correct. Accordingly, the 2020 M-Opinion is not arbitrary, capricious, or an abuse of discretion, and is squarely in accordance with law.

**a)** **The 2020 M-Opinion is correct that the Constitution grants the submerged lands at issue to the State.**

In order to determine whether the State or Federal government (in trust for the Nation) owned the submerged land at issue, the 2020 M-Opinion looked to the most recent Supreme Court case law, historical sources, the relevant treaties, and the Congressional and Executive record establishing and modifying the Reservation.  AR at 457–71 (2020 M-Opinion).  In doing so, it also relied on the HRA Report, which provided additional details about the historical record not available at the time of earlier M-Opinions.  AR at 457 (2020 M-Opinion at 1).  After a detailed analysis of these sources, the 2020 M-Opinion concluded that "the State of North Dakota is the legal owner of submerged lands beneath the Missouri River where it flows through the Reservation."  *Id.*

The 2020 M-Opinion applies the "equal footing doctrine," the constitutional principle that each state enters the Union on equal footing with the original thirteen states.  *See generally PPL Montana, LLC v. Montana*, 565 U.S. 576, 590–91 (2012).  Because each of the original States were understood to hold title to the land underneath navigable water, the equal footing doctrine provides that "[u]pon statehood, [each new] State gains title within its borders to the beds of waters then navigable."  *Id.* at 591; *see also Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 374 (1977) ("[T]he State's title to lands underlying navigable waters within its boundaries is conferred not by Congress but by the Constitution itself.").

Though Congress has the authority "to convey land beneath navigable waters, and to reserve such land for the United States" before statehood, determining ownership to submerged lands in the face of a potential pre-statehood reservation or conveyance "must begin with a *strong presumption* against defeat of a State's title."  *Idaho v. United States*, 533 U.S. 262, 272–73 (2001) (quoting *United States v. Alaska*, 521 U.S. 1, 34 (1997)) (alterations and internal

quotation marks omitted) (emphasis added).  "Congress . . . will defeat a future State's entitlement to land under navigable waters only in exceptional instances."  *Utah Div. of State Lands v. United States*, 482 U.S. 193, 201–02 (1987) (internal quotation marks omitted).  Accordingly, "disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." *United States v. Holt State Bank*, 270 U.S. 49, 55 (1926).  In concluding that the submerged lands at issue here passed to North Dakota at statehood, the 2020 M-Opinion is consistent with these well-established principles and therefore not arbitrary and capricious.

　　　　As the 2020 M-Opinion recognizes, the Supreme Court has set out a two-part test for determining whether federal intent to reserve submerged lands has been "definitely declared or otherwise made very plain."  *Holt State Bank*, 270 U.S. at 55.  That test asks: (1) "whether Congress intended to include land under navigable waters within the federal reservation, and" (2) "if so, whether Congress intended to defeat the future State's title to the submerged lands." *Idaho*, 533 U.S. at 273.  Where, as here, the reservation was created by Executive Order and only later recognized by Congress, the inquiry into congressional intent at step one has further nuance.  To satisfy the requirement that "Congress intended to include land under navigable waters within the federal reservation," the initial Executive reservation must "*clearly* include[] submerged lands, and Congress [must] recognize[] the reservation in a way that demonstrates an intent to defeat state title."  *Id.* (emphasis added).  Central to this inquiry is "whether Congress was on notice that the Executive reservation included submerged lands, . . . and whether the purpose of the reservation would have been compromised if the submerged lands had passed to the State."  *Id.* at 273–74.  Here, the 2020 M-Opinion correctly found that the historical record makes clear

that the Executive reservation did not include title to the riverbed, and that North Dakota's ownership of the riverbed does not compromise the reservation's purpose.

(i)     **The 2020 M-Opinion correctly found the Executive Reservation did not include title to the riverbed.**

The language of the instruments creating a reservation and describing its boundaries are the principal evidence of whether the executive reservation includes submerged lands underlying navigable waterways.  In *Holt State Bank*, the Supreme Court applied the strong presumption against pre-statehood conveyance to conclude that the lakebed of a navigable lake did not pass to the Red Lake Band of Chippewa Indians.  270 U.S. at 58; *see* AR at 459, 464–65 (2020 M-Opinion discussion).  The Court, focusing its analysis on "[t]he last treaties preceding the admission of the state," explained that these documents contained "no formal setting apart of what was not ceded, nor any affirmative declaration of the rights of Indians therein, nor any attempted exclusion of others from the use of navigable waters."  *Holt State Bank,* 270 U.S. at 58 (footnote omitted); *see* AR at 459, 464–65.  Instead, these treaties established a reservation but "nothing . . . which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a purpose to depart from the established policy . . . of treating such lands as held for the benefit of the future state."  *Id.* at 58–59.

The Supreme Court reaffirmed the principle recognized in *Holt State Bank* that finding a reservation of submerged lands requires clear, affirmative language to that effect in *Montana v. United States*.  450 U.S. 544 (1981); *see* AR at 465 (2020 M-Opinion discussion).  The *Montana* Court held that the Crow Tribe of Montana's claim to the bed of Bighorn River failed—even though, as with the Fort Berthold Reservation, the river itself was clearly within the reservation.  *Id.* at 551–57.  Again looking to the relevant treaties establishing the reservation, the Court rejected reliance on a treaty specifying the boundaries and granting "the Crow Indians the sole

right to use and occupy the reserved land, and, implicitly, the power to exclude others from it,"
because "reliance on that [language] simply begs the question of the precise extent of the
conveyed lands to which this exclusivity attaches."  *Id.* at 554.  Critically, the *Montana* Court
held, "[t]he mere fact that the bed of a navigable water lies within the boundaries described in the
treaty does not make the riverbed part of the conveyed land, especially when there is no express
reference to the riverbed."  *Id.*

The 2020 M-Opinion took the same approach as the Supreme Court in *Holt State Bank*
and *Montana* in reviewing the 1870 Executive Order, the 1880 Executive Order, and the 1886
Agreement—none of which include the requisite express or specific references to the bed of the
Missouri River.  While the 1870 and 1880 Executive Orders include the span of the Missouri
River within the boundaries of the Reservation, they are entirely silent as to the riverbed, failing
the Supreme Court's rule demanding that the inclusion of a riverbed in a Federal reservation
must be "directly declared or otherwise made very plain" in order to defeat the strong,
constitutional presumption of State title.  AR at 165–67 (1870 and 1880 Executive Orders); *Holt
State Bank*, 270 U.S. at 55.  And the language of the 1886 Agreement was even less specific, as
it included only a description of lands ceded by the Agreement and no specific description of the
remainder of the Reservation.[6]  AR at 174–78 (Transmittal of 1886 Agreement to Congress).

