IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MANDAN, HIDATSA, AND ARIKARA )      Civ. No. 1:20-cv-1918-ABJ
NATION, )
)
)
Plaintiff, )
)
v. )
)
UNITED STATES DEPARTMENT OF )
THE INTERIOR, *et al.,* )
)
)
)
Defendants. )

---

**Intervenor-Defendant State of North Dakota's Reply in Support of Cross-Motion for Partial Summary Judgment**

---

## TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

Introduction ................................................................................................ 1

I.     *Impel* Does Not Control This Case. ...................................................... 5

II.    The Jorjani M-Opinion Is Not Arbitrary and Capricious. .............................. 11

       A.     *The Bed of the Missouri River Was Not Included in the Lands Reserved for the Tribes.* ..................................................... 11

       B.     *The Reservation's Purposes Are Not Compromised by State Title to the Riverbed.* ........................................................ 14

       C.     *Reservation Diminishment Is Irrelevant in an Equal Footing Doctrine Analysis.* .................................................................. 18

       D.     *The Riverbed Was Not Part of the 1949 Taking Act* ........................... 19

Conclusion ................................................................................................. 20

CERTIFICATE OF SERVICE ......................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Alaska v. United States,*
545 U.S. 75 (2005) ............................................................... 15, 17

*Balt. & Annapolis R.R. Co. v. Wash. Metro. Area Transit Comm'n,*
642 F.2d 1365 (D.C. Cir. 1980) .......................................... 10

*Chickasaw Nation v. United States,*
534 U.S. 84 (2001) ................................................................. 13

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001) .............................................................. 13

*Confed. Bands of Ute Indians v. United States,*
330 U.S. 169 (1947) .............................................................. 12

*Draper v. United States,*
164 U.S. 240 (1896) .............................................................. 16

*Hickel v. Oil Shale Corp.*
400 U.S. 48 (1970) .................................................................. 9

*Idaho v. United States,*
533 U.S. 262 (2001) ....................................................... 12, 13, 16

*Ivy Sports Medicine LLC v. Burwell,*
767 F.3d 81 (D.C. Cir. 2014) ................................................. 8

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) .............................................................. 15

*Montana v. United States,*
450 U.S. 544 (1981) ........................................................ 3, 11, 12

*Moore v. United States,*
157 F.2d 760 (9th Cir. 1946) ............................................... 16

*Moore v. United States,*
330 U.S. 827 (1947) .............................................................. 16

*Muckleshoot Indian Tribe v. Trans-Can. Enters. Ltd.,*
713 F.2d 455 (9th Cir. 1983) ............................................... 16

*Puyallup Indian Tribe v. Port of Tacoma*,
    717 F.2d 1251 (9th Cir. 1983) ................................................................. 16

*Skokomish Indian Tribe v. France*,
    320 F.2d 205 (9th Cir. 1963) ................................................................... 16

*Solenex LLC v. Bernhardt*,
    962 F.3d 520 (D.C. Cir. 2020) ............................................................... 8, 9

*United States v. Alaska*,
    521 U.S. 1 (1997) ..................................................................... 12, 14, 17

*United States v. Holt State Bank*,
    270 U.S. 49 (1926) ................................................................... 11, 12, 15

*United States v. Milner*,
    583 F.3d 1174 (9th Cir. 2009) .................................................... 15, 16, 17

*Utah Div. of State Lands v. United States*,
    482 U.S. 193 (1987) ................................................................................ 12

*Yankton Sioux Tribe v. Gaffey*,
    188 F.3d 1010 (8th Cir. 1999) ................................................................. 18

## Statutory Authorities

30 U.S.C. §§ 181(a) ..................................................................................... 8

30 U.S.C. §§ 226(a) .................................................................................... 8

30 U.S.C. § 352 ........................................................................................... 8

## Rules and Regulations

*43 C.F.R. § 4.1 ....................................................................................... 6, 7

43 C.F.R. § 4.5 .......................................................................................... 7

L. Civ. R. 7(e) ............................................................................................ 5

## Agency Opinions

*Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979) ......................... 2, 5, 6, 8, 9, 10, 11

M-37003 (Jan. 18, 2001) ............................................................................ 5

*Solicitor Jorjani's Opinion* M-37056 (May 26, 2020).......................... 1-15, 18, 19

*Solicitor Tompkins' Opinion* M-37044 (Jan. 18, 2017) ............................... 2, 3, 6, 8, 19

**Additional Authorities**

*\*Departmental Manual ("DM"), Browse the Library*, DOI, (last visited Oct. 18, 2020) https://www.doi.gov/elips/browse. (last visited Oct. 18, 2020) ......... 5, 6, 7

Roger L. Nichols, *Backdrop For Disaster: Causes of the Arikara War of 1823*, 14 *South Dakota Historical Society* 93 (1984) ........................................................... 13

*Treaty with the Arikara Tribe, 1825, reprinted in* Charles Kappler, Indian Affairs: Laws and Treaties (vol. II Treaties) 237 (1904) ....................................................... 14

\* Authorities upon which Intervenor-Defendant North Dakota chiefly relies are marked with asterisks.

