**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MANDAN, HIDATSA, AND ARIKARA NATION, | ) ) ) |
| *Plaintiff and Intervenor Crossclaim Plaintiff,* | ) ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.* | ) ) ) |
| *Defendants and Crossclaim Plaintiffs,* | ) ) ) |
| and | ) ) |
| THE STATE OF NORTH DAKOTA, | ) ) ) |
| *Intervenor Defendant and Crossclaim Defendant.* | ) ) ) |

Civil Action No. 1:20-cv-01918-ABJ

**PLAINTIFF MANDAN, HIDATSA AND ARIKARA NATION'S BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS AS TO CROSSCLAIM**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................... 1

MATERIAL FACTS NOT IN DISPUTE............................................................................ 2

ARGUMENT ............................................................................................................. 6

I.   The Legal Standard Governing Judgment On The Pleadings................................. 6

II.  The Undisputed Material Facts Establish As A Matter Of Law That The United States
     Owns The Riverbed In Trust For The MHA Nation's Benefit.................................. 6

III. The Ownership Of The Riverbed Is Res Judicata................................................ 13

CONCLUSION.......................................................................................................... 17

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Akbar v. United States,*
  2024 WL 1701638 (D.D.C. 2024) ......................................................................2

*Alaska v. United States,*
  545 U.S. 75 (2005).............................................................................. *passim*

*Alexander v. City of Chicago,*
  994 F.2d 333 (7th Cir. 1993) ...........................................................................6

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
  501 U.S. 104 (1991)........................................................................................14

*B&B Hardware, Inc. v. Hargis Indus., Inc.,*
  575 U.S. 138 (2015)........................................................................................15

*Board of Regents of Univ. of Wisc. System v. Phoenix Int'l Software, Inc.,*
  653 F.3d 448 (7th Cir. 2011) .........................................................................15

*Brewer-Elliott Oil & Gas Co. v. United States,*
  260 U.S. 77 (1922)....................................................................................10, 11

*Burbridge v. Bradley Lumber Co.,*
  214 Ark. 135 (Ark. 1948) .................................................................................9

*Choctaw Nation v. Oklahoma,*
  397 U.S. 620 (1970)..................................................................................10, 11

*Coates v. U.S.,*
  124 Ct. Cl. 806, 110 F.Supp. 471 (1953).........................................................9

*Consolidated Towing Co. v. Hannah,*
  509 F.Supp. 1031 (W.D. Mo. 1981) .................................................................9

*Federated Department Stores, Inc. v. Moitie,*
  452 U.S. 394 (1981)........................................................................................17

*Gunter v. Atlantic Coast Line R. Co.,*
  200 U.S. 273 (1906)........................................................................................14

*Handly's Lessee v. Anthony,*
  5 Wheat. 374, 5 L.Ed. 113 (1820).....................................................................9

*Idaho v. United States,*
    533 U.S. 262 (2001)................................................................................7, 12

*Impel Energy Corp.,*
    42 IBLA 105 (Aug. 16, 1979).......................................................... *passim*

*Lapides v. Bd. of Regents of Univ. System of Georgia,*
    535 U.S. 613 (2002)..............................................................................14, 15

*Metlakatla Indian Community v. Dunleavy,*
    58 F.4th 1034 (9th Cir. 2023) ....................................................................10

*Missouri v. Arkansas,*
    213 U.S. 78 (1909)........................................................................................9

*Montana v. United States,*
    450 U.S. 544 (1981)....................................................................................12

*New Hampshire v. Ramsey,*
    366 F.3d 1 (1st Cir. 2004)...........................................................................15

*Nishimatsu Const. Co. v. Houston Nat'l Bank,*
    515 F.2d 1200 (5th Cir. 1975) ......................................................................2

*North Star Terminal & Stevedore Co. v. State,*
    857 P.2d 335 (Alaska 1993)........................................................................17

*Schuler v. PricewaterhouseCoopers, LLP,*
    514 F.3d 1365 (D.C. Cir. 2008) ....................................................................6

*Silver Eagle Mining Co. v. Idaho,*
    280 P.3d 679 (Idaho 2012)..........................................................................16

*Southern Pacific R. Co. v. United States,*
    168 U.S. 1 (1897).........................................................................................16

*Sunshine Anthracite Coal Co. v. Adkins,*
    310 U.S. 381 (1940).....................................................................................16

*Tapp v. Wash. Metro. Area Transit Auth.,*
    306 F. Supp. 3d 383 (D.D.C. 2016) ..............................................................2

*U.S. v. Flower,*
    108 F.2d 298 (8th Cir. 1939) ........................................................................9

*U.S. v. Tohono O'Odham Nation,*
    563 U.S. 307 (2011).....................................................................................15

*Underwood Livestock, Inc. v. United States,*
    417 F. App'x 934 (Fed. Cir. 2011) ...................................................................16

*United States v. Alaska,*
    521 U.S. 1 (1997) ..........................................................................................7, 12

*United States v. ITT Rayonier, Inc.,*
    627 F.2d 996 (9th Cir. 1980) ..........................................................................17

