**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| MANDAN, HIDATSA, AND ) | |
| ARIKARA NATION, ) | |
| ) | |
|     Plaintiff and Intervenor ) | |
|     Crossclaim Plaintiff, ) | |
| ) | |
|     v. ) | Civil Action No. 20-1918 (ABJ) |
| ) | |
| U.S. DEPARTMENT ) | |
| OF THE INTERIOR, *et al.*, ) | |
| ) | |
|     Defendants and ) | |
|     Crossclaim Plaintiffs, ) | |
| ) | |
|     and ) | |
| ) | |
| STATE OF NORTH DAKOTA ) | |
| ) | |
|     Intervenor-Defendant and ) | |
|     Crossclaim Defendant. ) | |
| ———————————————— ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

The question at the heart of this case is: who owns the riverbed underlying the portion of the Missouri River ("Riverbed") that runs through the Fort Berthold Indian Reservation ("Reservation") in central North Dakota? The question is not merely academic as the geographic area under the Riverbed is rich in oil and gas reserves.

Plaintiff, the Mandan, Hidatsa, and Arika Nation ("MHA Nation" or "Tribes"), filed this lawsuit in 2020 during the first administration of President Donald J. Trump against the U.S. Department of the Interior ("DOI"), the then-Secretary of the Department, and Daniel H. Jorjani, in his official capacity as the then-Solicitor of the Department of Interior (collectively "Federal

Defendants"). Compl. [Dkt. # 1]. It challenged an opinion issued by Jorjani in May 2020, which reversed the agency's longstanding position that the federal government held the Riverbed in trust for the MHA Nation, and purported to transfer ownership rights to the State of North Dakota. *See generally* Compl. The State of North Dakota intervened as a defendant in the matter in Count I, which challenged the opinion under the Administrative Procedure Act. *See* Op. and Order [Dkt. #15] (granting motion to intervene). While the motion for preliminary injunction, which had been deemed a motion for summary judgment, was pending, there was a change of administrations, and in early 2021, the incoming Department of Interior reviewed and withdrew the Jorjani opinion. This rendered Counts I and II, the claims in the complaint seeking to set aside and enjoin the implementation of the former Solicitor's opinion, moot. But as the Federal Defendants took steps to record title to the lands in dispute, and the parties moved forward to address the MHA Nation's claim for an accounting and the status of the existing oil and gas leases, the State of North Dakota successfully intervened in the remaining claims to seek to enforce its claimed ownership rights in the Riverbed. *See* Order (July 11, 2023) [Dkt. # 81]. Ultimately, the Federal Defendants were permitted to amend their answer to add a crossclaim seeking to quiet title to the Riverbed in favor of plaintiff MHA Nation, *see* Minute Order (July 23, 2024), and MHA Nation intervened in the crossclaim. *See* Pl.'s Compl. in Intervention as to Crossclaim [Dkt. # 101].

Pending before the Court are two dispositive motions: MHA Nation's motion for judgment on the pleadings, [Dkt. # 103] ("Pl.'s Mot. for J."), which the Federal Defendants have joined in part, and the Federal Defendants' motion for summary judgment on the crossclaim, [Dkt. # 119] ("Fed. Defs.' Mot. Summ. J."), which the MHA Nation has joined. Both motions present similar legal arguments, and North Dakota has opposed them both.

2

The Federal Defendants and MHA Nation maintain that the federal government possesses legal title to the Riverbed and holds it in trust for the MHA Nation. North Dakota contends that the state owns the Riverbed because, under a constitutional principle referred to as the "Equal Footing Doctrine," title passed to the state upon its admission to the Union in 1889. Federal Defendants and the MHA Nation urge the Court to answer the discrete and straightforward question presented based on the materials presented, but this question turns upon the consideration of several centuries of history, and the parties have proffered conflicting expert assessments of the underlying facts and the meaning of the handful of treaties, agreements, and other documents that relate to the Reservation and the Riverbed. Moreover, the federal government itself reversed its own opinion on Riverbed ownership both before and during this litigation.

In short, there appears to be a genuine dispute of material fact that must be resolved after a trial, during which the experts' opinions can be presented and explored through cross-examination. Therefore, and for the reasons to be set out in more detail below, the Court will deny the motion for judgment on the pleadings because it must look outside the pleadings and decide certain issues of fact to construe the meaning of the documents establishing the Reservation. The Court will also deny the motion for summary judgment without prejudice. Viewing the facts and drawing reasonable inferences in favor of North Dakota (the non-moving party), this case presents genuine disputes of material fact such that the Court cannot adjudicate the question of legal title to the Riverbed on the current record.

## THE FEDERAL GOVERNMENT'S POSITION ON THE OWNERSHIP
## OF THE RIVERBED & PROCEDURAL HISTORY

For more than eighty years, the Office of the Solicitor of the Department of Interior took the position that the Riverbed belonged to the MHA Nation. However, it reversed its position shortly after the first Trump administration came into office.