The 2020 M-Opinion examines how, as in *Holt State Bank* and *Montana*, the Executive

_____

[6] The Nation appears to rely at least in part on the 1851 Treaty of Fort Laramie to support their
ownership claim.  *See* Compl., ECF No. 1, at ¶ 25.  Reliance on this treaty, however, is
unavailing because it was not a treaty between the Nation and the federal government
establishing land rights.  The same treaty was addressed in *Montana.*  There, the Supreme Court
explained the "1851 treaty did not by its terms formally convey any land to the Indians at all, but
instead chiefly represented a covenant among several tribes which recognized specific
boundaries for their respective territories."  450 U.S. at 553 (citing Treaty of Fort Laramie, 1851,
Art. 5, 2 Kappler 594–95).  The Treaty of Fort Laramie thus "ha[s] no bearing on ownership of
the riverbed."  *Id.*

Orders at issue in this case are silent as to the riverbed, and therefore no reservation of the

riverbed can be inferred. *See Holt State Bank*, 270 U.S. at 58 (no tribal ownership of riverbed

absent some affirmative declaration or exclusion of others from such lands); *Montana*, 450 U.S.

at 554 ("The mere fact that the bed of a navigable water lies within the boundaries described in

the treaty does not make the riverbed part of the conveyed land, especially when there is no

express reference to the riverbed. . ."). Accordingly, the 2020 M-Opinion was correct to

conclude that the Executive reservation did not include the riverbed and, necessarily, did not put

Congress on notice of the riverbed's inclusion. *See Idaho*, 533 U.S. at 273–74 (Executive

reservation must "*clearly* include[] submerged lands" and Congress must be "on notice that the

Executive reservation included submerged lands" (emphasis added)).

Tellingly, the Nation's Complaint does not claim that any express reservation of the

riverbed was made before statehood, instead citing only boundary-describing documents, which,

again, are silent as to the riverbed. *See* Compl., ECF No. 1, at ¶¶ 26–30. Indeed, the Complaint

does not even appear to allege ownership, instead stating that these two executive orders and one

agreement indicate that "the *width* of the River," rather than its bed, is "within the Reservation

boundaries." *See id.* at ¶ 26 (emphasis added). The Nation's citation in its Complaint to the

North Dakota Constitution is similarly unavailing, because, though it disclaims any ownership

over Indian lands within the state, the North Dakota Constitution is silent as to what the "Indian

lands" in question are. *See* Compl., ECF No. 1, at ¶ 31. To the contrary, the state constitution's

mere reference to undefined "Indian lands," as in *Montana*, "simply begs the question of the

precise extent of the conveyed lands." 450 U.S. at 554.[7]

---

[7] Notably, the Nation's Motion for Preliminary Injunction and Partial Summary Judgment does
not engage with the relevant legal standard and contains no argument about the scope of the
Executive reservation to support their claim that the bed of the Missouri River belongs to the
Nation. *See generally* Mot. for PI, ECF No. 2-1. Because the Nation designated their motion for

As the 2020 M-Opinion found, AR at 467–68 (2020 M-Opinion), the Supreme Court's few decisions finding federal intent to overcome the Equal Footing Doctrine's presumption of State title to submerged lands are plainly distinguishable from the case here, strengthening the agency's opinion.  In *United States v. Alaska*, the Supreme Court held that the federal government reserved submerged lands beneath inland navigable waters in the National Petroleum Reserve and the Arctic National Wildlife Refuge.  521 U.S. at  32–61.  Applying *Montana* and *Utah Division of State Lands*, the Court identified language in each of the relevant reservation instruments clearly indicating that the purpose of those reservations necessitated the submerged lands' inclusion in the reservations.  *Id.* at 39–40, 51.  With respect to the National Petroleum Reserve, the Court noted that the executive order establishing the reserve "recited that 'there are large seepages of petroleum along the Arctic Coast of Alaska and conditions favorable to the occurrence of valuable petroleum fields on the Arctic Coast,' and described the goal of securing a supply of oil for the Navy as 'at all times a matter of national concern.'"  *Id.* at 39 (internal citation omitted).  This language indicated a purpose that necessitated ownership of submerged lands because it would impede access to and ownership of the minerals that the reservation was established to preserve.  *See id.*  Similarly, one of the Arctic National Wildlife Refuge's formative documents explained that the "lakes, ponds, and marshes" within the Refuge

---

preliminary injunction as their partial motion for summary judgment as to Count I, it is that filing in which the Nation must, under Rule 56, show their entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  Its failure to include in their motion any argument to rebut the presumption in favor of North Dakota ownership of the riverbed forfeits the issue.  *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) ("In a case based solely on judicial review of agency action, the district court sits as an appellate tribunal and disposes of the case on cross-motions for summary judgment. . . . Thus, a plaintiff's failure to raise arguments or theories in its motion for summary judgment results in waiver of those arguments."); *see San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg'l. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc) ("[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof.").