## Introduction

The only claim presently before the Court is whether a Department of the Interior ("DOI") legal opinion is arbitrary and capricious under the Administrative Procedure Act ("APA"), as alleged by Plaintiff (the "Tribes") in Count One of their Complaint. *See* Compl. ¶ 67, ECF No. 1. As Federal Defendants and Intervenor-Defendant State of North Dakota (the "State") collectively have demonstrated, the answer is no. The May 26, 2020 M-Opinion by Solicitor Jorjani, based on a multi-year examination of the applicable law and an expanded factual record, reasonably found insufficient evidence to refute the heavy constitutional presumption of State ownership of the Missouri riverbed lands at issue. *Solicitor Jorjani's Opinion* M-37056 (May 26, 2020) (AR000457) (the "Jorjani M-Opinion"). The Equal Footing Doctrine demands that courts not strip state ownership of submerged lands unless Congress plainly ordained that result prior to statehood. The Tribes' disagreement with the Jorjani M-Opinion does not amount to an APA violation. Accordingly, the Court should reject the Tribes' APA claim.

The Tribes' Reply is circular, relying on a central premise that the Tribes own the Missouri River bed within their Reservation boundaries. This flawed assumption underlies the Tribes' near-identical arguments under various headings such as "precedent," "trust responsibility," "reliance interests," and the "1984 Restoration Act." The Tribes go so far as to suggest that the Jorjani M-Opinion's "analysis of the relevant history and law regarding ownership of the riverbed" is "an issue that the Court need not reach at this stage." Pl. Reply at 2 n.1, ECF No. 30 ("Pl. Reply"). But the Jorjani M-Opinion's analysis of Missouri riverbed ownership

within the Tribes' Reservation, and its conclusion based thereon that the State holds title to the riverbed under the Equal Footing Doctrine, is precisely the issue presented to the Court.

The Tribes fare no better on reply in their ongoing effort to end-run judicial review of this issue of first impression by misrepresenting the 1979 administrative opinion in *Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979), as "*res judicata.*" As an initial matter, the Jorjani M-Opinion partially withdrew the January 18, 2017 M-Opinion by former Solicitor Tompkins, not the *Impel* decision. *Solicitor Tompkins' Opinion* M-37044 (Jan. 18, 2017) (AR000091) (the "Tompkins M-Opinion"). Moreover, not even the Tompkins M-Opinion regarded *Impel* as dispositive, and neither should this Court. Also, the Tribes' aggrandizement of *Impel* notably fails to address: (1) why the Tompkins M-Opinion was necessary in the first place if DOI had previously and irrevocably resolved the riverbed ownership issue; (2) why the Tribes subsequently felt compelled to hire their own historian rather than rely on the Tompkins M-Opinion or on *Impel*; (3) why the Tribes now complain of an incomplete factual record if the Tompkins M-Opinion was based on a complete record; and (4) why DOI purportedly has not acted on the Tribes' requests since 2011 to prepare title documents and maps that would reflect Tribal ownership of Missouri riverbed lands. *See* Compl. ¶ 11, ECF No. 1.

In any event, no legal principle precludes the DOI Solicitor from reconsidering a legal position adopted in a prior Solicitor M-Opinion or an Interior Board of Land Appeals ("IBLA") decision. Solicitor Jorjani acted within his legal

authority and with good reason to revisit the Tompkins M-Opinion on Missouri riverbed ownership. And the IBLA's earlier decision on Impel Energy's specific lease request did not, and could not, broadly and irrevocably determine riverbed title in favor of the Tribes or anyone else. DOI best understands its own internal delegations and administrative procedures, and the Tribes' self-interested and incorrect views thereof merit little weight.

Nor can the Tribes distract from the Court's APA review of the Jorjani M-Opinion's analysis by asserting political and personal attacks or conspiracy theories against DOI (e.g., "a complaisant DOI Solicitor") and the State for a purported "give away" of riverbed lands to the State, particularly since the Tribe never owned them. *E.g.*, Pl. Reply at 1, ECF 30; Compl. ¶ 1, ECF No. 1. Oddly, the Tribes characterize this case that they brought against DOI's independently rendered legal opinion as if it were instead brought by or against North Dakota to "re-litigate" riverbed title. *See* Pl. Reply at 1, ECF 30. And tellingly, the Tribes' false narrative remains silent on the Tribes' own role behind promulgation of the prior Tompkins M-Opinion issued just two days before Inauguration Day and at the exclusion of the State. *See* State of North Dakota Cross-Mot. for Partial Summ. J. at 12-13, ECF No. 21 ("State Br.").