*United States v. Milner,*
    583 F.3d 1174 (9th Cir. 2009), *cert denied,* 560 U.S. 918 (2010) ....................8, 12

*United States v. Sante Fe Pac. R. Co.,*
    314 U.S. 339 (1941) ..........................................................................................10

*Waters v. District of Columbia,*
    No. 18-2652 (ABJ), 2022 WL 715474 (D.D.C. March 10, 2022) ...........................6

*Wis. Dep't. of Corrs. v. Schacht,*
    524 U.S. 381 (1998) ..........................................................................................14

**Statutes**

Act of May 15, 1886, ch. 333, 24 Stat. 29, 44 (1886) ....................................................4

Pub L. 61 - 197, ch. 543, § 23,26 Stat. 989, 1032 (1891) ...............................................4

Pub. L 85-508, July 7, 1958, 72 Stat. 339 .....................................................................8

Pub. L. No. 81-437, ch. 790, 63 Stat. 1026 (1949) ....................................................5, 6

Pub. L. No. 98-602, tit. 2, 98 Stat. 3149, 3152 (1984) .................................................6

7 Stat. 259 .....................................................................................................................3

7 Stat. 261 .....................................................................................................................3

7 Stat. 264 .....................................................................................................................3

11 Stat. 749 ...................................................................................................................3

25 Stat. 676, chs. 180, 276-284 (1889) .........................................................4, 5, 11, 12

**Rules**

Fed. R. Civ. P. 12(c) ................................................................................................1, 2, 6

**Other Authorities**

2 KAPPLER, INDIAN AFFAIRS: LAWS AND TREATIES 881 (2d ed. 1904)......................3, 9

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
    1369 (3d ed.) ...............................................................................................................6

N.D. Const., art. XVI, § 203.2 (1889) .............................................................................5

H.R. Rep. No. 1025, 50th Cong., 1st Sess., p. 8 (1888) ..........................................11, 12

Restatement (First) of Judgments § 83 (1942)................................................................16

Restatement (Second) of Judgments § 24(1) (1982) ......................................................15

U.S. Const. amend XI .................................................................................................14, 15

U.S. Dep't of The Interior, General Land Office, Instructions to the Surveyors
    General of Public Lands of he United State for those Surveying Districts
    Established in and since the year 1850, at vii,, 12,
    https://glorecords.blm.gov/reference/manuals/1885_Manual.pdf .............................9

Plaintiff Mandan, Hidatsa, and Arikara Nation (the "MHA Nation") respectfully moves, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings on the federal crossclaim and the MHA Nation's Complaint in Intervention seeking to quiet title to the bed and banks of the Missouri River within the Fort Berthold Indian Reservation (the "Riverbed"). As shown below, title should be quieted in favor of the United States in trust for the benefit of the MHA Nation.

## INTRODUCTION

After North Dakota intervened in this action, the federal defendants filed a cross claim against North Dakota for a "declaratory judgment that the United States reserved the bed and banks of the Missouri River within the Fort Berthold Indian Reservation and, thus, the State did not acquire title to the Riverbed within the Reservation at the time of statehood." (Crossclaim p. 13). The crossclaim seeks "to quiet title to the United States' interests in the Riverbed and mineral interests underlying the Riverbed within the present boundaries of the Reservation." *Id*.  North Dakota claims title under the equal footing doctrine.  The federal defendants claim title in trust for the benefit of the MHA Nation.  The MHA Nation intervened in the federal crossclaim and claims beneficial title.

The Supreme Court has articulated a two-step test for ascertaining whether the United States has defeated the equal footing doctrine by setting submerged lands aside as part of a federal reservation: (1) whether the United States clearly intended to include submerged lands within the reservation; and (2) whether the United States expressed its intent to retain federal title to submerged lands within the reservation.  Here the relevant Treaties, Statutes and Executive Orders provide an affirmative answer to both questions, which defeats North Dakota's claim of title as a matter of law.

1

Furthermore, North Dakota's claim is barred by res judicata. Forty-five years ago, the State voluntarily submitted itself to the jurisdiction of the Interior Board of Land Appeals ("IBLA") to litigate the issue of whether it owns the Riverbed by virtue of the equal footing doctrine. The IBLA ruled against the State, and North Dakota chose not to seek judicial review of the issue. Accordingly, the IBLA decision is res judicata and precludes the State from re-litigating this issue.

## MATERIAL FACTS NOT IN DISPUTE

A motion brought under Rule 12(c) is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking at the substance of the pleadings and any judicially noted facts." *Tapp v. Wash. Metro. Area Transit Auth.*, 306 F. Supp. 3d 383, 391 (D.D.C. 2016) (internal citations and quotations omitted). "[T]he court need not accept factual allegations … as true 'insofar as they contradict ... matters subject to judicial notice,' nor is the court 'bound to accept the legal conclusions of the non-moving party.'" *Akbar v. United States*, 2024 WL 1701638, at *2 (D.D.C. 2024) (citations omitted). Here the following material facts are not in dispute:

1. The Department of the Interior and its Bureau of Indian Affairs ("BIA") are part of the United States government and hold and manage certain lands in trust for the MHA Nation. (Crossclaim ¶ 7 and N.D. Answer; Complaint in Intervention ¶ 4).[1]

2. The Fort Berthold Reservation is the permanent homeland of the MHA Nation. (Crossclaim ¶ 9 and N.D. Answer; Complaint in Intervention ¶ 5).