In 1936, DOI Solicitor Nathan Margold issued the first M-Opinion[1] addressing ownership of the Riverbed, finding that the Riverbed did not pass to North Dakota upon Statehood. Compl. ¶ 3. In 1949, the federal government then took land from the Reservation to build the Garrison Dam, which would then flood the stretch of the Missouri River within the Reservation. Compl. ¶¶ 4, 32. At that time, no one disputed the government's position, set forth clearly in the Margold Opinion, that the Riverbed belonged to the MHA Nation. *See* Compl. ¶¶ 4–6; Mem. in Supp. of Prelim. Inj. Mot. [Dkt. # 2-1] ("Prelim. Inj. Mem.") at 4. This conclusion remained in place through a total of thirteen presidential administrations, including those of Presidents Eisenhower, Nixon, Ford, Reagan, George Herbert Walker Bush, and George W. Bush.

In the early 1970s, one of the largest oil and gas fields in the United States was discovered beneath the Reservation. Compl. ¶ 34; *see also* Prelim. Inj. Mem. at 4. Unsurprisingly, this is when disputes arose over the ownership of the Riverbed. The energy company Impel sought federal oil and gas leases from DOI for the Riverbed within the Reservation, and those were contested in a proceeding before the Department's Interior Board of Land Appeals ("IBLA"). *See Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979). North Dakota, which was a party to the matter,

---

1    An "M-Opinion" refers to a legal opinion issued by the U.S. Department of the Interior's Office of the Solicitor. *See Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 277 n.8 (2d Cir. 2015); www.doi.gov/solicitor/opinions (last visited Jan. 6, 2026).

argued – as it does here – that it acquired title to the Riverbed under the Equal Footing Doctrine upon its admission to the Union in 1889.  *See id.* at 107, citing *Pollard's Lessee v. Hagan*, 44 U.S. 212 (1845); *Shively v. Bowlby*, 152 U.S. 1 (1894).  In 1979, the IBLA ruled that the Riverbed within the boundaries of the Reservation belonged to the MHA Nation and not the state.  *See Impel Energy Corp.*, 42 IBLA at 109.  North Dakota did not appeal the IBLA's decision, Fed. Defs.' Crossclaim [Dkt. #  98] ¶ 30; N.D. Answer to Crossclaim [Dkt. # 99] ¶ 30; Pl.'s Compl. in Intervention [Dkt. # 101] ¶ 17, and the federal government subsequently issued the oil and gas leases to Impel.    Compl. ¶ 42.

In 1984, Congress enacted the Fort Berthold Reservation Mineral Restoration Act, which restored the mineral interests covered by the 1949 Takings Act to trust status for the benefit and use of the MHA Nation.  Pub. L. No. 98-602, tit. 2, 98 Stat. 3149, 3152 (1984); Fed. Defs.' Crossclaim ¶ 59; N.D. Answer to Crossclaim ¶ 59; Pl.'s Compl. in Intervention ¶ 18.  Impel's leases were transferred to the Bureau of Indian Affairs, supposedly for the benefit of the plaintiffs. Compl. ¶ 42; Prelim. Inj. Mem. at 5.

Due to limitations in technology, the first attempts to extract oil and gas from the Riverbed were not successful.  But by the early 2000s, drilling technology had improved, and oil and gas extraction became viable.  Prelim. Inj. Mem. at 6.  At that point, North Dakota again asserted ownership to the Riverbed and issued its own competing oil and gas leases to private parties.  *Id.* at 6.  MHA Nation claims it is owed more than $200 million in back royalties from these competing leases.  Compl. ¶ 42; Prelim. Inj. Mem. at 7.

The MHA Nation repeatedly implored DOI to take action to formalize its ownership of the Riverbed within the Reservation.  *See* Compl. ¶¶ 50–53; Prelim. Inj. Mem. at 7.  In 2017, then-DOI Solicitor Hilary Tompkin issued another M-Opinion, which reaffirmed the 1936 Margold

5

Opinion and concluded that the mineral interests were held by the federal government in trust for the benefit of the MHA Nation.  Prelim. Inj. Mem. at 8, citing M-37044, *Opinion Regarding the Status of Mineral Ownership Underlying the Missouri River within the Boundaries of the Fort Berthold Reservation (North Dakota)* (Jan. 18, 2017).  After that, DOI began the process of recording the MHA Nation's title to the Riverbed.  *Id.*  Before that task could be completed, though, the Trump Administration halted the effort.  In May 2020, the incoming DOI Solicitor, Daniel Jorjani, issued a new M-Opinion, M-37056, reversing the agency's consistent position.  *Id.* at 9.  He announced that North Dakota held title to the Riverbed and that the permits previously issued by the federal government should be withdrawn.  *Id.*; Compl. ¶ 14.