"are nesting grounds for large numbers of migratory waterfowl," and "[t]he river bottoms with their willow thickets furnish habitat for moose."  *Id.* at 51 (internal citation omitted).  The Court concluded that these explicit references to wildlife uses of the Refuge's water bodies and river bottoms indicated that "the drafters of the application would not have thought that the habitats mentioned were only upland."  *Id.*

  *Idaho v. United States*, 533 U.S. 262 (2001) is also plainly distinguishable.  *See* AR at 466 (2020 M-Opinion discussion of *Idaho*).  There, first and foremost, the State of Idaho conceded that the 1873 Executive Order establishing the reservation included submerged lands. 533 U.S. at 268.  Idaho apparently did so based on the district court's fact finding that "Congress was on notice that the Executive Order of 1873 reserved for the benefit of the Tribe the submerged lands within the boundaries of the . . . Reservation," because the Secretary of the Interior responded to a Senate inquiry on that point.  *Id.* at 274–75 (internal citation omitted).  Of course, no such concession exists here, nor was there any similar Congressional notice.  Instead, both *Idaho* and *Alaska* contrast sharply from the language establishing the reservation here, which constitutes a mere boundary description that "*Montana* and *Utah Div. of State Lands* establish . . . does not in itself mean that submerged lands beneath those waters were conveyed or reserved."  *Alaska*, 521 U.S. at 38.  This contrast further demonstrates the 2020 M-Opinion's correctness in applying the presumption that states own submerged lands beneath navigable waterways.

  The Indian canons of construction are equally unavailing.  Generally, the Indian canons of construction provide that "treaties should be construed liberally in favor of the Indians . . . with ambiguous provisions interpreted to their benefit."  *Oneida Cty., N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 247 (1985) (internal citation omitted).  But, as the 2020 M-

Opinion notes, the Supreme Court has not used the Indian canons of construction to adjudicate disputes of this nature since developing the two-part test applicable here.  AR at 459 (2020 M-Opinion at 3 n.14).  Indeed, the principal cases discussed herein do not mention the Indian canon of construction.  *See, e.g.*, *Montana*, 450 U.S. at 549–56; *Idaho*, 533 U.S. at 272–81.  Declining to apply the Indian canon is appropriate because the Constitution guarantees a presumption in favor of state ownership of submerged lands defeated only by a *federal* intent to convey or reserve the land pre-statehood.  *See, e.g.*, *Idaho*, 533 U.S. at 273 (requiring Congressional intent to include submerged land within reservation as well as clear inclusion by the Executive).  To apply the Indian canon in this context would be inconsistent both with this constitutional presumption and with the Supreme Court's focus on federal, rather than tribal, intent.  Even assuming the canons apply to some portions of the analysis, they cannot alter the Supreme Court's clear holding in *Montana* that "[t]he mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed. . . ."  450 U.S. at 554.  Because this case mirrors *Montana*, the same result should follow.

<blockquote>(ii) <b>North Dakota's ownership of the riverbed does not compromise the government's purpose in establishing the Reservation.</b></blockquote>

Plaintiff has failed to demonstrate that the 2020 M-Opinion is incorrect on the dispositive question of whether the Executive Order reservation "clearly includes submerged lands." *Idaho*, 533 U.S. at 273.  Indeed, the Plaintiff does not brief the issue.  *See generally* Mot. for PI, ECF No. 2-1.  The Court thus need not proceed further.  Should it do so, however, the second step for determining Congressional intent regarding submerged lands—"whether the purpose of the reservation would have been compromised if the submerged lands had passed to the State"—also demonstrates North Dakota's ownership of the bed of the Missouri River.  *See Idaho*, 533 U.S. at

22

273–74.

As the Supreme Court has noted, its precedent "establish[s] that the *purpose* of a conveyance or reservation is a critical factor in determining federal intent." *Alaska*, 521 U.S. at 39. Central to this inquiry is whether the federal government's purpose in creating the Reservation necessitates Tribal ownership of the riverbed. *See id.* In *Montana*, the Supreme Court, after concluding that language including a river within the boundaries of a reservation did not, by itself, convey the bed of the river, next noted that "the Crows were a nomadic tribe dependent chiefly on buffalo, and fishing was not important to their diet or way of life." 450 U.S. at 556. Accordingly, no reason existed that "would have required Congress to depart from its policy of reserving ownership of beds under navigable waters for the future States" existed. *Id.*; *see also Alaska*, 521 U.S. at 37 (explaining *Montana* holding). Similarly, in *Utah Division of State Lands v. United States*, the Supreme Court concluded that a United States Geological Survey reservation circling Utah Lake did not reserve for the United States the lakebed. 82 U.S. at 206–07. Instead, the federal purpose of the reservation was to prevent homesteading around the lake, which did not necessitate ownership of the lakebed. *Id.* Absent a federal purpose that the lakebed would serve, then, the Supreme Court held the government automatically transferred those submerged lands to Utah upon entry into the United States. *Id.* at 207.

Following the analysis set out in these Supreme Court precedents, the 2020 M-Opinion examined the historical record here to determine the federal government's intent in establishing the Reservation. AR at 461, 470 (2020 M-Opinion at 5, 14). It concluded that the federal purpose of the Reservation was to provide adequate lands "to support the Nation with farming, livestock, and, to a lesser extent, hunting and forestry." AR at 461 (2020 M-Opinion at 5). The historical report commissioned to examine the historical record on this issue points out that the

Nation relied on subsistence farming even before United States involvement: "Being skilled agriculturists, the Upper Missouri tribes might grow hundreds of bushels of corn, beans, and squash in productive years."  AR at 461 (2020 M-Opinion at 5, (quoting HRA Report at 27)). BIA's early interactions with the Nation before the 1870 Executive Order, including its urging members of the Nation to move away from a central village to farming allotments elsewhere on the Reservation, also indicate the federal government's focus on agriculture.  AR at 461 (2020 M-Opinion at 5, n.28, (citing HRA Report at 19–20)).

The federal officials involved in setting the Reservation's boundaries similarly intended it to be used primarily for farming and other land-based activities.  Major General Winfield Scott Hancock, in 1869, ordered the examination of the area to determine the location and size of the Nation's Reservation and, in doing so, specified that the MHA Nation "should have a reservation sufficiently large for them to cultivate, to procure fuel, and hunt on, if possible, without encroaching too much on the public lands."  AR at 462 (2020 M-Opinion at 6 (quoting HRA Report at 53)).  And, as the 2020 M-Opinion points out, Captain Wainwright, who proposed the boundaries adopted by the 1870 Executive Order, stated in a letter ultimately forwarded to President Grant, that he had "endeavored in this proposed reservation to give [the Nation] land enough to cultivate and for hunting and grazing purposes."  AR at 462 (2020 M-Opinion at 6), 165 (Letter from S.A. Wainwright to Bvt. Brig Gen O.D. Green (Sept. 25, 1869)).  Conspicuous in its absence from these contemporary indications of federal intent is any reference to the riverbed or even to fishing generally.