On the merits, the Tribes identify no reversible error in the Jorjani M-Opinion's analysis of the principal legal issue in this matter—application of the Equal Footing Doctrine to submerged lands under the Supreme Court's controlling standard in *Montana v. United States*, 450 U.S. 544 (1981). The Tribes admit that

courts "will not infer an intent to defeat a future State's title to inland submerged lands unless the intention was definitely declared or otherwise made very plain." Pl. Reply at 31, ECF 30. Yet despite their stated quibbles with the administrative record, the Tribes nowhere proffer evidence of such plain Congressional intent that the Jorjani M-Opinion failed to consider. Indeed, nothing in the Tribes' historical counter-narrative conveys the riverbed to them; instead, the Tribes' Reply still largely rests on summarily equating any conveyance of the river *surface* with the riverbed *sub*surface (much like the "precedent" that the Tribes cite), but they are not equal and involve entirely different legal standards. The Tribes' circumstantial arguments and cherry-picked, limited evidence of occasional fishing traps in the Missouri River are woefully insufficient to overcome the extensive evidentiary record before Solicitor Jorjani, and now this Court, that uphold the heavy presumption of State ownership through application of the Equal Footing Doctrine.

Because the Tribes' Reply largely does not respond to—much less rebut—Defendants' cited authority and evidence, and repeats the Tribes' prior citations already distinguished by Defendants, the State will not repeat those points here.[1]

---

[1] As it did for its opening brief, the State again met and conferred with Federal Defendants regarding cross-reply briefing as the Court instructed. *See* Op. and Order at 7, ECF No. 15. Federal Defendants verified that they do not file joint merits briefs with other parties and do not externally share drafts prior to filing. Also, unlike for the opening briefs, the Court required simultaneous cross-reply briefing by Defendants. *Id*. Nevertheless, consistent with the Court's Order and its opening brief, the State again has undertaken good faith efforts to minimize duplication in this Reply.

The State instead here addresses certain new misstatements in the Tribes' Reply.[2]

## I.   *Impel* Does Not Control This Case.

The DOI Solicitor statutorily exerted the Secretary's authority in rendering the Jorjani M-Opinion. State Br. at 3-11, ECF No. 21. Moreover, the IBLA lacks jurisdiction to adjudicate title. *Id.* at 9-10. In their Reply, the Tribes once again barely address the Solicitor's legal authority at all. Nevertheless, the Tribes baselessly maintain that DOI confirmed their claim to riverbed title based on an IBLA decision from 40 years ago in which they neither were a party nor had any property interest at issue. Their Reply instead only further reveals their misunderstanding of the IBLA and its *Impel* decision.

The Tribes still cite no authority for their novel proposition that the IBLA binds the Solicitor or DOI for all time. Nor does their Reply dispute any of Defendants' cited authorities such as Opinion M-37003 (Jan.18, 2001) and the DOI

---

[2] Inexplicably, the Tribes disregarded multiple requirements for their Reply. First, it is untimely; the due date was October 1, 2020, and the Tribes never requested an extension to file it on October 8, 2020. *Id.* Second, it is overlong; Local Rule 7(e) limits a reply brief to 25 pages, and the Tribes never requested leave to file a 38-page reply. Third, to the extent the Tribes' Reply raises new arguments, they are waived. *See* Federal Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. & Cross-Mot. for Partial Summ. J. at 19-20 n.7, ECF No. 17 ("Fed. Br.") (citations omitted). The Tribes summarily attempt to avoid waiver but cite no authority to wait until their Reply to newly raise issues relating to the merits of the Jorjani M-Opinion. *See* Pl. Reply at 4 n.4, ECF No. 30. If the Tribes had concerns with their original motion as a motion for partial summary judgment, they should not have so agreed before the Court. Order at 2, ECF No. 7 ("The parties are agreed that the pending motion for preliminary injunction can be considered to be plaintiff's motion for partial summary judgment on Count One and resolved together with defendants' cross-motion for partial summary judgment as to that Count.").

Departmental Manual ("DM") showing that only the opposite is true.[3] *See* State Br. at 3-8, ECF No. 21. What is more, the Tribes now *admit* that "[i]t is true that the Solicitor can authoritatively construe the law for the Department on a <u>prospective</u> basis and, in doing so, can abrogate the reasoning in prior IBLA decisions." Pl. Reply at 12, ECF No. 30. Even under the Tribes' rubric, the Jorjani M-Opinion is prospective because the Impel Energy leases previously before the IBLA (and now expired) are unaffected by the M-Opinion. By its plain terms, the Jorjani M-Opinion withdrew the 2017 Tompkins M-Opinion, not the *Impel* decision or the oil and gas leases at issue therein.