---

[1] North Dakota has not responded to the MHA Nation's complaint in intervention on the quiet title crossclaim. The State, "by [its] default, admits the plaintiff's well pleaded allegations of fact." *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

3.       The United States entered into its first treaties with the three Tribes that comprise the MHA Nation in 1825.  Treaty with the Arikara, 7 Stat. 259; Treaty with the Mandan, 7 Stat. 264; Treaty with the Hidatsa, 7 Stat. 261.  (Crossclaim ¶ 12 and N.D. Answer; Complaint in Intervention ¶ 6).  In these treaties, the United States acknowledged the Tribes' country and took the tribes of the MHA Nation under its protection. Arts. 1-3, 5.

4.        The three Tribes entered into a second treaty with the United States in 1851. 11 Stat. 749.  (Crossclaim ¶ 14 and N.D. Answer; Complaint in Intervention ¶ 7).  Article 5 of that treaty described the territory of the MHA Nation south and west of the Missouri as, in relevant part, extending up the Missouri River from the Heart River to the Yellowstone River.

5.       On April 12, 1870, President Grant signed an Executive Order setting land apart as a new reservation for the MHA Nation.  (Crossclaim ¶ 19 and N.D. Answer; Complaint in Intervention ¶ 8).  This Executive Order described the boundaries of the Fort Berthold Reservation as follows:

> [f]rom a point on the Missouri River 4 miles below the Indian village (Berthold), in a northeast direction 3 miles (so as to include the wood and grazing around the village); from this point a line running so as to strike the Missouri River at the junction of Little Knife River with it; thence along the left bank of the Missouri River to the mouth of the Yellowstone River, along the south bank of the Yellowstone River to the Powder River, up the Powder River to where the Little Powder River unites with it; thence in a direct line across to the starting point 4 miles below Berthold."  (emphasis added)

1870 Executive Order, reprinted in 2 CHARLES J. KAPPLER, INDIAN AFFAIRS: LAWS AND TREATIES 881 (2d ed. 1904) (hereinafter "Kappler").

6.       In 1880, President Hayes signed another Executive Order that, among other things, added lands to the north and east of the 1870 Reservation:

> And it is further ordered that the tract of country in the territory of Dakota, lying within the following-described boundaries, viz, beginning on the most easterly point of the present Fort Berthold Indian Reservation (on the Missouri River); thence north to the township line between townships 158 and 159 north; thence

west along said township line to its intersection with the White Earth River; thence down the said White Earth River to its junction with the Missouri River; <u>thence along the present boundary of the Fort Berthold Indian Reservation and the left bank of the Missouri River to the mouth of the Little Knife River</u>; thence southeasterly in a direct line to the point of beginning, be, and the same hereby is, withdrawn from sale and set apart for the use of the [MHA Nation], as an addition to the present reservation in said Territory.  (emphasis added)

(Crossclaim ¶ 22 and N.D. Answer; Complaint in Intervention ¶ 9).

7.     Congress, by an Act of May 15, 1886, authorized the executive branch to "negotiate with the various bands or tribes of Indians in Northern Montana and at Fort Berthold, in Dakota, for a reduction of their respective reservations" and "with the Coeur d'Alene Indians for the cession of their lands outside the limits of the present Coeur d'Alene reservation[.]" Act of May 15, 1886, ch. 333, 24 Stat. 29, 44 (1886).

8.     Later the same year, on December 14, 1886, the United States negotiated an agreement with the MHA Nation that Congress ratified in 1891.  Act of Mar. 3, 1891, ch. 543, § 23, 26 Stat. 989, 1032 (1891) (the Fort Berthold Allotment Act).  Article I of this agreement diminished the size of the Reservation by ceding to the U.S. lands "lying north of the forty-eighth parallel of north latitude, and also all that portion lying west of a north and south line six miles west of the most westerly point of the big bend of the Missouri River, south of the forty-eighth parallel of north latitude," while otherwise leaving the Reservation's remaining boundaries intact.  (Crossclaim ¶ 24 and N.D. Answer; Complaint in Intervention ¶ 10).

9.     Congress authorized the admission of the Dakota Territory, which included present-day North and South Dakota, to the Union by passing the Enabling Act of 1889.  25 Stat. 676 (1889).  (Crossclaim ¶ 32 and N.D. Answer; Complaint in Intervention ¶ 12).

10.     The Enabling Act required that, before each prospective state was admitted to the Union, it must enact an "ordinance[] irrevocable without the consent of the United States" that

> the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title . . . to all lands lying within said limits [of the state] owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.