In response, the MHA Nation filed the instant lawsuit on July 16, 2020.  *See* Compl. Count I of the complaint alleged that the Jorjani opinion – the M-Opinion issued by the DOI Solicitor reversing course on Riverbed ownership – was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and sought to have it set aside pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).  Compl. ¶¶ 64–67.  Count II alleged that the Jorjani Opinion violated the APA because it was the result of improper political pressure.  Compl. ¶¶ 70–76.  Count III sought to compel an accounting under the APA of the property held by the Federal Defendants in trust for the MHA Nation and any funds that had been collected or received in connection with that property.  Compl. ¶¶ 77–83.  Count IV alleged a breach of the agency's fiduciary duty to protect the Tribes' beneficial ownership of the Riverbed and sought an order compelling Federal Defendants to "collect, deposit and invest, or pay over funds" owed to the Tribes from the extraction of minerals underlying the Riverbed.  Compl. ¶¶ 84–89.

At the time it filed its complaint, the MHA Nation also moved for a preliminary injunction, asking the Court to enjoin the defendants from taking actions to implement the Jorjani Opinion. *See* Pl.'s Mot. Prelim. Inj. [Dkt. # 2].  On July 31, 2020, with the consent of the parties, the Court consolidated the motion for preliminary injunction with the merits of Count I pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See* Order [Dkt. # 7].  In August of 2020, North Dakota filed an expedited motion to intervene in the action as of right under Federal Rule of Civil Procedure 24(a)(2) with respect to Count I.  Expedited Mot. to Intervene [Dkt. # 10].  The Court granted the motion, *see* Op. & Order [Dkt. # 15], and North Dakota filed an answer with respect to the Count I allegations.  Answer [Dkt. # 26].

By the time the motion for preliminary injunction was fully briefed in 2021, there had been another change in presidential administrations.  Upon taking office, the Biden Administration appointed a new DOI Solicitor, Robert T. Anderson.  DOI issued another M-Opinion on February 4, 2022, *see* Joint Status Rep. [Dkt. # 55], which reversed the Jorjani opinion and found that the "minerals underlying the submerged lands in question here are held in trust for the Nation, consistent with the Department's position since at least 1936."  *See* M-37073, *Opinion Regarding the Status of Mineral Ownership Underlying the Missouri River Within the Boundaries of the Fort Berthold Reservation* (Feb. 4, 2022) at 2.[2]  Given the new M-Opinion, the Federal Defendants changed their position in this litigation and aligned themselves with the MHA Nation against the State of North Dakota.  And because Counts I, II, and part of IV all turned on the legitimacy of the

---

2    Available at https://www.doi.gov/sites/default/files/m-37073-status-of-min-ownership-underlying-mo-river-w.in-boundaries-of-ft-berthold-res-nd-2.4.22.pdf.

withdrawn Jorjani opinion, the Court dismissed these counts as moot.  Minute Order (Apr. 19, 2022).

At that point, Count III and part of Count IV remained viable claims.  The MHA Nation opposed North Dakota's continued participation in the lawsuit, prompting North Dakota to file a formal motion to intervene on the remaining counts.  *See* Suppl. Mot. to Intervene [Dkt. # 59]].  On June 21, 2022, the Court denied the motion, finding that North Dakota did not have a legally protected interest in the remaining claims.  Order [Dkt. # 63].  North Dakota appealed that ruling to the U.S. Court of Appeals for the D.C. Circuit.  Notice of Appeal [Dkt. # 65].  On April 21, 2023, the D.C. Circuit reversed this Court's denial of intervention.  *Mandan, Hidatsa, & Arikara Nation v. Dep't of Interior*, 66 F.4th 282, 286 (D.C. Cir. 2023).  As a result, North Dakota was permitted to intervene in the lawsuit.

On July 23, 2024, with the Court's leave, the Federal Defendants filed an amended answer and a crossclaim against Intervenor North Dakota, seeking a declaratory judgment and injunctive relief to quiet title to the Riverbed.  Fed. Defs.' Am. Answer [Dkt. # 97]; *see also* Tr. of Proceedings on July 23, 2024 [Dkt. # 100] (setting forth in detail the reasons the Court granted the Federal Defendants' motion for leave to amend over the state's objection).  The MHA Nation intervened in the crossclaim.  MHA Nation Crosscl.  [Dkt. # 101].

This brings us to the dispositive motions currently pending before the Court.  On October 17, 2024, the MHA Nation filed a motion for judgment on the pleadings as to the crossclaim under Federal Rule of Civil Procedure 12(c), arguing that there are no material facts in dispute, and it is entitled to judgment as a matter of law.  Pl.'s Mot. for J.; Pl.'s Mem. for Mot. for J. [Dkt. # 104].  The Federal Defendants joined the MHA Nation's motion for judgment on the pleadings in part.  Fed. Defs.' Partial Joinder in Pl.'s Mot. for J. [Dkt. # 112].  On January 17,

2025, the Federal Defendants filed their own motion for summary judgment on the crossclaim against North Dakota, which essentially raises the same legal arguments as the motion for judgment on the pleadings.  *See* Fed. Defs.' Mem. in Supp. of Mot. Summ. J. [Dkt. # 119-1] ("Fed. Defs.' MSJ Mem.").[3]  MHA Nation joined the motion for summary judgment and filed a brief in support of the motion.  Pl.'s Brief in Support of Fed. Defs.' Mot. Summ. J. [Dkt. # 121]. The State of North Dakota opposed both motions, arguing, at bottom, that legal ownership of the Riverbed could not be decided as a matter of law on the pleadings or in response to the motion for summary judgment because the material facts central to the question were disputed.  *See* N.D. Opp. to Pl.'s Mot. for J. [Dkt. # 116]; N.D. Opp. to Fed. Defs.' Mot. Summ. J. [Dkt. # 124].