Finally, references to the government's purpose that post-date the 1870 creation of the Reservation confirm this focus on agriculture and other land-based pursuits.  In 1872, for example, a BIA agent provided a "saw log and cordwood contractor" with the boundaries of the

Reservation and "inform[ed] [it] that all persons are strictly forbidden by the War Dept. and Dept. of Interior to cut wood upon any of the land set apart for reservations for Indians unless the consent of the Indian is obtained, and they paid for their wood."  AR at 462 (2020 M-Opinion at 6; HRA Report at 58–59).  In 1880, in responding to a query from the Commissioner of Indian Affairs regarding a potential diminishment of the Reservation, another BIA agent described the Reservation's purpose as follows:

> It is the policy of the Government to encourage Indians in agricultural pursuits, and assist them in becoming self supporting, and for this purpose, it is absolutely necessary that their reservation should contain *good [arable?] and grazing lands*. To diminish the reservation of these Indians west of the Missouri River, would deprive them of nearly all their *good farming lands and timber*.  No compensation for this loss could be given by increasing the reservation east of the Missouri River, as the land is poor and barren, and without water or timber—especially the latter.

AR at 462–63 (2020 M-Opinion at 6–7, HRA Report at 66).  This direct explanation of the purpose of the Reservation stands in stark contrast to the BIA agent's sole passing reference to fishing elsewhere in the letter—which the 2020 M-Opinion correctly notes "appears to be the only written consideration of fishing made by the Executive in connection with designing the Reservation."  AR at 463 (2020 M-Opinion at 7).  There, the agent noted that the "character of the reservation outside of the grant to the Railroad Co. is not so well adapted to farming, grazing, fishing and hunting and other necessities of the Indians."  AR at 463 (2020 M-Opinion at 7, HRA Report at 66).  Ultimately, Congress expressed a similar governmental focus on agriculture and husbandry in the preamble to the bill ratifying the 1886 Agreement:

> [I]t is the policy of the Government to reduce to proper size existing reservations when entirely out of proportion to the number of Indians existing thereon, with the consent of the Indians, and upon just and fair terms; and whereas the Indians of the several tribes, parties hereto, have vastly more land in their present reservation than they need or will ever make use of, and are desirous of disposing of a portion thereof in order to obtain the means necessary to enable them to become *wholly self-supporting by the cultivation of the soil and other pursuits of husbandry*[.]

AR at 463 (2020 M-Opinion at 7), 172 (1886 Agreement).

The 2020 M-Opinion recognizes the Nation's historic use of the river for fishing, for capturing "float bison," and for trade and security.  AR at 463 (2020 M-Opinion at 7).  These activities included ordinary fishing from the surface, along with the use of traps and weirs fixed to the riverbed.  AR at 464 (2020 M-Opinion at 7–8).  But, as the 2020 M-Opinion points out, as of 1890, the vast majority of the Nation's subsistence came from sources other than fishing: "[S]eventy percent (70%) of tribal subsistence came from farming, stock raising, or wage labor; fifteen percent (15%) from government rations; and fifteen percent (15%) from the combined activities of '[h]unting, fishing, root-gathering, etc.'"  AR at 463–64 (2020 M-Opinion at 7, quoting HRA Report at 21).  In any event, evidence of historic uses of the river and riverbed by the Tribe cannot indicate a *federal purpose* to that effect.  Instead, the proper inquiry, as discussed, is into the federal government's purpose in establishing the reservation.  *See, e.g.*, *Utah Div. of State Lands*, 482 U.S. at 206–07.  Given the complete absence of evidence of either an Executive or a Congressional purpose to promote or even continue the Nation's uses of the river, much less the riverbed, in the recognized Reservation, the 2020 M-Opinion correctly concluded that the bed of the Missouri River within the Reservation passed to North Dakota at statehood.  *Montana*, 450 U.S. 553–55 (presumption in favor of state ownership not overcome by mere boundary description).

      (iii)    **The 2020 M-Opinion correctly found the Garrison Dam project does not affect North Dakota's ownership of the riverbed.**

The only substantive argument that the Nation makes supporting its contention that it owns the bed of the Missouri River—albeit in one paragraph—is that the 2020 M-Opinion "contravenes the 1984 Restoration Act, which explicitly restored all subsurface mineral interests in the taken lands to trust status for the benefit and use of the MHA Nation."  Motion for PI, ECF

No. 2-1, at 14.  The 2020 M-Opinion's analysis on this point is reasonable and not contrary to

the Restoration Act.  As the 2020 M-Opinion explains, the Takings Act that recognized the

impoundment of Reservation lands caused by the Garrison Dam only applies to "right, title and

interest of *said tribes, allottees and heirs of allottees* in and to the lands constituting the Taking

Area described in section 15."  AR at 469 (2020 M-Opinion at 13), 7 (Takings Act).