Try as they may, the Tribes cannot transform the IBLA's *Impel* decision into something it is not. Simply stated, the IBLA's purview is more limited than the Solicitor's. As its very name implies, the IBLA decides particular *appeals* properly before it, and nothing more. Specifically, the IBLA adjudicates "appeals to the head of the Department from decisions rendered by Departmental officials" from only certain DOI agencies, and "relating to" only particular types of matters, including federal oil and gas leasing.[4] 43 C.F.R. § 4.1(b)(2); *see also* 112 DM 13.8; 212 DM 13.5. Other types of disputes (e.g., on Indian lands) fall under the jurisdiction of other "Appeals Boards," or sometimes (e.g., Fish and Wildlife Service biological

---

[3] The Tribes elsewhere embrace the DM to argue the M-Opinion is a "final legal interpretation" that is "binding" on "all other Departmental offices and officials." Pl. Reply at 5, ECF No. 30. They also cite the DM to argue "consultation" obligations. *Id.* at 25.

[4] *Browse the Library, DOI,* (last visited Oct. 18, 2020) https://www.doi.gov/elips/browse.

opinions) there is no available Office of Hearings and Appeals administrative appeal remedy at all. *See* 43 C.F.R. § 4.1(b); 212 DM 13.8. Even where the IBLA has decided an appeal, the Secretary, including the Solicitor exerting by statute the Secretary's full legal authority, may revisit that prior IBLA decision. 43 C.F.R. § 4.5; 212 DM 13.6, 13.8. As the State showed, and the Tribes' Reply ignores, the Tribes' citation to "finally" in 43 C.F.R. § 4.1 merely indicates that an appellant receiving an adverse IBLA decision may next appeal to federal district court. State Br. at 5, ECF No. 21 (citation omitted); *see* Pl. Reply at 13, ECF No. 30.

Impel Energy's dispute fell within the IBLA's jurisdiction because the company appealed a Bureau of Land Management ("BLM") decision denying its applications for oil and gas leases. The IBLA conducted an adjudication of the dispute before it and reversed BLM's denial of certain leases to Impel. The IBLA had no occasion or authority to render decisions on legal title to the Missouri riverbed,[5] or to bind future Solicitor M-Opinions bearing on that issue.[6] Were it

---

[5] Nor did BLM have authority to render a decision on competing claims to mineral ownership. BLM's authority is limited to making decisions whether to *lease* mineral deposits "owned by the United States," 30 U.S.C. §§ 181(a), 226(a), or that are "within the lands acquired by the United States," 30 U.S.C. § 352. The Tribes identify no authority for BLM or the IBLA to adjudicate disputes among competing mineral ownership claimants for lands subject to leasing under these authorities. The Tribes' cited cases regarding factual inquiries into cadastral surveys are inapposite given that this case involves undisputedly submerged lands below navigable waters when North Dakota became a state. *See* Pl. Reply at 11, ECF No. 30. It defies reason to suggest that DOI—one party to the ownership dispute with a vested interest in its outcome—should have unilateral authority to resolve that dispute, unless Congress expressly so provides.

[6] The Tribes further mask the different respective authorities of the Solicitor and the IBLA by mislabeling the Jorjani M-Opinion as also an "adjudication." *See id.* at

otherwise, and were *Impel* truly dispositive of all title to the Missouri riverbed and underlying minerals, then former Solicitor Tompkins could not have reanalyzed that issue either. The Tribes cannot credibly champion and ask the Court to reinstate the Tompkins M-Opinion that they favor (and which did not consider *Impel* to be dispositive), while simultaneously contending that post-*Impel* any Solicitor "lacks the authority" to issue an M-Opinion expressing DOI's legal view on Missouri riverbed ownership. *See* Pl. Reply at 9, 19, ECF No. 30.

The Tribes also cannot place a limitations period on the Solicitor's authority. *See id.* at 15-16. The Tribes again mis-cite *Ivy Sports Medicine LLC v. Burwell,* 767 F.3d 81, 89 (D.C. Cir. 2014), which the State easily refuted because Congress here enacted no separate statutory process to revisit prior DOI decisions. State Br. at 7, ECF No. 21. The Tribes' new Reply argument that the Solicitor's authority "expired" based on the passage of time has also been refuted in this Circuit. *Solenex LLC v. Bernhardt*, 962 F.3d 520, 527 (D.C. Cir. 2020) ("But the law is well settled that '[d]elay alone is not enough' to strip the agency of its ability to act or to justify setting aside agency action.") (citation omitted). In *Solenex*, even cancellation of a more than 30-year-old lease based on alleged shortcomings at lease issuance was not arbitrary and capricious under the APA. *Id.* at 530. In any event, as a factual matter, the Tribes ignore that Solicitor Jorjani undertook this review directly on the heels of the 2017 Tompkins M-Opinion. State Br. at 7, ECF No. 21. Thus, it is

---

1, 2. Unlike the IBLA's actual adjudication of the *Impel* litigation, the Jorjani M-Opinion was not the product of a contested proceeding. Rather, it was occasioned by changes in governing law and a fuller factual record.

difficult to perceive what so-called "reliance interests" the Tribes could have accrued in that brief interim, and the administrative record evidences no injury to the Tribes beyond their inability to seize the State's mineral interests in the Missouri riverbed. *See* Pl. Reply at 2, 22-24, ECF No. 30; *Solenex*, 962 F.3d at 529 ("But unidentified and unproven reliance interests are not a valid basis on which to undo agency action.").