25 Stat. 676, ch. 180, Sec. 4. The Act further provided that no "lands embraced in Indian, military, or other reservations of any character [shall] be subject to the grants . . . of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain." *Id.*, Sec. 10.

11.    In accordance with the Enabling Act, a Constitutional Convention was held in Bismarck, North Dakota, where the delegates selected to represent the citizens of the future State adopted the North Dakota Constitution on August 17, 1889. The North Dakota Constitution was ratified by voters on October 1, 1889, prior to North Dakota's admission to the Union. (Crossclaim ¶ 34 and N.D. Answer).

12.    The North Dakota Constitution provides that "[t]he people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States." N.D. Const., art. XVI, § 203.2 (1889).

13.    In 1949, the United States took title to more than 150,000 acres encompassing the Missouri River within the Reservation that would be flooded by the construction of the Garrison Dam and the creation of Lake Sakakawea (the "1949 Takings Act"). Pub. L. No. 81-437, ch.

790, 63 Stat. 1026 (1949).  (Crossclaim ¶¶ 54-56 and N.D. Answer; Complaint in Intervention ¶ 16).

14.    In 1979, the Interior Board of Land Appeals ("IBLA") issued an adjudication holding that the Missouri Riverbed within the boundaries of the Reservation is a part of the Reservation and is not owned by North Dakota. *Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979).  North Dakota had intervened in that action but did not seek review of that decision. (Crossclaim ¶ 30 and N.D. Answer; Complaint in Intervention ¶ 17).

15.    In 1984, Congress restored the mineral interests taken by the 1949 Takings Act to trust status for the benefit and use of the MHA Nation in the Fort Berthold Reservation Mineral Restoration Act (the "Restoration Act"). Pub. L. No. 98-602, tit. 2, 98 Stat. 3149, 3152 (1984). (Crossclaim ¶ 59 and N.D. Answer; Complaint in Intervention ¶ 18).

## ARGUMENT

## I.    The Legal Standard Governing Judgment On The Pleadings

"Parties are entitled to pretrial judgment on the pleadings 'if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law.'"  *Waters v. District of Columbia*, No. 18-2652 (ABJ), 2022 WL 715474, at *8 (D.D.C. March 10, 2022) (quoting *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008)).  A Rule 12(c) motion asks a court to address the merits of the parties' claims and defenses.  *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1369 (3d ed.).  Thus, "the standard courts apply for summary judgment and for judgment on the pleadings 'appears to be identical.'"  *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993).

## II.    The Undisputed Material Facts Establish As A Matter Of Law That The United States Owns The Riverbed In Trust For The MHA Nation's Benefit.

The undisputed material facts establish as a matter of law that the United States holds title to the Riverbed in trust for the benefit of the MHA Nation.[2]  North Dakota's claim of title under the equal footing doctrine does not survive scrutiny.

The Supreme Court's most recent decision on the applicability of the equal footing doctrine to a federal reservation is *Alaska v. United States*, 545 U.S. 75 (2005) ("*Alaska II*").  Relying on its earlier decision in *Idaho v. United States*, 533 U.S. 262, 273 (2001),[3] the Court laid down a two-step inquiry for determining when a new State does not obtain title to submerged land:

> [I]t is now settled that the United States can defeat a future State's presumed title to submerged lands . . . by setting submerged lands aside as part of a federal reservation. To ascertain whether Congress has made use of that power, we conduct a two-step inquiry. We first inquire whether the United States clearly intended to include submerged lands within the reservation. If the answer is yes, we next inquire whether the United States expressed its intent to retain federal title to submerged lands within the reservation. We will not infer an intent to defeat a future State's title to inland submerged lands unless the intention was definitely declared or otherwise made very plain.

*Alaska II*, 545 U.S. at 100 (citations and quotations omitted).  In this case, the answer to both of those inquiries is yes, which vitiates North Dakota's claim of title to the Riverbed.

In *Alaska II*, the Court had to determine whether an Executive Order setting aside a National Monument prior to Alaska statehood defeated Alaska's claim of title to the submerged lands within the Monument under the equal footing doctrine. The Court found that the first test was satisfied because the federal proclamation creating the reservation clearly placed the submerged lands within the federal boundaries. *Alaska II,* 545 U.S. at 102; *accord United States*

---

[2] The cultural and economic importance of the Missouri River to the MHA Nation is well documented. But because the issue of title in this case can be decided as a matter of law, it is not necessary to recite the historical facts showing the MHA Nation's ties to the river.

[3] In *Idaho*, the Court rejected the state's equal footing claim to lands submerged by Coeur d'Alene lake and the St. Joe river within the exterior boundaries of the Coeur d'Alene Indian reservation. It ruled that the United States holds title, in trust for the Coeur d'Alene Tribe, to those submerged lands. 533 U.S. at 265.