In 2025, when the second Trump Administration took office, DOI suspended the 2022 M-Opinion issued by the Biden Administration.  N.D. Opp. to Fed. Defs.' Mot. Summ. J. at 3. However, the Federal Defendants have informed the Court that they have not changed their legal position in the case, *see* Fed. Defs.' Reply [Dkt. # 130] at 21, n.14 ("Nor does the recent 'suspension' of certain M-Opinions 'revise' Federal Defendants' legal position in this case."), and they have not withdrawn the motion for summary judgment seeking a ruling that vindicates the MHA Nation's ownership the Riverbed.  *See* Fed. Defs.' Mot. Summ. J.

---

3       Apart from the different legal standards the Court must use to adjudicate the dispositive motions, the key difference between the motion for judgement on the pleadings and the motion for summary judgment is that the parties submitted factual support in the form of expert testimony and documentary evidence in connection with the motion for summary judgment.  The legal arguments are essentially the same otherwise, and the parties frequently cross-reference their briefs between both dispositive motions.

## STANDARD OF REVIEW

**Motion for Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c).[4] Parties are entitled to pretrial judgment on the pleadings "if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008), quoting *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992). When analyzing a motion for judgment on the pleadings, the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Peters*, 966 F.2d at 1485, quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988); *see Thompson v. District of Columbia*, 428 F.3d 283, 284 (D.C. Cir. 2005) (viewing the complaint's allegations in the light most favorable to the plaintiff when the defendants filed a 12(c) motion); *see also Hall v. District of Columbia*, 867 F.3d 138, 152 (D.C. Cir. 2017) ("A Rule 12(c) motion considers the defendants' answer together with the complaint . . . .").

While there are opinions in this district that state that the standards of review for a Rule 12(b)(6) motion and a Rule 12(c) motion are "essentially the same" or "virtually identical," *see, e.g.*, *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008), citing *Plain v. AT & T Corp.*, 424 F. Supp. 2d 11, 20 n.11 (D.D.C. 2006); *Maniaci*, 510 F. Supp. 2d at 58; *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26, 35–36 (D.D.C. 2004), the standard set out in the

---

4       Pleadings are closed for Rule 12(c) purposes when a complaint and an answer have been filed. *See* Fed. R. Civ. P. 7(a); *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 60 (D.D.C. 2007) ("Pleadings are closed within the meaning of Rule 12(c) if no counter or cross claims are at issue when a complaint and an answer have been filed.").

*Schuler* case by the D.C. Circuit more closely resembles a summary judgment type of determination.

Wright's Federal Practice and Procedure makes the same observation, noting that a Rule 12(c) motion asks a court to address the merits of the parties' claims and defenses and not simply procedural barriers or pleading deficiencies. 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1369 (3d ed. 2017) (commenting that the appropriate standard of review for a Rule 12(c) motion is more similar to a Rule 56 motion for summary judgment, except that the Court may only consider the contents of the pleadings); *see also Jones v. Dufek,* 830 F.3d 523, 528 (D.C. Cir. 2016) ("The district court properly resolved these questions as a matter of law on a motion under Rule 12(c)."), citing *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993) ("[T]he standard courts apply for summary judgment and for judgment on the pleadings appears to be identical.") (internal quotation marks omitted).[5]

If on a Rule 12(b)(6) or 12(c) motion, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (applying the same test when converting a Rule 12(b)(6) motion to one for

---

[5]    *See also Landmark Am. Ins. Co. v. VO Remarketing Corp.*, 619 F. App'x 705, 708 (10th Cir. 2015) ("Granting a motion for judgment on the pleadings requires the movant to establish an absence of any issue of material fact and entitlement to judgment as a matter of law."); *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008) ("A grant of judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.") (internal quotation marks omitted); *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008) ("[Rule 12(c)] [j]udgment will only be granted where the moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law."); *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987) ("A motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law.").

summary judgment).  But the "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  The Court has the discretion to decide if it will convert a motion for judgment on the pleadings to one for summary judgment.  *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (noting that the failure to comply with the procedures to convert a motion to dismiss to one for summary judgment is evaluated under an "abuse of discretion" standard); *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006) ("The decision to convert a motion to dismiss into a motion for summary judgement, however, is committed to the sound discretion of the trial court.").  *See also Hollis v. U.S. Dep't of Army*, 856 F.2d 1541, 1544 (D.C. Cir. 1988); *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985) ("[T]he reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the procedural requirements of the applicable rules were observed.").