Importantly, then, the Takings Act did not take title for the United States to lands owned by

North Dakota.  Because, as discussed, the bed of the Missouri River passed to North Dakota at

statehood, the Takings Act did not cover that submerged land.  Thus, when Congress restored

those subsurface lands taken in 1949 through the 1984 Restoration Act, the bed of the Missouri

River was not part of that restoration.  Instead, as the Restoration Act recognizes, it returned to

the Nation "all mineral interests in the lands located within the exterior boundaries of the Fort

Berthold Indian Reservation which . . . *were acquired by the United States*, for the construction,

operation, or maintenance of the Garrison Dam and Reservoir Project. . . ."  Pub. L. No. 98–602,

tit. 2, § 202(a)(1), 98 Stat. 3149, 3152 (emphasis added).  Because the riverbed—owned by

North Dakota and not the Notion—was never "acquired by the United States," the Restoration

Act did not convey interests in those submerged lands to the Nation.  The Nation's one-

paragraph argument to the contrary notwithstanding, *see* Mot. for PI, ECF No. 2-1, at 14, the

2020 M-Opinion was thus in accordance with law on this point as well.

> **b)**  **The 2020 M-Opinion is entitled to deference and is not arbitrary and capricious merely because it alters Interior's interpretation.**

As demonstrated, the 2020 M-Opinion is in accordance with law and is therefore entitled

to deference.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *United States v. Mead*

*Corp.*, 533 U.S. 218, 234–35 (2001).  To the extent that the foregoing discussion of the 2020 M-

Opinion's analysis does not resolve the issue, the deference accorded to an agency's

27

interpretation depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140; *see Orton Motor, Inc. v. United States Dep't of Health & Hum. Servs.*, 884 F.3d 1205, 1211 (D.C. Cir. 2018). Deference under *Skidmore* is "more than acknowledgement that the agency's position is more convincing than its adversaries', as would be true any time it submitted the more convincing brief." *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1254 (D.C. Cir. 2003). Interpretations by agencies, which possess "a body of experience and informed judgment," *Skidmore*, 323 U.S. at 140, "warrant respect" from the courts, *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003). Here, the 2020 M-Opinion reflects the reasoned judgment of the Department. It relied extensively on a third-party historical report commissioned precisely for use in determining this issue. AR at 457 (2020 M-Opinion at 1), 342 (HRA Report at 1). In doing so, it discussed and analyzed the facts as compared to numerous Supreme Court precedents and determined that it required some "express language or fundamental federal purpose in favor of tribal ownership of the submerged lands beneath the Missouri River," which the record did not reflect. AR at 464–68 (2020 M-Opinion at 8–12). This reasoned judgment is entitled to deference under *Skidmore*.

Courts have applied *Skidmore* deference to Solicitor's Opinions, and this Court should do the same. *See McMaster v. United States*, 731 F.3d 881, 892 (9th Cir. 2013) ("We conclude that the Solicitor's Opinion is entitled to respect under *Skidmore*. It is a well-reasoned, formal, signed, twenty-two page opinion . . . that is thorough in its consideration, and ultimately persuasive.") (citation, quotation marks, and alterations omitted)); *Manning v. United States*, 146 F.3d 808, 814 n.4 (10th Cir. 1998). Such deference is appropriate here even though the 2020

M-Opinion represents a departure from previous interpretations.  As the Supreme Court has recognized, "[a]n initial agency interpretation is not instantly carved in stone.  On the contrary, the agency must consider varying interpretations and the wisdom of its policy on a continuing basis, for example . . .  in response to changed factual circumstances, or a change in administrations."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (citations, quotations marks, and alteration omitted).  And, in recognizing that it constituted a change in interpretation and thoroughly explaining the reasons for its interpretation and its departure from prior interpretations, the 2020 M-Opinion satisfies the APA, as "there is 'no basis in the [APA] or in [Supreme Court] opinions for a requirement that all agency change be subjected to more searching review.'"  *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1036–37 (D.C. Cir. 2012) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)); AR at 457 (2020 M-Opinion at 1) (citing the comprehensive historical report and reconsideration of relevant case law as reasons for withdrawing earlier opinion).

For these reasons, the 2020 M-Opinion is not arbitrary and capricious, and should be upheld.

### 3.    Interior is not precluded from issuing the 2020 M-Opinion.

Plaintiff argues that a 1979 decision by the Interior Board of Land Appeals (IBLA), *Impel Energy Corporation*, prohibits the Department issuing any opinions inconsistent with the reasoning of the case.  Mot. for PI, ECF No. 2-1, at 10 (citing *Impel Energy Corp.,* 42 IBLA 105).  This argument misunderstands the *Impel* case's holding as well as the relationship between IBLA, the Secretary, and the Solicitor.  Plaintiff essentially has it backwards: Solicitor's Opinions bind the Department, including the IBLA and other parts of the Department's Office of Hearings and Appeals (OHA)—not vice versa.  Additionally, Plaintiff seeks to rely on the

doctrine of *res judicata*, but that doctrine does not apply here and even if it did would not forever prohibit the Department from adopting different reasoning from that employed in *Impel*.

First, it is important to note that the *Impel* holding was considerably narrower than it would appear from Plaintiff's description.  In the case, Impel challenged a Bureau of Land Management (BLM) finding that the agency could not issue Impel tribal leases to the riverbed because those submerged lands belonged to North Dakota.  The case's holding did not definitively resolve the status of the riverbed property at issue but merely held BLM's reasoning was insufficient and remanded its leasing decision:

> [W]e hold that the reasoning set forth in BLM's decision of April 19, 1978, will not support rejection of Impel's applications to lease for oil and gas. . . . [T]he decision appealed from is reversed and the applications are remanded to BLM for their further consideration consistent herewith.

42 IBLA 105, 114.  While BLM did, on remand, issue Impel leases to the riverbed, Impel never acted on those leases, and the leases have long expired.  Thus, the *Impel* holding, limited as it was to a single, expired BLM leasing decision, is obsolete and no longer has any practical relevance.  It is thus incorrect to say the 2020 M-Opinion "reversed" the *Impel* decision; there was nothing left to reverse.  Mot. for PI, ECF No. 2-1, at 10.

Moreover, the IBLA does not have authority to adjudicate title.  The Board is delegated limited authority to "decid[e] matters within the jurisdiction of the Department. . . ."  43 C.F.R. § 4.1 (emphasis added).  And the Department's authority does not extend to "the authority to adjudicate legal title to real property," which "is a judicial, not an executive, function."  *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 752 (10th Cir. 2005); *see generally Borax Consolidated, Ltd. v. City of Los Angeles*, 296 U.S. 10 (1935); *see also*, e.g., *United States v. Louisiana*, 229 F. Supp. 14, 19 (W.D. La. 1964) (Interior lacks authority to determine land ownership through land surveys); *Pueblo of Santa Clara,* 40 IBIA at 255 (the Bureau of Indian Affairs does not have

authority to "render decisions in title disputes").  In *Impel*, the IBLA had authority to decide the concrete dispute before it:  whether BLM could issue the requested leases to Impel Energy.  The IBLA could not, and therefore did not, decide the ultimate status of title to the property at issue.