Finally, the Tribes cannot invoke the *Impel* decision as *res judicata*. Again, *res judicata* is fundamentally an affirmative *defense*, not a plaintiff's cause of action. State Br. at 8-9, ECF No. 21. The Tribes also conflate judicial decisions and *res judicata* with agency decision-making, and the result is predictably confusing. As noted above, the Jorjani M-Opinion is not a judicial judgment; therefore, the cases the Tribes cite regarding re-litigation of previous adjudications in contested proceedings are irrelevant. Moreover, the Tribes' argument fundamentally misapprehends not only *Impel,* but much of the case law they cite to support their novel position. For example, the Tribes cite a footnote in *Hickel v. Oil Shale Corp.* for the proposition that a DOI decision not appealed from is *res judicata*. Pl. Reply at 17, ECF No. 30 (citing 400 U.S. 48, 50 n.3 (1970)). However, *Hickel,* like *Impel* and other sources cited by the Tribes, relates to adjudication of a specific mining claim or lease.[7] *Hickel,* and *Impel,* may be *res judicata* as to *that lease or claim* and

---

[7] The Tribes' Reply cites a sentence in an article written by one of the State's counsel 20 years ago that 'individual IBLA decisions are binding on the Department with regard to the particular parties to the administrative adjudication under the doctrine of res judicata.' Pl. Reply at 17 n.10, ECF No. 30.  This statement is

between those *same parties*.[8] Here, the parties and leases (now expired) are not identical.

The Tribes also cite *Balt. & Annapolis R.R. Co. v. Wash. Metro. Area Transit Comm'n*, 642 F.2d 1365 (D.C. Cir. 1980), for the proposition that an agency cannot revise its legal interpretations where it is bound by *res judicata*. Pl. Reply at 18, ECF No. 30. That case involved an agency overruling *sub silentio* a decision that had been in effect for the previous 12 years. *Balt. & Annapolis R.R. Co.*, 642 F.2d at 1366. *Res judicata* did *not* apply and the court remanded for further analysis because the deciding agency had not provided any basis upon which the court could determine if its reversal of course was arbitrary and capricious. *Id.* at 1370, 1373. Here, by contrast, the Jorjani M-Opinion contains extensive, reasoned, and well-documented analysis. The Tribes' other citations fare no better.

In sum, the *Impel* decision is part of the administrative record in this case, and the Court thus may freely consider it. *See* State Br. at 11, ECF No. 21. But that is a far cry from the Tribes' attempt to tie the Court's hands to *Impel* in this APA challenge. DOI's regulations do not ordain such a result. Indeed, this case highlights the propriety of revisiting DOI's prior reasoning for future application.

---

entirely consistent with the State's position and does not suggest *Impel* has any binding effect beyond *particular parties* and on the *particular leases* at issue there.
[8] The Tribes' claim that it could (but does not) assert successor-in-interest privity with the federal government in *Impel* is misguided at best. *See id.* at 17 n.9. *Impel* was an appeal of a decision by a federal agency (BLM) denying Impel Energy certain specific leases. Not only are the parties not identical, the Tribes allege privity with a party advancing the opposite interests.  In other words, the Tribes' position fails both tests for whether *res judicata* applies.

Here, a review of the *Impel* ruling reveals its incorrect equation of the river and riverbed, and its inadequate analysis to overcome the Equal Footing Doctrine under the Supreme Court's binding legal test articulated in *Montana* two years after *Impel* and the expanded historical record before Solicitor Jorjani. Thus, the Tribes cannot evade the Court's independent review of the Jorjani M-Opinion's merits under the proper APA standard.

## II.   The Jorjani M-Opinion Is Not Arbitrary and Capricious.

The Jorjani M-Opinion is based on an extensive review of the independently-compiled historical record and legal precedent. *See* State Br. at 11-21. The Tribes' disagreement with the Jorjani M-Opinion does not make it arbitrary and capricious.

### A.   *The Bed of the Missouri River Was Not Included in the Lands Reserved for the Tribes.*

On Reply, the Tribes now argue that descriptions of reservation boundaries in Congressional and executive acts encompass the Missouri River. Pl. Reply at 27-28, 32-33, ECF No. 30. The State does not dispute that the identified River portions are within the Reservation bounds.  However, those acts conveying property interests to the Tribes do not contain a *single* reference to the bed of the river—and it is the bed, i.e., the "lands underlying navigable waters," to which the Equal Footing Doctrine applies. *United States v. Holt State Bank*, 270 U.S. 49, 54 (1926). The Tribes do not distinguish river from riverbed. They merge what the Supreme Court has kept distinct.