*v. Alaska*, 521 U.S. 1, 51 (1997) ("*Alaska I*") (where boundary line followed the extreme low water line of the Arctic Ocean, federal reservation "necessarily encompasses the periodically submerged tidelands").  Turning to the second inquiry, the Court held that "the provisions of the [Alaska Statehood Act] themselves suffice" to express the United States' intent to retain federal title to submerged lands within the reservation.  545 U.S. at 103.  Specifically, the Court relied on the proviso in the Act that the transfer of federal lands to Alaska "shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife nor facilities utilized in connection therewith, or in connection with general research activities relating to fisheries or wildlife."  *Id.* at 105.

Subsequently, the Ninth Circuit applied the *Alaska II* test to an Indian reservation in *United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009), *cert denied*, 560 U.S. 918 (2010).  The court held that the Executive Order establishing the Lummi Indian Reservation defeated the State of Washington's equal footing claim to tidelands within the reservation. The first inquiry was satisfied because the Executive Order "explicitly extend[ed] the reservation to the low-water mark, thereby including the tidelands."  *Id.* at 1185. The second inquiry was satisfied because Congress had "recognized the validity of the executive order reservation by requiring the new state to 'forever disclaim all right and title . . . to all lands . . . owned or held by any Indian or Indian tribes.'"  *Id.* at 1186.  This made it "abundantly clear here that Washington would not have title to the lands in question, thereby satisfying the second step of the congressional intent test." *Id.*  The court concluded that "the United States owns the tidelands and holds them in trust for the Lummi." *Id.*

This case is directly akin to *Idaho* and *Milner*, and the Ninth Circuit's analysis is equally applicable here.  As in *Milner*, the first step of the *Alaska II* inquiry is satisfied by the Executive

Orders that defined the MHA Nation's Reservation.  The Executive Order of 1870 described the

boundary as beginning and ending at "a point on the Missouri River."  Kappler, Vol. I, p. 881.

Further, both the 1870 and 1880 Executive Orders placed the north boundary of the Fort Berthold

Reservation on the "left" or outer north bank of the Missouri River, *id.* at pp. 881, 883, thereby

expressly including all the Riverbed within the Reservation.[4]  The significance of such a boundary

was explained by Chief Justice Marshall in *Handly's Lessee v. Anthony*, 5 Wheat. 374, 379, 5

L.Ed. 113 (1820):

> When a great river is the boundary between two nations or states, if the original
> property is in neither, and there be no convention respecting it, each holds to the
> middle of the stream. But when, as in this case, one State is the original proprietor,
> and grants the territory on one side only, it retains the river within its own domain,
> and the newly-created State extends to the river only. (emphasis added).

Here, the MHA Nation originally held title to the Missouri River and the land on both sides

based on aboriginal possession.  The Executive Orders diminished the MHA Nation's land but

---

[4] The Missouri River flows east and south after it enters North Dakota, toward the Mississippi. The "left" and "right" banks of the River are determined by looking downstream. *See* U.S. DEP'T OF THE INTERIOR, GENERAL LAND OFFICE, INSTRUCTIONS TO THE SURVEYORS GENERAL OF PUBLIC LANDS OF THE UNITED STATES FOR THOSE SURVEYING DISTRICTS ESTABLISHED IN AND SINCE THE YEAR 1850, at viii, 12, https://glorecords.blm.gov/reference/manuals/1855_Manual.pdf. ("Standing with the face looking down stream, the bank on the left hand is termed the 'left bank' and that on the right hand the 'right bank.' These terms are to be universally used to distinguish the two banks of [a] river or stream."); *Burbridge v. Bradley Lumber Co.*, 214 Ark. 135, 153 (Ark. 1948) ("We have judicial knowledge that in government surveys the left bank of a river means the bank corresponding with the left side of a person who is proceeding downstream; and the right bank is determined in like manner."). A number of courts have recognized that the left bank of the Missouri River is the east or north side. *See Missouri v. Arkansas*, 213 U.S. 78, 82 (1909) ("the left bank of the Missouri river, opposite the mouth of the Kansas or Kaw [River]"); *U.S. v. Flower*, 108 F.2d 298, 299 (8th Cir. 1939) (recognizing that the "right" of the Missouri River is the Nebraska bank while the "left" side is the Iowa side); *Coates v. U.S.*, 124 Ct. Cl. 806, 808, 110 F.Supp. 471, 473 (1953) (recognizing that the "left" bank of the Missouri River is the north side); *Consolidated Towing Co. v. Hannah*, 509 F.Supp. 1031, 1032 (W.D. Mo. 1981) (same)

expressly acknowledged that the land reserved for the MHA Nation still included the Missouri River and its bed.[5]

This conclusion as to the first part of the *Alaska II* test is reinforced by the Supreme Court's decisions in *Brewer-Elliott Oil & Gas Co. v. United States*, 260 U.S. 77 (1922) and *Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970), which addressed whether various portions of the bed of the Arkansas River had been included in Indian reservations. *Brewer-Elliott* involved the Osage Reservation, which was bounded on one side by "the main channel of the Arkansas river." 260 U.S. at 81. The United States brought suit to establish the Indians' right to the riverbed and the oil reserves beneath it, and the State of Oklahoma intervened to claim that the riverbed had passed to it at statehood. The Supreme Court held both that the segment of the Arkansas River in question was non-navigable and that "the title of the Osages as granted certainly included the bed of the river as far as the main channel, because the words of the grant expressly carry the title to that line." *Id.* at 87.