Because North Dakota had a full opportunity to oppose the motion for summary judgement, submitting its own statement of facts and expert declarations, it would be fair to construe the motion for judgment on the pleadings as one for summary judgment.  *See Hollis*, 856 F.2d at 1544; *Tele–Communications of Key West, Inc.*, 757 F.2d at 1334.  But if the Court were to convert the motion for judgment on the pleadings into a motion for summary judgment, the motion would be indistinguishable from the motion for summary judgment, which has been filed by the same parties and makes the same arguments.

**Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).   A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.   *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).   In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"   *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### The Equal Footing Doctrine and the *Alaska II* Inquiry

The Equal Footing Doctrine is a constitutional principle that ensures that new states admitted to the United States have the same rights and privileges as existing states.   *See Idaho v. United States*, 533 U.S. 262, 272 (2001).   To enable new states to enter the Union on an "equal footing" with the original States regarding interests such as ownership of submerged lands, the Equal Footing Doctrine creates a general presumption that "title to land under navigable waters passes from the United States to a newly admitted State" at the time of statehood.   *Id*.   However,

that presumption can be defeated when the United States reserved and retained the submerged land "for a particular national purpose such as . . . an Indian reservation." *Id*. at 273.

The Supreme Court has created a two-step test to determine whether a new state possesses title to submerged land within a federal reservation. First, a court must consider whether "the United States clearly intended to include submerged lands within the reservation." *Alaska v. United States*, 545 U.S. 75, 100 (2005) ("*Alaska II*"). Second, the Court considers whether "the United States expressed its intent to retain federal title to submerged lands within the reservation." *Id*.; *Idaho*, 533 U.S. at 273 (explaining that step two focuses on whether the United States recognizes the reservation "in a way that demonstrates an intent to defeat state title"). If the answers to both questions are "yes," the Equal Footing Doctrine's presumption that submerged lands passed to States is rebutted.

Regarding step one, to ascertain whether the United States *intended* to include the submerged lands in the reservation, other courts have examined the language the federal government used when creating the reservation, as well as the intended purpose of the reservation. *See, e.g.*, *Idaho*, 533 U.S. at 273–74 (examining the language the Executive used to create the reservation, whether Congress was "on notice" that the reservation included submerged lands, and whether the purpose of the reservation "would have been compromised if the submerged lands had passed to the State"), citing *United States v. Alaska*, 521 U.S. 1, 41–46, 55–61 (1997) ("*Alaska I*"); *see also United States v. Idaho*, 95 F. Supp. 2d 1094, 1102 (D. Idaho 1998), *aff'd*, 210 F.3d 1067 (9th Cir. 2000), *aff'd sub nom*, *Idaho v. United States*, 533 U.S. 262 (2001) (discussing what the federal government *knew* when the reservation was established and that the government was "plainly aware" of the vital importance of the submerged lands to the tribe). These are inherently fact-specific inquiries.

14

Indian Canon of Construction

The Supreme Court has also instructed that treaties and statutes concerning Indian tribes must generally be construed liberally in favor of tribes. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Antoine v. Washington,* 420 U.S. 194, 199 (1975). This canon of construction is "rooted in the unique trust relationship between the United States and the Indians." *Blackfeet Tribe*, 471 U.S. at 766, quoting *Oneida Cnty. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). The Court later reiterated the point:

> When we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."

*Cnty. of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (alteration in original), quoting *Blackfeet Tribe*, 471 U.S. at 766.

The Supreme Court has not directly addressed the interplay of the Indian canon and the Equal Footing Doctrine, but it has given its approval to the Ninth Circuit's analysis in *United States v. Idaho,* which did. *See United States v. Idaho*, 210 F.3d 1067, 1073 (9th Cir. 2000), *aff'd, Idaho*, 533 U.S. at 265, 281. In that decision, the Ninth Circuit held that Congress intended to include the submerged lands in Lake Coeur d'Alene in the reservation and that they were retained by the Tribe. *See United States v. Idaho*, 210 F.3d at 1073. In doing so, it wrote: "Juxtaposed in this case are two principles, both of which must be accorded due weight: the canon of construction favoring Indians and the presumption under the Equal Footing Doctrine that a State gains title to submerged lands within its borders upon admission to the Union."). The Ninth Circuit acknowledged that under the Equal Footing Doctrine, courts must begin with presumption that title to submerged lands must pass to the state. *Id.* at 1074 ("In any submerged lands/equal footing

15

case, a court must begin with a strong presumption against defeat of a state's title."). But in determining whether that presumption has been overcome, the Indian canon should apply where ambiguities in the relevant documents exist. *Id.* at 1075, quoting *Confederated Salish & Kootenai Tribes v. Namen,* 665 F.2d 951, 962 (9th Cir.1982) (noting "the Supreme Court's very frequent admonitions that doubtful language in Indian treaties must be construed in favor of the Indians"). To the extent necessary, this Court will follow this model in its analysis.