Regardless, the 2020 M-Opinion does have the power to abrogate the reasoning in prior IBLA decisions.  IBLA possesses only the delegated power of the Secretary.  43 C.F.R. § 4.1.  IBLA's power to decide matters is not superior to that of the Secretary; to the contrary the IBLA's authority is exercised "subject to any limitations on its authority imposed by the Secretary."  *Id.*; *see also* 43 C.F.R. § 4.5(a) ("Nothing in this part shall be construed to deprive the Secretary of any power conferred upon him by law.").  The Solicitor is the Department's primary legal officer, and the Secretary has delegated to that office the authority to issue M-Opinions to provide "final legal interpretations . . . on all matters within the jurisdiction of the Department."  Department of Interior Manual, 209 D.M. 3.2(A)(11), available at https://go.usa.gov/xG4Rh.

The IBLA itself has held numerous times that "it is well settled that the Solicitor's M-Opinions are binding on the Board, which is a constituent part of the Office of Hearings and Appeals (OHA)."  *Pueblo of San Felipe*, 190 IBLA 17, 29 (Apr. 5, 2017).  This interpretation is reflected in the Department's Manual which recognizes that the Board's authority "does not include authority. . . [t]o overrule, modify, or disregard formal legal interpretations (M-Opinions) issued by the Solicitor."  Department of Interior Manual, 211 DM 13.9(C), available at https://go.usa.gov/xG4nC.  This view is also documented in multiple opinions from the Solicitor's office.  *See, e.g.*, M-Opinion M-37003 (January 18, 2001) ("[W]e wish to reaffirm that Solicitor's M-Opinions are binding on the OHA."), available at https://go.usa.gov/xG4ng.  Thus, even if the 2020 M-Opinion did "reverse" the *Impel* decision, as Plaintiff claims, this is

within the Solicitor's power; the Department is not forever bound by the reasoning in decades-old IBLA decisions.

Nor is the Department forever bound to follow the reasoning in the *Impel* decision by *res judicata*, as the Plaintiff argues.  Mot. for PI, ECF No. 2-1, at 12.  *Res judicata* is an umbrella term referring to "two distinct doctrines regarding the preclusive effect of prior litigation." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020); *Taylor v. Sturgell,* 553 U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'").  The first doctrine encompassed by *res judicata* is "issue preclusion (sometimes called collateral estoppel)," which precludes a party from re-litigating an issue actually decided in a prior case and necessary to the judgment.  *Lucky Brand Dungarees,* 140 S. Ct. at 1594 (citations omitted).  The second doctrine is "claim preclusion (sometimes itself called res judicata)."  *Id.*  Plaintiff is not explicit but appears to be relying upon issue preclusion; regardless both are addressed below.

First, Plaintiff plainly cannot rely upon claim preclusion.  Claim preclusion prevents "repetitious litigation involving the same cause of action or the same issues."  *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983).  A subsequent lawsuit will be precluded "if there has been a prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction."  *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006).  The Plaintiff was not a party to *Impel*; the parties were BLM, Impel Energy Corporation, and the State of North Dakota as intervenor.  42 IBLA 105.  Because the Plaintiff was not party to the litigation, it has no legal right to raise claim preclusion.[8]

---

[8] In addition, *res judicata* is primarily employed as a defense, used by a defendant to "bar[] a second suit

Second, Plaintiff cannot rely on issue preclusion.  The Supreme Court has rejected the

application of non-mutual offensive issue preclusion against the United States.  *See United States*

*v. Mendoza*, 464 U.S. 154, 162 (1984); *see also Am. Med. Int'l Inc. v. Sec'y of Health, Educ. &*

*Welfare*, 677 F.2d 118 (D.C. Cir. 1981) (per curiam).  Regardless, it is a plaintiff's burden to

show the requirements of issue preclusion that include:

> First, the same issue now being raised must have been contested by the parties and
> submitted for judicial determination in the prior case. Second, the issue must have
> been actually and necessarily determined by a court of competent jurisdiction in
> that prior case. . . . Third, preclusion in the second case must not work a basic
> unfairness to the party bound by the first determination.

*Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (citations and

footnote omitted).  Plaintiff has failed to make any showing at all as to these factors.  Moreover,

Plaintiff was not party to the prior administrative case, IBLA's ruling was limited only to the

sufficiency of BLM's reasoning in 1979, and preclusion here, forty-one years later, works a basic

unfairness to the Department's ability to execute its responsibilities in a changing legal

landscape.  Plaintiff has cited no case applying *res judicata* in circumstances analogous to this

case; indeed, the case Plaintiff relies on recognizes that "[t]he Department has repeatedly ruled

that its decisions are not to be controlled by the same strict doctrine of res judicata which obtains

as to judgments of the courts."  *West v. Standard Oil Co.*, 278 U.S. 200, 214 n.4 (1929).

Regardless, even if a plaintiff has proven each element of issue preclusion is present, the

application of the doctrine "is inappropriate if there has been an intervening 'change in

controlling legal principles.'"  *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 306 (D.C. Cir.

2015) (citation omitted); *Bobby v. Bies*, 556 U.S. 825, 834 (2009) ("[C]hange in [the] applicable

---

based on the same cause of action." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955).  It is not
typically available for use offensively, especially by an entity that was not party to the prior litigation, as
Plaintiff seeks to do here. *Id.*

legal context" obviates issue preclusion (second alteration in original) (quoting Restatement (Second) of Judgments § 28, cmt. c (Am. Law Inst. 1980))); *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 363 (1984) (refusing to find a party bound by "an early decision based upon a now repudiated legal doctrine"); *Montana v. United States*, 440 U.S. 147, 155, 157–58 (1979) (asking "whether controlling facts or legal principles ha[d] changed significantly" since a judgment before giving it preclusive effect and also explaining that a prior judgment was conclusive "[a]bsent significant changes in controlling facts or legal principles" since the judgment); *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 559 (1948) (issue preclusion "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally").  The change-in-law exception recognizes that applying issue preclusion in changed circumstances may not "advance the equitable administration of the law." *Bobby*, 556 U.S. at 836–37; *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019).