The Supreme Court has confirmed that a river's presence within a reservation is inconsequential for state riverbed title. "The mere fact that the bed of

a navigable water lies within the [reservation] boundaries described in the treaty does not make the riverbed part of the conveyed land . . . ." *Montana*, 450 U.S. at 554; *see also Holt State Bank*, 270 U.S. at 58 (inclusion of Mud Lake within Red Lake Reservation boundaries alone does not "effect . . . a disposal"). This is "especially" so where the treaty does not contain an "express reference to riverbed." *Montana*, 450 U.S. at 554; *see also Idaho v. United States*, 533 U.S. 262, 273 (2001); *Utah Div. of State Lands v. United States*, 482 U.S. 193, 202 (1987). There is a distinction between identifying a boundary that "merely . . . encloses" a navigable waterway, and establishing a reservation for purposes "that necessarily embraced certain *submerged lands*." *United States v. Alaska*, 521 U.S. 1, 39 (1997) ("*Alaska I*"). Solicitor Jorjani respected the juridical distinction between "navigable waters" and "submerged lands." Jorjani M-Opinion at AR000460-61.

The Tribes, citing generalized "canons of construction," ask the Court to interpret the Congressional and executive acts to include the riverbed. Such canons, however, were not applied in *Holt State Bank* nor in either *Idaho* or *Montana*. Solicitor Jorjani considered their application, but with good reason declined to apply them, noting that the Supreme Court has not invoked them since developing its two-part test in deciding Equal Footing Doctrine cases. Jorjani M-Opinion at AR000459 n.14.

And canons go only so far. They cannot be used to "hold that the Indians owned the lands merely because they thought so." *Confed. Bands of Ute Indians v. United States*, 330 U.S. 169, 180 (1947). "[C]anons are not mandatory rules," but

12

rather guides "'often countered . . . by some maxim pointing in a different direction.'" *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001)). Here, there is more than a conflicting maxim. There is a "default rule" that title passed to the State. *Idaho*, 533 U.S. at 272. The strong presumption of state title is founded in the United States Constitution and rebuttable only in exceptional instances of public exigency, and then only with a very plain expression of federal intent. Jorjani M-Opinion at AR000458-59 (citations omitted). It is this federal intent that determines whether a state has lost its equal footing title to a tribe, not what the tribe thought or intended. *See id.* In addition, during the decades preceding statehood there was uninterrupted, year-after-year river use by the federal government for a variety of purposes, as well as by private companies and thousands if not tens of thousands of non-Indians. State Br. at 16-18, ECF No. 21. The Tribes have no response to this non-Indian river use, which undermines their claim that the 1886 Agreement gave them control of both the river and its underlying lands.[9]

---

[9] The Tribes assert they needed access to the river to conduct trade. Pl. Reply at 30, ECF No. 30. But they cite nothing in support, and the record shows otherwise. *See Mem. from North Dakota to DOI* (Oct. 23, 2017) at AR000189-190. The Tribes further assert that in 1823 the Arikara fought "a war" over the river. Pl. Reply at 30, ECF No. 30. First, isolated hostilities that occurred so long before the 1886 Agreement have little if any relevance in interpreting it and deciding what North Dakota acquired at statehood in 1889. Second, a war was not fought. According to the journal article cited by the Tribes, a couple battles were fought on the banks of the Missouri in present-day South Dakota and they were not fought over the river, but for a handful of other causes. *See id.*; Roger L. Nichols, *Backdrop For Disaster: Causes of the Arikara War of 1823*, 14 *South Dakota Historical Society* 93 (1984). The resulting treaty contains provisions indicating the Arikara either did not control the river or relinquished control of it. In the treaty, they acknowledged the

**B.** *The Reservation's Purposes Are Not Compromised by State Title to the Riverbed.*

"[A] critical factor" in deciding whether the government intended to deprive a state of its equal footing rights is determining whether state title to the riverbed would compromise the purposes for which the reservation was established. *Alaska I*, 521 U.S. at 39. The Tribes, however, do not explain their view of the purposes for which the Fort Berthold Reservation was established under the 1886 Agreement — presumably because accomplishing those purposes did not depend on Tribal use of or title to the riverbed.

"[R]epeatedly and consistently," Solicitor Jorjani found "the record demonstrates a consonant Executive and Congressional purpose for the Reservation to support the [Mandan, Hidatsa, and Arikara] Nation's agricultural and grazing activities, and to a lesser extent its hunting and timber resources." Jorjani M-Opinion at AR000463; *see also* Fed. Br. at 16-17, 22-26, ECF No. 17; State Br. at 14-15, ECF No. 21. Indeed, the preamble to the 1886 Agreement states the Reservation is to "'enable [Tribal members] to become wholly self-supporting by the *cultivation of the soil* and other *pursuits of husbandry*.'" Jorjani M-Opinion at AR000463.