While *Brewer-Elliott* reserved the question whether the same result would follow had the river segment at issue been navigable, the Court subsequently found it "well settled that the United States can dispose of lands underlying navigable waters just as it can dispose of other public lands." *Choctaw Nation*, 397 U.S. at 633. The question presented there was whether treaty grants had conveyed title to the bed of a navigable portion of the Arkansas River to the Cherokee and Choctaw Nations. The river forms the boundary between the land granted to the Cherokees to the north and the Choctaws to the south, but the State of Oklahoma asserted title to the riverbed under the equal

---

[5] Extinguishment of a tribe's aboriginal title cannot be lightly implied and any doubts are resolved in favor of the tribe. *See United States v. Sante Fe Pac. R. Co.*, 314 U.S. 339, 354 (1941). Likewise, the Indian canon of construction requires that the Executive Orders be construed in favor of the MHA Nation. *See Metlakatla Indian Community v. Dunleavy*, 58 F.4th 1034, 1045-46 (9th Cir. 2023). In this case, however, resort to these canons is not necessary.

footing doctrine. The relevant treaties and land patents variously described the boundary as running "up" or "down" the River and "down the main channel of the Arkansas River." *See id.* at 628-30. The Court concluded that "the entire Arkansas River … was within the metes and bounds of the treaty grants to petitioners [the tribes]." *Id.* at 631. It noted that "the most specific language of those instruments is identical to that we said 'expressly' conveyed title to the river bed in *Brewer-Elliott*." *Id.* at 634. The Court reasoned that "[t]ogether, petitioners were granted fee simple title to a vast tract of land through which the Arkansas River winds its course. The natural inference from those grants is that all the land within their metes and bounds was conveyed, including the banks and bed of rivers." *Id.* Likewise, here the natural conclusion from the Executive Orders placing the north boundary of the Reservation on the outer bank of the Missouri River and describing the south boundary as beginning and ending at a point "on the Missouri River" is that all the riverbed within the Reservation belonged to the MHA Nation.

The second *Alaska II* step is satisfied here because the Enabling Act, which governed the admission of both North Dakota and Washington into the United States, required the new states to "forever disclaim all right and title to … all lands … owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, … said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." 25 Stat. 676, 677 (1889).[6] As the Ninth Circuit concluded, this made it "abundantly clear" that the

---

[6] The legislative history of the Enabling Act underscored that existing Indian reservations in the Territory of Dakota, including the Fort Berthold Reservation, were "excluded from the jurisdiction" of the new state. H.R. Rep. No. 1025, 50th Cong., 1st Sess., p. 8 (1888). It noted that "there are in the Territory of Dakota large Indian reservations, which by the terms of the bill are excluded from the jurisdiction of the proposed State. The Indian reservations and the number of acres in each are as follows: … Fort Berthold, 2,912,000 … making a total of 26,847,115 acres. This is more than one fourth of the entire area of the Territory." H.R. Rep. No. 1025, 50th Cong., 1st Sess., p. 8 (1888). Likewise, the minority view included in the report noted that "Another reason for opposing a division of Dakota, as provided in the pending bill, is found in the fact that

new states "would not have title to the lands in question, thereby satisfying the second step of the congressional intent test." *Milner*, 583 F.3d at 1186; *accord Alaska I*, 521 U.S. at 41-42; *Alaska II*, 545 U.S. at 103-10; *Idaho*, 533 U.S. at 275-78.

The premise of the equal footing doctrine is that new States enter the Union "on an 'equal footing' with the original 13 Colonies and succeed to the United States' title to the beds of navigable waters within their boundaries." *Alaska I*, 521 U.S. at 5. Under this doctrine, "the Federal Government holds [lands under navigable waters] in trust for future States, <u>to be granted to such States</u> when they enter the Union and assume sovereignty on an 'equal footing' with the established States." *Montana v. United States*, 450 U.S. 544, 551 (1981) (emphasis added). But North Dakota was admitted to the Union on the express conditions that it disclaim any right or title to Indian lands (which it did in its own Constitution), and the United States retained "absolute jurisdiction and control" over Indian lands and that the State was excluded from any jurisdiction over them. Further, Section 10 of the Enabling Act expressly states that no lands within any Indian reservation shall "<u>be subject to the grants</u> . . . <u>of this act</u> until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain." 25 Stat. 676, 679. Thus, North Dakota did not succeed to the United States' title to the Riverbed because the United States did not relinquish it. Instead, Congress explicitly expressed its intent to retain federal title over the entire Reservation, including the Riverbed.