**The Case Is Not Suitable for Summary Disposition.**

The starting point of the *Alaska II* analysis is a strong presumption that under the Equal Footing Doctrine, title of the Riverbed passed to North Dakota upon Statehood. *See Idaho*, 533 U.S. at 272–273*; see also Alaska I*, 521 U.S. at 34; *Montana v. United States*, 450 U.S. 544, 551 (1981), quoting *Pollard's Lessee v. Hagan*, 44 U.S. 212, 222–23, 229 (1845) ("[T]he federal government holds [submerged lands] in trust for future States, to be granted to such States when they enter the Union and assume sovereignty on an 'equal footing' with the established States."). The issue before the Court, then, is has the presumption been defeated?

Plain Language of the Reserving Documents

At step one, the Court must determine whether the United States intended to include the Riverbed within the Reservation. *Idaho*, 533 U.S. at 272–73, quoting *Alaska I*, 521 U.S. at 36 (ownership of submerged lands "is ultimately a matter of federal intent"). In making this decision, the Court is required to look to the plain language of the Reserving Documents first. "When faced with a question of statutory interpretation, a court first must look to the language of the act itself." *Higgins v. Marshall*, 584 F.2d 1035, 1037 (D.C. Cir. 1978), citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917). Absent a persuasive reason to the contrary, courts give the plain language of an enactment their ordinary meaning. *Id*.

The Federal Defendants and the MHA Nation contend that the "plain and unambiguous" language of the Reserving Documents establish the intent of the United States to include the Riverbed within the Reservation as a matter of law.  Fed. Defs.' MSJ Mem. at 20–21; Fed. Defs.' Joinder in Mot. J. Pleadings at 9–10.  Although the historical record is vast, the parties primarily point to a small set of relevant documents here.[6]

First, in 1851, the United States negotiated the Treaty of Fort Laramie ("1851 Treaty") with the MHA Nation and other tribes.  Fed. Defs.' Statement of Material Facts [Dkt. # 119-2] ("Fed. Defs.' SOF") ¶ 62; N.D. Statement of Facts and Resp. to Fed. Defs.' SOF [Dkt. # 124-1] ("N.D. SOF Resp.") ¶ 62.  The 1851 Treaty described the land reserved for the MHA Nation as:

> The territory of the [MHA Nation], commencing at the mouth of the Heart River, thence *up the Missouri River* to the mouth of the Yellowstone River; thence up on the Yellowstone River to the mouth of Powder River in a southeasterly direction, to the head-waters of the Little Missouri River; thence along the Black Hills to the head of Heart River; and thence down Heart River to the place of beginning.

Treaty of Fort Laramie with the Sioux, etc., 1851, 11 Stat. 749 (Sept. 17, 1851); Fed. Defs.' SOF ¶ 68; N.D. SOF Resp. ¶ 68 (emphasis added).

Second, in 1866, the MHA Nation negotiated an agreement with the United States granting rights-of-way through "their country" and ceding "certain lands situated on the northeast side of the Missouri River."  Fed. Defs.' SOF ¶ 73, citing Agreement at Fort Berthold, July 27, 1866, art. 3 & addenda, reprinted in 2 Charles J. Kappler, *Indian Affairs:  Laws and Treaties*, 1053, 1055

---

6    The parties collectively refer to the documents used to establish the reservation as the "Reserving Documents," and the Court will utilize that nomenclature.  The term includes the 1851 Treaty, the 1866 Agreement, the 1870 Executive Order, and the 1880 Executive Order.

(1904); N.D. SOF Resp. ¶ 73.  This agreement was never ratified.  Fed. Defs.' SOF ¶ 73; N.D.

SOF Resp. ¶ 73.

Third, in 1870, an Executive Order officially established the boundaries of the Reservation.

Fed. Defs.' SOF ¶ 86; N.D. SOF Resp. ¶ 86, citing Executive Order (Apr. 12, 1870), *Executive*

*Orders Relating to Indian Reservations, from May 14, 1855 to July 1, 1912*.  It provides:

> *From a point on the Missouri River* four miles below the Indian village
> (Berthold), in a northeast direction three miles (so as to include the wood
> and grazing around the village); from this point a line running so as to strike
> the Missouri River at the junction of Little Knife River with it; *thence along
> the left bank of the Missouri River* to the mouth of the Yellowstone River,
> along the south bank of the Yellowstone River to the Powder River, up the
> Powder River to where the Little Powder River unites with it; thence in a
> direct line across to the starting point four miles below Berthold.