Here, there has clearly been such a change in legal principles.  IBLA decided *Impel* before the *Montana*, *Alaska*, and *Idaho* Supreme Court cases clarified the relevant legal standard. *See* Section IV(A)(2), *supra*.  *Impel* relied on earlier Supreme Court caselaw as well as *United States v. Finch* as support for its ruling. 548 F.2d 822 (9th Cir. 1976), *vacated* 433 U.S. 676 (1977) (per curiam); *Impel Energy Corp.,* 42 IBLA 105, 113.  *Finch* was a Ninth Circuit case proceeding nearly parallel with *Montana v. United States* that was directly abrogated by the Supreme Court in *Montana*.[9]  Based on *Finch* and the pre-*Montana* Supreme Court caselaw,

---

[9] Even before *Montana*, the Supreme Court had reversed *Finch* on jurisdictional grounds.  *See Finch v. United States*, 433 U.S. 676 (1977).  This calls into question IBLA's reliance on the case even had it not been subsequently abrogated.

*Impel* reasoned simply that because the river was located within the Reservation, the riverbed must have been conveyed to the Nation.  42 IBLA 105, 114.  But a mere two years later the Supreme Court held this was insufficient to overcome the presumption of State ownership. *Montana,* 450 U.S. at 554.  This holding has been confirmed by subsequent Supreme Court cases.  *See* Section IV(A)(2), *supra*.  As discussed at length in Section IV(A)(2), above, the caselaw regarding the equal footing doctrine has changed substantially since the 1979 *Impel* decision.  This is a paradigmatic case of "an intervening change in controlling legal principles" where res judicata principles do not apply.  *Canonsburg Gen. Hosp.*, 807 F.3d at 306 (internal citation and quotation marks omitted).

Finally, Plaintiff's theory that a 1979 IBLA case prevents the Department from ever revising its legal position contravenes the well-established principle of administrative law that agencies have inherent authority to reconsider their decisions.[10]  *See Spanish Int'l Broad. Co. v. FCC*, 385 F.2d 615, 621 (D.C. Cir. 1967) ("The power to reconsider is inherent in the power to decide."  (quoting *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)); *Dun & Bradstreet Corp. Found. v. United States Postal Serv.*, 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review."); *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980) ("Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." (citing *Albertson*, 182 F.2d at 399)).

---

[10] Though this line of cases concern "decisions" that are generally final agency actions, the reasoning is equally applicable—if not more applicable—to internal agency opinions such as the 2020 M-Opinion at issue here.

In sum, Plaintiff's arguments that the 1979 IBLA decision forever bind's Interior is incorrect; the Department was free to adopt the 2020 M-Opinion and was not arbitrary and capricious in so doing.

### B.   Plaintiff has made no showing of irreparable harm.

Absent a showing of irreparable harm, no injunction may issue.  *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 165 (D.D.C. 2018).  The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England (Chaplaincy)*, 454 F.3d 290, 297 (D.C. Cir. 2006).  To obtain the requested injunction, the Nation must demonstrate that irreparable harm is likely, not just a "possibility."  *Winter*, 555 U.S. at 22.  It must provide actual evidence, not simply conclusory statements or unsupported allegations.  *Wisc. Gas Co.,* 758 F.2d at 674.  The injury "must be beyond remediation" and "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."  *Chaplaincy,* 454 F.3d at 297 (internal quotation omitted).  The Tribe must provide actual evidence, not simply conclusory statements or unsupported allegations;   "'bare allegations of what is likely to occur are of no value;' the movant must, instead, '*substantiate* the claim that irreparable injury is "likely" to occur.'"  *Cal. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171 (quoting *Wisc. . Gas Co.,* 758 F.2d at 674).

Plaintiff discusses how the 2020 M-Opinion directs Interior officials to take actions including "withdrawal of any existing oil and gas permits for extraction in submerged lands beneath the Missouri River" allegedly resulting in the Nation's loss of revenue from those permits.  Mot. for PI, ECF No. 2-1, at 15 (internal quotation omitted).  However, the loss of revenue from leases of submerged land is a monetary harm not sufficient to justify extraordinary

injunctive relief.  Courts in this Circuit have recognized that economic loss can constitute irreparable injury only in limited circumstances: where "monetary loss . . . threatens the very existence of the movant's business," . *Wis. Gas Co.*, 758 F.2d at 674, or where the claimed economic loss is unrecoverable, *Nat'l Mining Ass 'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011); *Dallas Safari Club v. Bernhardt*, No. 19-CV-03696 (APM), 2020 WL 1809181, at *5 (D.D.C. Apr. 9, 2020).  This is not the case here, nor has Plaintiff alleged it is.  And if royalties collected by the State are deemed improper, Plaintiff can sue to recover them.  The availability of such compensation "in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Wisc. . Gas Co.,* 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)).

Plaintiff also alleges that without an injunction it will suffer "loss of sovereign authority over the Tribe's historic lands."  Motion for PI, ECF No. 2-1, at 15 (citing *Mashpee Wampanoag Tribe v. Bernhardt*, No. 18-2242 (PLF), 2020 WL 3034854, at *3 (D.D.C. June 5, 2020), *appeal docketed,* No. 20-5237 (D.C. Cir. Aug. 7, 2020)).  But this argument assumes that the submerged lands were indeed held in trust for the Nation prior to the 2020 M-Opinion.  In fact, Interior does not have the power to decide whether the Tribe or State have sovereignty over the submerged lands. *See* Section IV(A)(2), *supra*.  Thus, the only tangible impact from the 2020 M-Opinion on the Nation comes from leasing decisions made in reliance on it and those decisions implicate monetary harm, not loss of sovereignty.  Plaintiff has not demonstrated the harm necessary to warrant extraordinary injunctive relief.