Rather than address reservation purposes, the Tribes make the unsupported claim that they controlled the river in the 1800s. Pl. Reply at 30, ECF No. 30. They

_____

United States' "supremacy," allowed the government to regulate their "trade and intercourse," and agreed to "give safe conduct to all persons . . . authorized by the United States to pass through their country . . . ." *Treaty with the Arikara Tribe, 1825*, at arts. 2, 4, 5, *reprinted in* Charles Kappler, Indian Affairs: Laws and Treaties (vol. II Treaties) 237 (1904). There were no violent events between the Tribes and the United States in the decades preceding the 1886 Agreement. *See Mem. from North Dakota to DOI* (Oct. 23, 2017) at AR000197-199.

14

also state they used the river for various purposes, but Solicitor Jorjani found these uses of a limited scope and unlike the broad and life-sustaining uses of waterways as those described in Equal Footing Doctrine decisions involving Pacific Northwest tribes and the Coeur d'Alene Tribe. *See id.*; Jorjani M-Opinion at AR000466-67. Solicitor Jorjani considered tribal uses of the Missouri River, and finding little relationship between those uses and the Reservation's purposes to encourage farming and husbandry, concluded those purposes are not compromised by state title to the riverbed. He did not find the "exceptional instances" needed to rebut the strong presumption of State title. *See Holt State Bank*, 270 U.S. at 55. His decision is not erroneous, let alone the "'clear error of judgment'" needed to set it aside. *E.g., Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted).

The Tribes argue that Solicitor Jorjani misapplied the law by failing to consider *United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009), and *Alaska v. United States*, 545 U.S. 75 (2005) ("*Alaska II*"). Pl. Reply at 31, ECF No. 30. That these cases, or others, are unmentioned in the Jorjani M-Opinion does not mean Solicitor Jorjani failed to consider the applicable body of case law. More importantly, they do not yield a different result here.

*Milner* addressed a dispute over the boundary of the Lummi Tribe's reservation in the State of Washington. More particularly, it involved the reservation or non-reservation status of tidelands on the Pacific coast. The reservation was expanded under an 1873 Executive Order to include land bordering the ocean and described the reservation's seaward boundary as to "'the low-water

15

mark on the shore . . . .'" *Milner*, 583 F.3d at 1180 (citation omitted). Homeowners of lots adjoining the coast asserted that the tidelands were submerged lands under the Equal Footing Doctrine and as such passed to the State at statehood. *Id.* at 1183.[10] The Executive Order's express reference to the low-water mark, coupled with the facts that the Lummi "depended heavily on fishing and digging for shellfish as a means of subsistence" and needed the tidelands to access those resources, formed the basis on which the Court ruled for the Tribe. *Id.* at 1186. Unlike most Equal Footing Doctrine cases, the Executive Order in *Milner* did not generally refer to or encompass the body of water at issue, but rather described a specific location or mark on the underlying land, "the low-water mark" on the tidelands. *Id.* at 1180. This specificity allowed the Court to apply the Indian lands disclaimer provision in Washington's Enabling Act, which the Ninth Circuit had not done in prior submerged lands disputes arising in the State of Washington.[11]

The Supreme Court in *Montana* and *Idaho* did not rely on Indian land disclaimer provisions. The provisions should be applied as a shield to protect land already established as Indian land, and not as a sword to decide in the first instance the Indian or non-Indian status of land. This approach is consistent with *Draper v. United States*, 164 U.S. 240, 244 (1896), which requires that these provisions be

---

[10] The State did not claim the tidelands and did not intervene in the suit. *Milner*, 583 F.3d *at* 1184.

[11] *Id*. at 1185-86, compare *with Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983), and *Muckleshoot Indian Tribe v. Trans-Can. Enters. Ltd.,* 713 F.2d 455 (9th Cir. 1983), and *Skokomish Indian Tribe v. France*, 320 F.2d 205 (9th Cir. 1963), and *Moore v. United States*, 157 F.2d 760 (9th Cir. 1946), *cert. denied,* 330 U.S. 827 (1947)

reasonably interpreted to ensure the equality of states. Likewise, the North Dakota Constitution's disclaimer provision has no relevance here. State Br. at 21-22, ECF No. 21.

In *Alaska II,* the Court considered whether Executive Orders establishing Glacier Bay National Park expressed an intent to deprive Alaska of title to lands underlying Glacier Bay. 545 U.S. at 80-81. The Court referred to "the complex ecosystem of Glacier Bay and the surrounding land" and its importance for understanding the Park's purposes. *Id*. at 99. If submerged lands were not part of the Park, this would have undermined at least three purposes for the Park. *Id*. at 102. It would have impaired scientific study of the tidewater glaciers, impaired efforts to study and preserve interglacial forests found both above and below the tideline, and compromised protection of the flora and fauna in "Glacier Bay's complex and interdependent ecosystem." *Id*. Solicitor Jorjani applied the same kind of analysis.