Ultimately, the question of whether the Riverbed rests with the MHA Nation or the State "is a matter of federal intent." *Idaho*, 533 U.S. at 273, *quoting Alaska I*, 521 U.S. at 36. Applying the test used in *Alaska II* and *Milner*, the federal intent in this case is clear because (1) the 1870

---

there are in that Territory at this time nine Indian reservations, the jurisdiction over which is reserved to the United States, and excluded from the Territory and from the proposed State, so long as the Indian titles exist." *Id.* at 24.

and 1880 Executive Orders expressly defined the Reservation to include the Missouri River, and (2) Congress required North Dakota state to disclaim any right to Indian reservations and expressly withheld those lands from the State.

## III.    The Ownership Of The Riverbed Is Res Judicata

The ownership of the Riverbed as between the United States and North Dakota is res judicata because it was adjudicated in *Impel Energy Corp.*, 42 IBLA 105 (August 16, 1979). In that case, Impel Energy submitted applications to the Bureau of Land Management ("BLM") seeking oil and gas leases for a portion of the Riverbed. BLM denied the applications, asserting that lands underlying the Missouri River passed to North Dakota on the date of its admission to the Union and hence were unavailable for Federal leasing. Impel appealed this decision to the IBLA and argued that the Riverbed was "federally owned, because title to the lands was held by the United States in trust for the Indians of the Fort Berthold reservation from 1851 until title was transferred to the United States in 1949 to permit construction of the Garrison Dam and Reservoir." 42 IBLA at 110. North Dakota intervened in the IBLA proceeding and "argue[d] that the United States was without the power to transfer the subject lands, whether outright or in trust, to the Fort Berthold Indians, because title to such lands was held by the United States as trustee for the State of North Dakota until its admission to the Union." *Id.* at 110-11.

The IBLA ruled in favor of Impel: "We hold that the Treaty of Fort Laramie and the Executive Order of April 12, 1870, both of which were made prior to the admission of North Dakota to the Union, were effective conveyances to carry out a public purpose appropriate to the objects for which the United States held the Territory." *Id.* at 112. The Board concluded:

> We find that the language of the Treaty of Fort Laramie and the Executive Order of April 12, 1870, when considered with the case law and the various utterances made contemporaneously with the treaty, discloses an intention to include the lands underlying the Missouri River, insofar as it runs through the Fort Berthold reservation, among the lands of the reservation itself. The import of this finding is

13

<u>that title to the lands which Impel seeks to lease for oil and gas has never passed to</u>
the State of North Dakota.

*Id.* at 114 (emphasis added).  Although North Dakota could have sought judicial review of the

IBLA decision, it chose not to do so.

It is a "sound and obvious principle of judicial policy that a losing litigant deserves no

rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance

to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S.

104, 107 (1991).  This policy is embodied in the doctrine of res judicata, which precludes North

Dakota from re-litigating its claim of title to the Riverbed before this Court.  All of the prerequisites

for application of res judicata are satisfied here.

First, the IBLA had jurisdiction to decide the issue of title as between the United States and

North Dakota.  By voluntarily intervening in the *Impel* proceeding to litigate its claim of title to

the Riverbed, North Dakota waived its immunity and submitted itself to the jurisdiction of the

IBLA.  It is firmly established that a state waives its immunity by invoking the jurisdiction of a

federal tribunal.  "[T]he [Supreme] Court has made clear in general that 'where a State <u>voluntarily</u>

becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby

and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh

Amendment.'" *Lapides v. Bd. of Regents of Univ. System of Georgia*, 535 U.S. 613, 619 (2002)

(quoting *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284 (1906) (emphasis in *Lapides*).

The Court emphasized the "need to avoid inconsistency, anomaly, and unfairness," 535 U.S. at

620, and referenced Justice Kennedy's concurrence in *Wis. Dep't. of Corrs. v. Schacht*, 524 U.S.

381, 393-94 (1998) which had underscored the unfairness of allowing States to litigate under a

one-sided rule that "[s]hould the State prevail, the plaintiff would be bound by principles of res

judicata," but "[i]f the State were to lose ... it could void the entire judgment simply by asserting its immunity on appeal." *See* 535 U.S. at 620, 621.

Likewise, a state waives its immunity by voluntarily making itself a party in a federal administrative forum. "A state can waive its Eleventh Amendment immunity to suit … by a clear declaration that it intends to submit itself to the jurisdiction of a federal court or administrative proceeding." *New Hampshire v. Ramsey*, 366 F.3d 1, 15 (1st Cir. 2004). "When a state chooses to intervene in a federal case, it waives its immunity for purposes of those proceedings." *Board of Regents of Univ. of Wisc. System v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 463 (7th Cir. 2011). "To permit the state to reverse course would contravene the reasons for the doctrine of waiver by litigation conduct recognized by *Lapides* and *Lapides's* core concern that a state cannot selectively invoke its Eleventh Amendment immunity to gain litigation advantage." *Ramsey*, 366 F.d at 16-17.

Second, "[t]he now-accepted test in preclusion law for determining whether two suits involve the same claim or cause of action depends on factual overlap, barring 'claims arising from the same transaction.'" *U.S. v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011). The judgment in the first case extinguishes all claims "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Restatement (Second) of Judgments* § 24(1) (1982). Here the legal claim and the operative facts that determine it are the same as in *Impel*.