Fed. Defs.' SOF ¶ 87 (emphasis added in SOF); N.D. SOF Resp. ¶ 87.[7]

Finally, in 1880, another Executive Order altered the Reservation boundaries by

extinguishing Indian title to certain lands and adding additional land:

> And it is further ordered that the tract of country in the territory of Dakota,
> lying within the following-described boundaries, viz, beginning on the most
> easterly point of the present Fort Berthold Indian Reservation (on the
> Missouri River); thence north to the township line between townships 158
> and 159 north; thence west along said township line to its intersection with
> the White Earth River; thence down the said White Earth River to its
> junction with the Missouri River; thence along the present boundary of the
> Fort Berthold Indian Reservation *and the left bank of the Missouri River* to
> the mouth of the Little Knife River; thence southeasterly in a direct line to
> the point of beginning, be, and the same herby is, withdrawn from sale and

---

[7]    The Federal Defendants and the MHA Nation posit that the term "left bank" means the "far
bank" of the River, which they suggest indicates that the United States meant to include the entire
width of the River within the boundaries of the Reservation.  Fed. Defs.' SOF ¶ 91.  North Dakota
does not dispute that the Reserving documents contain those words or that the historical exterior
boundaries of the Reservation included the entire width of the River.  N.D. SOF Resp. ¶ 91.  But
they dispute that this language means that any stretch of the River or the Riverbed was reserved
for the MHA and note that, in any event, this boundary was no longer part of the Reservation under
the later 1886 agreement that was ratified by Congress.  N.D. SOF Resp. ¶ 91.

set apart for the use of the [Nation], as an addition to the present reservation in said Territory.

Fed. Defs.' SOF ¶¶ 94–95 (emphasis added), citing Executive Order (July 13, 1880), *Executive Orders Relating to Indian Reservations*, *from May 14, 1855 to July 1, 1912*; N.D. SOF Resp. ¶¶ 94–95.[8]

The language of the Reserving Documents alone does not clarify whether the federal government intended to include the submerged lands in the Reservation, for the purposes of step one of the *Alaska II* inquiry. The terms "riverbed" or "submerged lands" are not used anywhere in the documents, and there is no dispute about this. And while controlling case law recognizes there is no requirement that the federal government make an explicit reference to the submerged lands, *see Idaho*, 533 U.S. 262, affirming *United States v. Idaho*, 95 F. Supp. 2d 1094, that would have been one clear way for the United States to express its intent. *See Alaska I*, 521 U.S. at 34, ("We will not infer an intent to defeat a future State's title to inland submerged lands unless the intention was definitely declared or otherwise made very plain.") (internal quotation marks omitted). Absent an explicit reference, the language on its face does not unambiguously indicate one way or another whether the federal government intended to include the Riverbed itself in the Reservation. This means the Court must look beyond the plain language of the Reserving

---

8       In 1886, the MHA Nation and the United States also entered into an 1886 Agreement that reduced the boundaries of the Reservation in the north and west to those currently in effect. Fed. Defs.' SOF ¶ 103. Congress did not ratify the 1886 Agreement until March 3, 1891, after North Dakota's admission to the Union in 1889. Fed. Defs.' SOF ¶¶ 111, 114; 51 Cong. Ch. 553, 26 Stat. 989 at 1035. The parties do not rely heavily on this agreement.

Documents to determine the federal government's intention, and for that reason alone, the motion for judgment on the pleadings fails.[9]

What is disputed is the *meaning* of the operative language at that time and whether it was intended to include the Riverbed in the Reservation or was used solely to describe the boundaries of the Reservation. The MHA Nation and Federal Defendants argue that by drawing the Reservation's boundaries to include the River, particularly to include the "far side" of the River such that the entire width of the River fell within the Reservation, the United States intended to include the *Riverbed* itself. *See e.g.*, Pl.'s Mem. for Mot. for J. at 9; Fed. Defs.' SOF ¶ 91. In other words, they say that because the Reserving Documents expressly defined the Reservation to include the River, they argue that it must follow that the United States intended to convey the Riverbed to the MHA Nation. North Dakota asserts that any references to the Missouri River were made merely because it was a recognizable geographic feature and that phrases like "up" or

---

9       MHA Nation also asserts that its motion for judgment on the pleadings should be granted because ownership of the Riverbed has already been resolved as a matter of law in accordance with the doctrine of res judicata. Pl.'s Mem. for Mot. for J. at 13–17. It points out that the IBLA administrative proceeding in 1979 involving Impel's oil and gas leases in the Riverbed presented and resolved the title question. *Id.* North Dakota was a party to that proceeding and did not appeal the IBLA's decision that the Riverbed belonged to the MHA Nation. *See id.* at 14.

Res judicata, or claim preclusion, bars a claim only if there has been prior litigation "(1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). Federal Defendants do not appear to join this argument and did not submit briefing on this point. MHA Nation's argument here fails on the fourth element. MHA Nation has made no showing that the IBLA, which concerned the issuance of oil and gas leases to the Riverbed, has subject-matter authority to adjudicate the issue of title to the Riverbed. *See Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 91 (2017) ("A court of competent jurisdiction is a court with the power to adjudicate the case before it.").

"along" the Missouri River were common phrases in geographic descriptions of reservation lands. *See* N.D. Opp. to Fed. Defs.' Mot. Summ. J. at 9–11, 25.