## C.    A preliminary injunction is not in the public interest.

Plaintiff's failure to show either irreparable harm or likelihood of success on the merits is reason enough to deny their motion for preliminary injunction.  The Court need not go further to

consider the balance of equities and public interest, since the Plaintiff's showing of entitlement to a preliminary injunction has already failed. *See Nken v. Holder*, 556 U.S. 418, 435–36 (2009) ("Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party."). But should the Court proceed to these factors, the balance of the equities and the public interest favor denying preliminary injunctive relief. In determining whether to grant preliminary injunctive relief, "courts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). When "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Id.* (internal citations omitted).

Here, the Constitution mandates that submerged lands under navigable waters that were not previously conveyed or reserved become the property of the States (here, North Dakota) upon entry to the union. *See, e.g.*, *Montana*, 450 U.S. at 552 ("A court deciding a question of title to the bed of a navigable water must . . . begin with a strong presumption against conveyance by the United States" contravening state ownership.). Absent a Congressional intent to reserve the riverbed that was "definitely declared or otherwise made very plain," *United States v. Holt State Bank*, 270 U.S. at 55, North Dakota is entitled to full ownership of the bed of the Missouri River. Congress did not do this here, and so the riverbed passed to the State. *See* Section IV(A)(2), *supra*. Thus, though the Nation alleges it will suffer a loss of sovereignty because of the 2020 M-Opinion, that opinion merely recognizes the property right which vested in North Dakota at statehood. In doing so, the 2020 M-Opinion is appropriately employing the strong, constitutional presumption in favor of the State. *See, e.g.*, *Oregon ex rel. State Land Bd.*,

38

429 U.S. at 374 ("[T]he State's title to lands underlying navigable waters within its boundaries is conferred not by Congress but by the Constitution itself.").

The public interest supports denial of a preliminary injunction here at least as strongly as when the principle that "a court sitting in equity cannot ignore the judgment of Congress" is implicated. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (internal citation and quotation marks omitted). Here, as when Congress has affirmatively spoken on a matter, the Court cannot exercise its discretion to reject the result that the Constitution commands. *Id.* (citations omitted); *see also Nken*, 556 U.S. at 436 (noting that "prompt execution of removal orders" serves the public interest by furthering "the streamlined removal proceedings" established by Congress and avoiding "a continuing violation of United States law" (internal quotation omitted)).

The Nation contends that the equities favor it because "a preliminary injunction will not substantially injure other interested parties." Mot. for PI, ECF No. 2-1, at 16 (internal citation and quotation marks omitted). Not so. The Supreme Court rejected a similar argument in *Nken*, holding that the public interest in preventing wrongful removal of aliens provides "no basis for the blithe assertion of an absence of any injury to the public interest when a stay is granted." 556 U.S. at 436 (internal quotation marks omitted). Rather, as the Supreme Court held, "there is always a public interest in prompt execution of removal orders" as delay undermines Congress's streamlined removal proceedings and "permits and prolongs a continuing violation of United States law." *Id.* (internal quotation marks omitted). The Court should thus reject the Nation's argument that the public interest is not harmed when an agency of the United States is prevented from carrying out the Constitution's command under the equal footing doctrine.

The Nation's reference to the United States' promises in its 1825 treaties regarding its aboriginal property is similarly unavailing.  *See* Mot. for PI, ECF No. 2-1, at 17.  As discussed, the relevant inquiry is whether the federal government intended to reserve the riverbed of the Missouri for the Tribe instead of conveying its title to North Dakota on that State's admission to the United States. *See* Section IV(A)(2), *supra*.  The Nation's invocation of the 1825 treaties as supporting a public interest—which, tellingly, they do not cite to support their claim to the riverbed—is simply unsupported.  Instead, the public interest and equities strongly favor denying the Nation's motion for preliminary injunction, because the 2020 M-Opinion is in accordance with, and furthers, the correct interpretation and application of United States constitutional law.

## V.     CONCLUSION

Plaintiff has failed to show that the 2020 M-Opinion is arbitrary and capricious or contrary to law.  On this basis Summary Judgement should be granted for the Federal Defendants as to Plaintiff's first claim, and no preliminary injunctive relief is warranted.  The 2020 M-Opinion correctly interprets the law and should be upheld.

Dated: September 1, 2020                 Respectfully submitted,

                                         JEAN E. WILLIAMS
                                         DEPUTY ASSISTANT ATTORNEY GENERAL
                                         Deputy Assistant Attorney General
                                         United States Department of Justice
                                         Environment and Natural Resources Division

                                         By: */s/ Reuben Schifman*
                                         REUBEN S. SCHIFMAN
                                         JACOB D. ECKER
                                         Trial Attorneys
                                         U.S.  Department of Justice
                                         Environment and Natural Resources Division

Natural Resources Section
P.O.  Box 7611
Washington, D.C.  20044-7611
Telephone: (202) 305-4224
reuben.schifman@usdoj.gov


*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MANDAN, HIDATSA, AND ARIKARA NATION, | |
| Plaintiff | |
| v. | Civil Action No. 1:20-cv-01918-ABJ |
| THE UNITED STATES Department of Interior, *et al.*, | |
| Defendants | |

**[PROPOSED] ORDER**

Pending before the Court are Plaintiff's Motion for Preliminary Injunction and Motion for Partial Summary Judgment (ECF No. 2) and Federal Defendants' Cross-Motion for Partial Summary Judgment (ECF No. 16).  For the reasons set forth in the Federal Defendants' Motion, the Court grants Federal Defendants' Motion and denies Plaintiff's Motions. Accordingly,

It is hereby ORDERED that Plaintiff's Motion for Summary Judgment and Motion for Preliminary Inunction is DENIED and Federal Defendants' Cross-Motion for Summary Judgment is Granted.

SO ORDERED this ___ day of _____, 2020.

Dated: _____

_____
The Honorable Amy Berman Jackson
United States District Judge

## **CERTIFICATE OF SERVICE**

I, Reuben S. Schifman, hereby certify that on Tuesday September 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and copies will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Reuben Schifman*
REUBEN S. SCHIFMAN

43