The Tribes' review of *Milner* and *Alaska II* neglects the discussion of reservation purposes in those decisions, the "critical factor in determining federal intent." *Alaska I*, 521 U.S. at 39. The Tribes also seek to tie facts regarding establishment of the Fort Berthold Reservation to those regarding establishment of the Coeur d'Alene Reservation.  Pl. Reply at 32-34, ECF No. 30. Defendants have explained the significant dissimilarities between the two situations. *See* Fed. Br. at 21, ECF No. 17; *Mem. from North Dakota to DOI* (Oct. 23, 2017)  at AR000196-199. These differences extend from tribal uses of the waterways and what role those uses

had in tribal life, to the respective Tribes' communications and relationships with federal officials and what Congress and officials in Washington, D.C. knew about tribal uses of the waterways. Congress and those officials had been informed how the Coeur d'Alene Tribe used Lake Coeur d'Alene and the St. Joe River and how important, if not vital, those uses were to that Tribe. *See id.* at AR000196. In contrast, and based on the report by DOI's consulting historian, "there is little evidence" that uses of the Missouri River by the Mandan, Hidatsa, and Arikara "were prominent in the Executive's consideration of the [Fort Berthold] Reservation, and no evidence Congress was on notice or aware of these uses at all." Jorjani M-Opinion at AR000463. Federal officials could not have intended to protect Tribal river uses if they had no knowledge of them. That principle applies with even stronger force to the riverbed, which was divorced from any limited river uses. In this context, the Tribes' review of these uses is irrelevant. *See* Pl. Reply at 30, 35-37, ECF No. 30.

C.   ***Reservation Diminishment Is Irrelevant in an Equal Footing Doctrine Analysis.***

The Tribes assert that only Congress can diminish an Indian reservation, and if the Jorjani M-Opinion is not set aside it will constitute an unlawful diminishment of the Fort Berthold Indian Reservation. *Id.*at 37. This argument is a red herring because DOI has not diminished anything. Diminishment is "the reduction in size of a reservation." *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1017 (8th Cir. 1999). Confirming State title to the bed of the Missouri River does not reduce the size of the Reservation. The Reservation boundaries remain as drawn under the 1886

18

Agreement. In Equal Footing Doctrine cases, courts have not applied a reservation diminishment element to the analysis.

### D.   *The Riverbed Was Not Part of the 1949 Taking Act.*

Lastly, Defendants demonstrated that Congress did not take from or restore to the Tribes any title to the Missouri riverbed in conjunction with the Garrison Dam project. *See* Fed. Br. at 26-27, ECF No. 17; State Br. at 22-25, ECF No. 21. The Tribes offer no reply except to again cite the 1949 and 1984 statutes and the Tompkins M-Opinion. In particular, the Tribes do not respond to the State's cited statements regarding the limits of what the United States acquired under the 1949 Taking Act. Namely, the Corps of Engineers (the responsible agency for the Dam project) made clear that the riverbed was not among the lands acquired, and the Tribal Chairperson, Tribal attorney, and a sponsor of the 1984 Restoration Act explained that the land taken under the 1949 Act was of three kinds—cropland, pasture, and woodlands—which necessarily excludes submerged lands. *See* State Br. at 23-25, ECF No. 21. Solicitor Jorjani set forth other reasons why the 1949 Taking Act did not include the riverbed. *See* Jorjani M-Opinion at AR000468-470.

Because the 1984 Restoration Act restored to the Tribes only what was taken from them, it could not affect the riverbed. The Tribes invoke a canon of construction that any doubt about legislation enacted to benefit a tribe should be resolved in the tribe's favor.  Pl. Reply at 37, ECF No. 30. The scope of the 1984 Act, however, depends entirely on what lands were taken under the 1949 Act. It is the 1949 statute that requires interpretation, but because it was enacted to benefit the Dam project rather than the Tribe, the canon is inapplicable to it.

## Conclusion

For the reasons above and in the States' opening brief, and the reasons set forth by Federal Defendants, the Court should grant summary judgment for Defendants on Count One of the Tribes' Complaint.

October 22, 2020.

**STATE OF NORTH DAKOTA**
**WAYNE STENEHJEM**
**ATTORNEY GENERAL**

*/s/ Nessa Horewitch Coppinger*

Nessa Horewitch Coppinger (DC Bar No. 477467)
James Auslander (DC Bar No. 974898)
Peter Schaumberg (DC Bar No. 913202)
Special Assistant Attorneys General
1350 I St. NW, Suite 700
Washington, DC 20005
Telephone:      (202) 789-6053
Facsimile:      (202) 789-6190
Email:  ncoppinger@bdlaw.com
         jauslander@bdlaw.com
         pschaumberg@bdlaw.com

*Attorneys for Intervenor-Defendant State of North Dakota.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and copies will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Nessa Horewitch Coppinger*

Nessa Horewitch Coppinger