Third, res judicata applies to administrative adjudications. "[T]he [Supreme] Court's longstanding view [is] that '[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.' " *B&B*

*Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015) (citations omitted).  Accordingly, adjudications by the IBLA have preclusive effect in subsequent litigation.  *See Underwood Livestock, Inc. v. United States*, 417 F. App'x 934, 937-38 (Fed. Cir. 2011) (party bound by IBLA decision that its predecessors-in-interest lacked a valid right-of-way); *Silver Eagle Mining Co. v. Idaho*, 280 P.3d 679, 683 (Idaho 2012) (IBLA decision precluded subsequent quiet title action in state court).

Fourth, res judicata can be invoked by a plaintiff to resolve a quiet title action.  In one venerable decision, the Supreme Court held that res judicata resolved an action by the United States to quiet title to lands in California.  The Court adhered to "[t]he general principle announced in numerous cases [which] is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified."  *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48-49 (1897).  Accordingly, the Court declined to "go behind the former adjudication, and deny to the United States the benefit of the rule making that adjudication, so long as it was unmodified, conclusive, as between the parties to it, of all matters actually determined under the issues in the prior suits." *Id.* at 62.

Fifth, the MHA Nation can invoke *Impel* as res judicata because it is in privity with the United States.  "A judgment is res judicata in a second action upon the same claim between the same parties or those in privity with them." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402 (1940); *see generally Restatement (First) of Judgments* § 83 (1942).

16

Finally, North Dakota cannot avoid the preclusive effect of *Impel* by arguing that *Impel* was wrong or that the law governing application of the equal footing doctrine has changed in the following years. "[T]he res judicata consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). "The doctrine of res judicata does not depend on whether the prior judgment was free of error. If it did, judgments would lack finality, the very rationale of the rule of res judicata." *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1004 (9th Cir. 1980) (citation omitted).[7]

## CONCLUSION

The undisputed material facts establish that the equal footing doctrine does not apply to the Riverbed, and that the United States holds title to the Riverbed in trust for the MHA Nation. Further, the IBLA decision in *Impel* precludes North Dakota from re-litigating its claim of title to the Riverbed before this Court.

Accordingly, the Court should enter a judgment granting the following relief:

1.  Declaring that North Dakota did not receive title to the Riverbed or the underlying mineral interests when it entered the Union;

2.  Declaring that North Dakota has no right or title or interest in the Riverbed or its underlying mineral interest and no right of possession of the same;

---

[7] *See also North Star Terminal & Stevedore Co. v. State*, 857 P.2d 335, 338-40 (Alaska 1993) (even if legal principles controlling the equal footing doctrine had changed, "if prior judgments could be modified to conform with subsequent changes in judicial interpretations, we might never see the end of litigation").

3.    Declaring that the title to the Riverbed is quieted in favor of the United States, including the underlying mineral interests, to be held by the United States in trust for the MHA Nation's exclusive use, benefit, occupancy, and enjoyment;

4.    Declaring any North Dakota-issued leases to the Riverbed to be void ab initio;

5.    Permanently enjoining North Dakota from asserting any right, title, or interest in or to the Riverbed or underlying mineral interests, or otherwise interfering in any way with the exclusive possession, use, and occupancy of such lands by the United States or the MHA Nation;

6.    Permanently enjoining North Dakota from issuing any new leases relating to the minerals underlying the Riverbed;

7.    Issuing an injunction cancelling any North Dakota-issued leases to the Riverbed as unlawfully issued; and

8.    Compelling North Dakota to remit to the United States as trustee for the MHA Nation, or directly to the MHA Nation, any bonus, royalty, or other monies received by North Dakota from the leasing and/or production of minerals underlying the Riverbed, including pre- and post-judgment interest on all amounts at the maximum rate allowed by law.

Dated this 17th day of October, 2024.          Respectfully submitted,

**ROBINS KAPLAN LLP**

By: /s/ *Timothy Q. Purdon*

Timothy Q. Purdon (D.C. Bar No. ND0007)
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Tel:  (701) 255-3000
Fax: (612) 339-4181
TPurdon@RobinsKaplan.com

Timothy W. Billion (D.C. Bar No. SD0001)
140 North Phillips Avenue, Suite 307
Sioux Falls, SD 57104
Tel:  (605) 335-1300
Fax: (612) 339-4181
TBillion@RobinsKaplan.com

*and*

**HOLLAND & KNIGHT LLP**

Steven D. Gordon (D.C. Bar No. 219287)
Philip Baker-Shenk (D.C. Bar No. 386662)
800 17th Street, N.W., Suite 1100
Washington, D.C.  20006
steven.gordon@hklaw.com
philip.baker-shenk@hklaw.com
Tel: (202) 955-3000
Fax: (202) 955-5564

*Attorneys for Plaintiff Mandan, Hidatsa, and Arikara Nation*