All parties rely extensively on several quiet title cases from the U.S. Supreme Court that have addressed similar factual and legal issues. *See, e.g.*, *Idaho*, 533 U.S. at 277–78; *Alaska I*, 521 U.S. at 4; *Alaska II*, 545 U.S. at 78. But if anything, the case law points to a conclusion that the motions are premature, because in the authorities cited, the federal intent for submerged lands was determined on a full evidentiary record. In *Idaho v. United States*, for example, the Supreme Court affirmed the lower courts' decision quieting title in favor of the United States on behalf of the Coeur d'Alene Tribe against the State of Idaho to a lakebed within a reservation. 533 U.S. 262. But the Supreme Court's decision came after the district court held a nine-day bench trial, *see id.* at 272, during which the parties presented evidence through expert and lay testimony, written reports, scientific studies, and historical documents – all of which enabled the district court to ascertain the meaning of the language used by the federal government to establish the reservation and to make extensive factual findings. *See United States v. Idaho*, 95 F. Supp. 2d at 1099. No such process has occurred here.[10]

Notably, in the *Idaho* case, the Supreme Court relied on a finding by the district court that the reservation included an "unusual boundary" that crossed the lake from east to west, which the trial court found indicated federal intent to include the submerged lands in the reservation. 533 U.S. at 274 (citing district court findings of fact). And in making the determination that the

---

10    Moreover, the *Idaho* case is factually distinguishable because Idaho conceded that the reservation included submerged lands, *Idaho*, 522 U.S. at 274, whereas North Dakota makes no such concession here. The Supreme Court inquired into the purpose of the reservation in the first place, noting that this concession made sense given the purpose of the reservation and that a "right to control the lakebed and adjacent waters was traditionally important to the Tribe" considering the Tribe's dependence on fishing. *Id.* These are facts to be explored in this case.

boundary was "unusual" and therefore indicated an intent to include the submerged lands in the Reservation, the trial court relied heavily on expert reports and a variety of exhibits. *Idaho*, 95 F. Supp. 2d at 1116–17 (citing expert reports and numerous exhibits); *see id.* at 1101 (explaining that the trial court's findings were based in part on testimony from four experts who were "well within their respective areas of expertise, supported by documentary evidence and were not diminished on cross-examination").

The same is true of the other cases cited by the parties. In *Alaska II*, the Supreme Court appointed a Special Master who wrote a lengthy report, recommending a grant of summary judgment in favor of the federal government after a "thorough examination of historical documents" covering a period of 184 years. 545 U.S. at 82; *see also Alaska I*, 521 U.S. at 4 (utilizing a special master). Moreover, caselaw quotes alone – even those from the Supreme Court – do not speak directly to the evidentiary inquiry necessary in this case.

A review of the materials proffered in support of and in opposition to the motion for summary judgment, which consist largely of dueling expert opinions, underscores the need for further proceedings before the Court makes a determination. *See, e.g.*, Fed. Defs.' MSJ Mem. at 21–22, citing Fed. Defs.' SOF ¶¶ 90–91; N.D. Opp. to Fed. Defs.' Mot. Summ. J. at 23–27 (citing expert testimony throughout statement of material facts); *see also* N.D. SOF Resp. ¶¶ 87–104 (disputing material facts with its own expert testimony). Each expert reviewed the language of the Reserving Documents and relevant historical evidence and offered their expert opinions about their meaning in lengthy reports and deposition transcripts. *Compare, e.g.*, Decl. of Dr. Keith A. Zahniser [Dkt. # 119-3] at 14 (opining that it is "quite clear" from the language of the executive orders that the United States intended to include the Riverbed in the Reservation); Expert Report

of Joshua Alexander [Dkt. # 119-4] at 93[11] ("When reviewing federal documents establishing an Indian reservation, the boundary calls within the federal documentation [are] strong evidence of federal intent to include everything within the boundaries as part of the Indian reservation."); Decl. of Michael L. Lawson [Dkt. # 122-1] at 5 ("[T]he Federal Government understood that the Tribes needed to retain ownership of the Missouri River and its bed within the boundaries of the Fort Berthold Reservation, notwithstanding how its exterior lines might be defined."); Decl. of Dr. Charles A. Nettleman, III [Dkt. # 128] at 2–3 ("After a review of the treaties and executive orders leading to the creation of the MHA's current reservation, it is my expert opinion that the [references to] the Missouri River in the land descriptions were simply references to a natural boundary in then un-surveyed lands, not a reservation or conveyance to the MHA of the submerged river bed or the river itself where it flowed through the reservation.").  While expert testimony will undoubtedly be critical to the ultimate determination of these factual issues, the Court is not prepared to pronounce judgment as a matter of law based on written opinions without the benefit of live testimony and cross-examination.

These genuine disputes of material fact preclude the Court from summarily determining whether the United States clearly intended to include the submerged lands in the Reservation, as required by the first step of the *Alaska II* inquiry.  The Court will defer its answer on this issue, as well as step two of the *Alaska II* inquiry, until it has the benefit of a full factual record.

---

11      Because there are multiple documents filed in the same attachment, this page number refers to the ECF file stamped page number.

**CONCLUSION**

For all of the reasons set forth above, MHA Nation's motion for judgment on the pleadings is DENIED and the Federal Defendants' motion for summary judgment is DENIED.

AMY BERMAN JACKSON
United States District Judge

DATE:  January 6, 2026